UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

99 SEP 21  PM 3: 17

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| ROBERT MULLINS, MICHEAL D. DESRUISSEAUX, and THOMAS MILES, ) ) ) | |
| Plaintiffs, ) | |
| ) | CV 97-BU-1897-S |
| vs. ) | |
| ) | |
| CRAVEN CROWELL, JOHNNY H. HAYES, and WILLIAM H. KENNOY, ) ) | |
| ) | |
| Defendants. ) | **ENTERED** |
| ) | SEP 2 1 1999 |
| MICHAEL G. MURKS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CV 97-BU-2011-S |
| vs. ) | |
| ) | |
| CRAVEN CROWELL, JOHNNY H. HAYES, and WILLIAM H. KENNOY, ) ) | |
| ) | |
| Defendants. ) | |
| ) | |
| MILLARD SHELTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CV 97-BU-2012-S |
| vs. ) | |
| ) | |
| CRAVEN CROWELL, JOHNNY H. HAYES, and WILLIAM H. KENNOY, ) ) | |
| ) | |
| Defendants. ) | |

139

JAMES R. WILLIAMS,                             )
                                               )
            Plaintiff,                         )
                                               )
vs.                                            )        CV 97-BU-2013-S
                                               )
CRAVEN CROWELL, JOHNNY H. HAYES,               )
and WILLIAM H. KENNOY,                         )
                                               )
            Defendants.                        )
_____            )
                                               )
JERRY CHANDLER,                                )
                                               )
            Plaintiff,                         )
                                               )
vs.                                            )        CV 97-BU-2015-S
                                               )
CRAVEN CROWELL, JOHNNY H. HAYES,               )
and WILLIAM H. KENNOY,                         )
                                               )
            Defendants.                        )
_____            )
                                               )
NOONAN W. GREENE,                              )
                                               )
            Plaintiff,                         )
                                               )
vs.                                            )        CV 97-BU-2016-S
                                               )
CRAVEN CROWELL, JOHNNY H. HAYES,               )
and WILLIAM H. KENNOY,                         )
                                               )
            Defendants.                        )

THOMAS LARRY BAILEY,                     )
                                         )
     Plaintiff,                          )
                                         )
vs.                                      )     CV 97-BU-2143-S
                                         )
CRAVEN CROWELL, JOHNNY H. HAYES,         )
and WILLIAM H. KENNOY,                   )
                                         )
     Defendants.                         )
                                         )
JERRY GOTHARD,                           )
                                         )
     Plaintiff,                          )
                                         )
vs.                                      )     CV 97-BU-2287-S
                                         )
CRAVEN CROWELL, JOHNNY H. HAYES,         )
and WILLIAM H. KENNOY,                   )
                                         )
     Defendants.                         )
                                         )
EDWARD J. SMART,                         )
                                         )
     Plaintiff,                          )
                                         )
vs.                                      )     CV 97-BU-2314-S
                                         )
CRAVEN CROWELL, JOHNNY H. HAYES,         )
and WILLIAM H. KENNOY,                   )
                                         )
     Defendants.                         )

FRANK N. SPEER.                              )
                                             )
           Plaintiff,                        )
                                             )
vs.                                          )    CV 97-BU-2315-S
                                             )
CRAVEN CROWELL, JOHNNY H. HAYES,             )
and WILLIAM H. KENNOY,                       )
                                             )
           Defendants.                       )
                                             )
MARC W. SHORES,                              )
                                             )
           Plaintiff,                        )
                                             )
vs.                                          )    CV 97-BU-2322-S
                                             )
CRAVEN CROWELL, JOHNNY H. HAYES,             )
and WILLIAM H. KENNOY,                       )
                                             )
           Defendants.                       )
                                             )
TIMOTHY L. MANSELL                           )
                                             )
           Plaintiff,                        )
                                             )
vs.                                          )    CV 97-BU-2325-S
                                             )
CRAVEN CROWELL, JOHNNY H. HAYES,             )
and WILLIAM H. KENNOY,                       )
                                             )
           Defendants.                       )

RICKY S. COATS,                            )
                                           )
            Plaintiff,                     )
                                           )
vs.                                        )   CV 97-BU-2464-S
                                           )
CRAVEN CROWELL, JOHNNY H. HAYES,           )
and WILLIAM H. KENNOY,                     )
                                           )
            Defendants.                    )
_____          )
                                           )
BOBBY MASSEY,                              )
                                           )
            Plaintiff,                     )
                                           )
vs.                                        )   CV 97-BU-2480-S
                                           )
CRAVEN CROWELL, JOHNNY H. HAYES,           )
and WILLIAM H. KENNOY,                     )
                                           )
            Defendants.                    )
_____          )
                                           )
HALBERT PUTNAM,                            )
                                           )
            Plaintiff,                     )
                                           )
vs.                                        )   CV 97-BU-2482-S
                                           )
CRAVEN CROWELL, JOHNNY H. HAYES,           )
and WILLIAM H. KENNOY,                     )
                                           )
            Defendants.                    )

TROY TUCKER,                                    )
                                                )
              Plaintiff,                         )
                                                )
vs.                                             )        CV 97-BU-2509-S
                                                )
CRAVEN CROWELL, JOHNNY H. HAYES,                )
and WILLIAM H. KENNOY,                          )
                                                )
              Defendants.                       )
                                                )
LANNY W. SMITH,                                 )
                                                )
              Plaintiff,                         )
                                                )
vs.                                             )        CV 97-BU-2758-S
                                                )
CRAVEN CROWELL, JOHNNY H. HAYES,                )
and WILLIAM H. KENNOY,                          )
                                                )
              Defendants.                       )
                                                )
BARBARA G. HOVATER,                             )
                                                )
              Plaintiff,                         )
                                                )
vs.                                             )        CV 97-BU-2809-S
                                                )
CRAVEN CROWELL, JOHNNY H. HAYES,                )
and WILLIAM H. KENNOY,                          )
                                                )
              Defendants.                       )

THOMAS A. CROW and MARION G.          )
RAINER,                               )
                                      )
          Plaintiffs,                 )
                                      )
vs.                                   )          CV 98-BU-2932-S
                                      )
CRAVEN CROWELL, JOHNNY H. HAYES,      )
and WILLIAM H. KENNOY,                )
                                      )
          Defendants.                 )
                                      )
LONNER T. CHANDLER and RICHARD B.     )
DUTTON,                               )
                                      )
          Plaintiffs,                 )
                                      )          CV 99-BU-0061-S
vs.                                   )
                                      )
CRAVEN CROWELL, JOHNNY H. HAYES,      )
and WILLIAM H. KENNOY,                )
                                      )
          Defendants.                 )

## Memorandum Opinion

.

Before the Court are a number of pending motions in the consolidated case of *Mullins v. Crowell, et al.*, lead case number CV 97-BU-1897-S. Pending in this

consolidated case are (1) a motion for summary judgment filed by the Defendants, Craven

Crowell ("Crowell"), Johnny H. Hayes ("Hayes") and William H. Kennoy ("Kennoy"), on

August 14, 1998,[1] against the claims of Plaintiffs (collectively, "original Plaintiffs")

Thomas L. Bailey ("Bailey"), Jerry W. Chandler ("J. Chandler"), Ricky S. Coats ("Coats"),

Michael D. Desruisseaux ("Desruisseaux"), Jerry Gothard ("Gothard") Noonan Greene

("Greene"), Barbara Hovater ("Hovater"), Timothy L. Mansell ("Mansell"), Bobby Massey

("Massey"), Thomas Miles ("Miles"), Robert Mullins ("Mullins"), Michael Murks

("Murks"), Halbert Putnam ("Putnam") Millard I. Shelton ("Shelton"), Marc Shores

("Shores"), Frank Speer ("Speer"), Edward Smart ("Smart"), Lanny Smith ("Smith"), and

Troy Tucker ("T. Tucker") (Document 55); (2) a motion for leave to file a reply brief filed

---

[1] Section 504a of the Rehabilitation Act, 29 U.S.C. § 794a, states that claims for disability discrimination in employment brought under the Rehabilitation Act pursuant to section 501, "[t]he remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-16), including the application of sections 706(f) through 706(k) (42 U.S.C. 2000e-5(f) through (k)), shall be available. . . ." By implication, the exhaustion requirements contained in 42 U.S.C. 2000e-16 have also been held to apply to claims against federal agencies brought under section 504 of the Rehabilitation Act. *See Doe v. Garrett*, 903 F.2d 1455,1459 (11th Cir. 1990), *cert. denied, Doe v. Garrett*, 499 U.S. 904 (1991).

Under 42 U.S.C. § 2000e-16(c), a plaintiff filing an action against a federal agency is required to name "the head of the department, agency, or unit, as appropriate," as the defendant. *See Vinieratos v. United States, Department of Air Force Through Aldridge*, 939 F.2d 762, 771 (9th Cir. 1991); *McGuinness v. United States Postal Service*, 744 F.2d 1318, 1322 (7th Cir. 1984) (stating, with respect to a claim brought pursuant to the Rehabilitation Act, that "[t]he only proper defendant in a Title VII suit is the head of the agency accused of having discriminated against the plaintiff.") *See also Hawkes v. United States Postal Service*, 979 F.2d 583, 1992 WL 344784 (7th Cir. 1992) (unpublished disposition) ("Persons who believe that they are victims of discrimination on account of handicap must follow the procedural rules established by §42 U.S.C. 2000e- 16(c), including the provision that the complaint name 'the head of the department, agency, or entity' as the defendant."). *Cf. Bryant v. United States Department of Agriculture*, 967 F.2d 501, 504-05 (11th Cir. 1992) (noting that amendment to complaint to name department head, even if it did relate back to original complaint, would not cure plaintiff's failure to file suit within thirty [now sixty] days after receiving notice of right to sue).

The Plaintiffs named Crowell, Hayes and Kennoy as Defendants in this action, suing them in their official capacities as the head of the TVA. Plaintiffs seem to list them all in their official capacities as the Chairman of the Tennessee Valley Authority ("TVA"). *See* Plaintiff's Brief in Response to Court's Order of June 22, 1999 at 2. It is unclear which of these individuals constitutes the "head" of the TVA, for purposes of the statute, however.

by the Defendants on October 5, 1998 (Document 74);[2] (3) a second motion for summary judgment filed by the Defendants on June 9, 1999, against the claims of Plaintiffs (collectively, "new Plaintiffs") Lonner T. Chandler ("L. Chandler"), Thomas A. Crow ("Crow"), Richard B. Dutton ("Dutton"), and Marion G. Rainer ("Rainer") (Document 116); (4) a motion for leave to submit the decision of the EEOC in *Hines v. Runyon* filed by the Plaintiffs on July 9, 1999 (Document 128);[3] (5) a motion for leave to file an affidavit out of time filed by the Plaintiffs on July 13, 1999 (Document 129);[4] (6) a motion to dismiss Richard B. Dutton with leave to refile filed by the Plaintiffs on July 20, 1999 (Document 131); (7) a motion for leave to submit additional evidence filed by the Plaintiffs on July 28, 1999 (Document 133); (8) a motion to include the parties' briefs on the motions for summary judgment as part of the record filed by the Plaintiffs on July 28, 1999 (Document 134); (9) a motion to change, modify, expand, and/or clarify the Plaintiffs' theory of the case to focus on how the Plaintiffs' impairments substantially limit major life activities other than working filed by the Plaintiffs on August 5, 1999 (Documents 136 & 138); and (10) a motion to permit change of theory and/or submission of additional evidence as a matter of equity filed by the Plaintiffs on August 9, 1999 (Document 137).

---

[2]  Because the Court, in an order entered on November 19, 1998, requested re-briefing by the parties, said motion to file a reply brief (Document 74) has been rendered MOOT, as the Defendants have enjoyed the opportunity to argue the issues that they wished to bring out in their reply brief in the secondary briefing schedule entered by this Court.

[3]  New law or newly-found cases are always welcome. The motion for leave to submit the decision of the EEOC in *Hines v. Runyon* (Document 128) will be GRANTED.

[4]  Although the affidavit of Dutton was filed seven days after it was due to support the Plaintiffs' brief in opposition to the fifth motion for summary judgment, it appears to the Court that no prejudice would occur as a consequence of its late filing. The motion for leave to submit the affidavit of Dutton out of time (Document 129) will be GRANTED.

In their motions for summary judgment, the Defendants contend that each of the Plaintiffs is incapable of presenting a genuine issue of triable fact as to his or her claims of disability discrimination under sections 501(b) and 504(a) of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 791(b) & 794(a). The original and new Plaintiffs respond that there exist genuine issues of triable fact on their claims that the Tennessee Valley Authority ("TVA") discriminated against them on the basis of their disabilities by classifying them in segregated competitive areas and levels — thereby impairing their ability to compete for retention in the face of an impending reduction in the workforce — and by terminating them through the reductions in force.[5]

Summary judgment offers the parties an invaluable opportunity to test the mettle of a case before it ever reaches trial. In evaluating a motion for summary judgment, the court assesses all of the proof the parties can bring to bear to ascertain the presence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Under Federal Rule of Civil Procedure 56, the court's determination of the propriety of summary judgment is to be tempered by a strong inclination in favor of the non-movant. Therefore, only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law is a grant of summary judgment appropriate. FED. R. CIV. P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

It is the initial responsibility of the movant to inform this court of the grounds for its motion and to specifically identify those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The movant carries no meager

---

[5] Though these seem to be the principal claims of the Plaintiffs, it is arguable, from the briefs of the Plaintiffs and the Defendants, that there are other, secondary claims that the Plaintiffs seek to assert. However, these claims do not appear in the Plaintiffs' second amended consolidated complaint and therefore will not be addressed by the Court.

burden, for it must illuminate for the district court, with reference to materials on file, the reasons why the non-movant cannot or does not raise a genuine issue of material fact sufficient to support a trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). *But see Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998) ("When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' [*Celotex*] at 323 [], in order to discharge this initial responsibility. Instead, the moving party simply may '"show[ ]"' — that is, point[ ] out to the district court — that there is an absence of evidence to support the nonmoving party's case.'").

Only after the moving party has satisfied this initial burden must the nonmoving party "make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). At that point, Federal Rule of Civil Procedure 56(e) dictates that the nonmoving party "go beyond the pleadings" and by "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts'" showing there exist genuine issues for trial. *Celotex*, 477 U.S. at 324; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). "If the non-moving party fails to 'make a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' then the court must enter summary judgment for the moving party." *Gonzalez v. Lee County Housing Authority*, 161 F.3d at 1294 (11th Cir. 1998). Bare speculation based on loose construal of the evidence will not satisfy the non-movant's burden. *See id*.

While the district court is permitted to consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in deciding whether to grant or deny a summary judgment motion, FED. R. CIV.

P. 56(c),the non-movant bears the absolute responsibility of designating the specific facts in the record that support its claims. *See United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1438 (11th Cir. 1991); *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). In other words, Federal Rule of Civil Procedure 56 "does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Id. See also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied*, — U.S. —, 116 S.Ct. 74 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson*, 477 U.S. at 254-55. Nonetheless, the court must abstain from examining the probity of conflicting evidence and from deciding issues of credibility. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). Still though, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135 F.3d 1422, 1425 (11th Cir. 1998) (*citing Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

## Background & Procedural History

On July 24, 1997, Robert Mullins filed his complaint against Crowell, Hayes and Kennoy, as the heads of the TVA,[6] alleging numerous violations of the Rehabilitation Act of 1973.[7] Soon thereafter, fifteen other cases were filed against the Defendants, alleging essentially the same claims against the Defendants and reiterating the factual bases for those claims.[8] On September 25, 1997, the Defendants filed a motion to consolidate the filed cases into a single action, to which the Plaintiffs in those cases objected. In an order entered on October 31, 1997, the Defendants' motion to consolidate was granted. In addition, two other cases filed after the Defendants moved to consolidate the cases[9] were also brought into the single, consolidated action.

---

[6] *See, supra*, at n.1, for an explanation of why Hayes and Kennoy are arguably improperly named in the present action.

[7] The initial complaint of Mullins was originally filed in the United States District Court for the Middle District of Alabama by error on July 21, 1997. After withdrawing that complaint, Mullins re-filed his complaint in the United States District Court for the Northern District of Alabama. The re-filed case, styled *Mullins v. Crowell, et al.*, CV 97-S-1897-S, was originally assigned to Judge C. Lynwood Smith.

[8] These cases, as originally styled, are *Murks v.Crowell, et al.*, CV 97-AR-2011-S, *Shelton v. Crowell, et al.*, CV 97-H-2012-S, *Williams v. Crowell, et al.*, CV 97-P-2013, *Chandler v. Crowell, et al.*, CV 97-AR-2015-S, and *Greene v. Crowell, et al.*, CV 97-P-2016-S, all filed on August 4, 1997; *Bailey v. Crowell, et al.*, CV 97-P-2287-S, filed on August 28, 1997; *Gothard v. Crowell, et al.*, CV 97-AR-2143-S, filed on August 18, 1997; *Smart v. Crowell, et al.*, CV 97-AR-2314-S, *Speer v. Crowell, et al.*, CV 97-AR-2315-S, *Shores v. Crowell, et al.*, CV 97-AR-2322-S, and *Mansell v. Crowell, et al.*, CV 97-N-2325-S, all filed on September 3, 1997; *Coats v. Crowell, et al.*, CV 97-AR-2464-S, filed on September 15, 1997; *Massey v. Crowell, et al.*, CV 97-P-2480-S, and *Putman v. Crowell, et al.*, CV 97-N-2482-S, both filed on September 16, 1997; and *Tucker v. Crowell*, CV 97-AR-2509-S, filed on September 19, 1997. In the original *Mullins* complaint, Mullins states that he is disabled under the Rehabilitation Act because his impairment substantially limits his ability to work. This allegation is reiterated in each of the individual complaints.

[9] These two additional cases are *Smith v. Crowell, et al.*, CV 97-S-2758-S, filed on October 17, 1997, and *Hovater v. Crowell, et al.*, CV 97-S-2809-S, filed on October 24, 1997.

The original Plaintiffs filed their first amended consolidated complaint on November 12, 1997, adding in that complaint an additional party, Sharon A. Hill ("Hill"), whose claims have since been dismissed by the district court and, on appeal, by the Eleventh Circuit Court of Appeals, No. 98-6603 (11th Cir., Mar. 5, 1999). In paragraph 2 of their first amended consolidated complaint, the Plaintiffs state:

> Plaintiffs are former employees of TVA and for purposes of this action are disabled workers within the meaning of the Rehabilitation Act of 1973, 29 U.S.C. [§] 701, et seq., in that they all have a disability *which substantially impairs their ability to work, they have all been recognized by TVA as having such a disability, and they all have a record of such a disability with TVA.*

(Emphasis and bold added.)  In the remainder of their first amended consolidated complaint, the Plaintiffs assert essentially the same claims presented in their individual original complaints.[10]

After filing two motions for partial summary judgement, each of which was granted, the Defendants filed a third motion for summary judgment on July 13, 1998, arguing that all "civil service claims" of the Plaintiffs were due to be dismissed. Noting that it was by no means clear that the Plaintiffs had, in fact, raised civil service claims and chastising the Defendants for submitting successive, fragmented motions for summary judgment where a single motion would do, the district court denied the motion for summary judgment on July 14, 1998, but indicated that the Defendants could have one

---

[10] On January 23, 1998, the Plaintiffs filed a motion to amend their complaints to add as additional plaintiffs Desruisseaux and Miles, which was granted on January 30, 1998. The Defendants filed, on January 26,.1998, a motion for partial summary judgment on all of Hill's claims. On March 23, 1998, the Defendants filed a second motion for partial summary judgment to dismiss all claims of the Plaintiffs arising out of the Plaintiffs' not being selected for other positions within TVA and not being transferred into other positions of TVA. The district court granted both motions on July 1, 1998, and dismissed all non-selection and transfer claims of the Plaintiffs and dismissed all claims of Hill. Hill filed a notice of appeal on July 31, 1997; as noted, the Eleventh Circuit Court of Appealslater affirmed her dismissal from the case. *Hill v. Crowell*, No. 98-6603 (11th Cir., Mar. 5, 1999).

final bite at the summary judgment apple by filing a single, comprehensive motion for summary judgment on or before August 14, 1998.

The Defendants followed the district court's instructions, filing a single, comprehensive motion for summary judgment on August 14, 1998 ("fourth motion for summary judgment"). A submission order was entered on August 18, 1998. In their responsive brief filed on September 16, 1998, the Plaintiffs, in the introduction section of their brief, state that they are all "former employees of TVA with permanent impairments that affect *their ability to work* who were terminated by TVA in a reduction by reduction-in-force (RIF) in 1996 and 1997." Plaintiffs' Responsive Brief of September 16, 1998, at 1 (emphasis added). On page 11 of their responsive brief filed before the district court, the Plaintiffs state:

> Even though many of the Plaintiffs *may be* substantially limited in their ability to perform manual tasks, walk, and for at least one — Ed Smart, who suffered a head injury — to learn, *for the purposes of this case the Plaintiffs make no claims that their impairments have any effect on any major life activity other than* ***working***. Therefore, *this Court need only consider whether the Plaintiffs' impairments substantially limit their ability to perform a class of jobs . . . or a broad range of jobs in different classes*; whether TVA maintained records indicating that the Plaintiffs have such impairments; or whether TVA regarded the Plaintiffs as having such impairments.

Plaintiffs' Responsive Brief of September 16, 1998, at 11 (emphasis and bold added). On October 5, 1998, the Defendants filed a motion for leave to file a reply brief. Fifteen days later, on October 20, 1998, the case was reassigned to this Judge.

On November 18, 1998, this Court, after examining the briefs in support of and in opposition to the fourth motion for summary judgment, recognized that an explication of the factual predicates of each Plaintiff's disability or disabilities was absent or that such explication was sorely inadequate. As such, the Court requested that the parties re-brief the summary judgment motion, paying careful attention to the facts relevant "to each plaintiff's alleged disability and situation." In their revised brief in response to the

Defendants' motion for summary judgment, the Plaintiffs presented to the Court, with the exception of Plaintiff Hovater, identical assertions regarding each Plaintiff's alleged disability:

> Plaintiff . . . has testified that he has a physical impairment which substantially limits his ability to *work*. His restrictions prevent him from doing a class of jobs as well as a wide range of jobs in different classes. He has a record of such an impairment with TVA. He was regarded by TVA [as] having such an impairment.

Plaintiffs' Revised Brief in Opposition to Defendants' Motion for Summary Judgment at 13-29 (emphasis and bold added). From the Plaintiffs's side, this was, with few exceptions, the only "particularized" explication in their opposition brief of how each Plaintiff was disabled; in their factual statements, the Plaintiffs generally did not even bother to spell out the specifics of how they were substantially limited in their ability to work and how their impairments caused their substantial limitations.[11] With regard to Plaintiff Hovater, the Plaintiffs state in their brief that:

> . . . Hovater has testified that her back problem did not substantially limit her ability to work as a clerk word-processor or secretary. However, she has a record with TVA of being substantially impaired *in her ability to perform the class of jobs that make up clerical and secretarial work*, and she was regarded by TVA [as] having such an impairment.

Plaintiffs' Revised Brief in Opposition to Defendants' Motion for Summary Judgment at 25-26 (emphasis added). In addition, the Plaintiffs reasserted the claim, stated in their initial opposition brief, that "for the purposes of this case the Plaintiffs make no claims that their impairments have any effect on any major life activity *other than working*." Plaintiff's Revised Brief in Opposition to Defendants' Motion for Summary Judgment at 47 (emphasis and bold added). On February 4, 1999, finding itself only with excerpts of

---

[11] This task the Plaintiffs left to the Defendants, who spelled out the impairments suffered by the Plaintiffs and the limitations consequent to those impairments with some degree of particularity.

deposition testimony, the Court requested the parties to file full copies of all depositions relevant to the resolution of the Plaintiffs' claims.

During the period that the Defendants' fourth motion for summary judgment was pending, two more cases were filed in the Northern District of Alabama against the Defendants alleging essentially the same claims posited by the original Plaintiffs in their amended consolidated complaint.[12] On February 10, 1999, the Defendants filed a motion to consolidate these two cases into the *Mullins* action. The next day, on February 11, 1999, the Court granted the motion, consolidating the cases together. At that point (and at this point), this Court had twenty (20) cases consolidated into a single action against the Defendants. On February 24, 1999, the Court granted a motion of Plaintiff Chandler, filed prior to consolidation, to amend his complaint to include Dutton as a plaintiff in *Chandler v. Crowell*, CV 99-S-0061-S.

Another attempt at consolidation was made on February 25, 1999, this time by the Plaintiffs. In a motion filed that day, the Plaintiffs sought to consolidate *Gill v. Crowell, et al.*, CV 98-N-2931-S with the instant action. Four days later, on March 1, 1999, the Plaintiffs filed a motion to sever and consolidate the cases of Putman and Gothard. The Court denied both of the Plaintiffs' motions on March 4, 1999. However, in the order denying the motions, the Court offered the Plaintiffs "ten (10) days in which to amend their complaint in the instant action such that [the claims of Gothard and Putman are made] plain on the face of the complaint, rather than obscured behind the other plaintiffs' . . . discrimination claims." Court's Order of March 4, 1999, at 8.

On March 12, 1999, the Plaintiffs filed their second amended consolidated complaint. In the second amended consolidated complaint, the Plaintiffs characterize the general nature of their claims as follows:

---

[12] These cases, as originally styled, are *Crow v. Crowell, et al.*, CV 98-J-2932-S, filed on November 24, 1998, and *Chandler v. Crowell, et al.*, CV 99-S-0061-S, filed on January 13, 1999.

This is a disability discrimination case. The plaintiffs contend that the Tennessee Valley Authority (TVA) intentionally discriminated against them, in violation of the Rehabilitation Services Act, 29 U.S.C. § 701, *et seq.* (The "Act"), specifically § 791(b) (often referred to as § 501) and § 794(a) (often referred to as § 504) thereof, by intentionally segregating and classifying them by competitive area, competitive level, and permanency for reduction-in-force purposes because of their disabilities and then by using their competitive areas, levels and permanency classifications to deny them the opportunity to compete for retention with non-disabled employees doing similar work (TVA put them on retention registers containing only themselves or other similarly re-employed physically impaired employees) when TVA terminated them following the elimination of their jobs by reduction-in-force (RIF), pursuant to and in fulfillment of a fraudulent scheme to reduce worker's compensation expenses. The Plaintiffs further contend that they are victims of disparate impact in that there was, in TVA's 1996 and 1997 reductions-in-force, a significant negative disparity in the retention of disabled employees at clerical levels when TVA's specially re-employed OWCP workers (a group that includes the Plaintiffs) are considered. The Plaintiffs contend that [the] existence of a facially neutral discriminatory policy may be inferred from the disparate results.

Plaintiffs' Second Amended Consolidated Complaint at 6-7. The Plaintiffs again characterize themselves, in ¶ 2 of their complaint, as "former employees of TVA . . . who were injured on the job and were unable to return to their former occupations without accommodation . . . ; and for purposes of this action are disabled workers within the meaning of the Rehabilitation Act of 1973, 29 U.S.C. [§] 701, *et seq.*, in that *each has a disability which substantially impairs his{} ability to **work**, each has been recognized by TVA as having such a disability, and/or each has a record of such a disability.*" Plaintiffs' Second Amended Consolidated Complaint at 7-8 (emphasis and bold added).

In count one of their second amended consolidated complaint, the Plaintiffs assert a claim of disparate treatment under § 501 of the Rehabilitation Act in that the Defendants classified and segregated them into separate competitive areas, competitive levels and permanency statuses in violation of the requirement of 29 U.S.C. § 791(b) that TVA implement an affirmative action plan for the hiring, placement and advancement of disabled individuals. The statutory provision is violated, the Plaintiffs allege, citing 29

C.F.R. § 1630.5, because the requirement of an affirmative action program creates a duty that TVA not discriminate by segregating its employees in a way that adversely affects their employment status.

The second count of the second amended consolidated complaint also alleges a claim of disparate treatment on behalf of all Plaintiffs in the consolidated action, this time under section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). According to the Plaintiffs, in ¶ 36 of their second amended consolidated complaint,

> TVA intentionally classified and segregated each of the Plaintiffs by competitive area, competitive level, and permanency status . . . for reduction-in-force purposes because of their disabilities and denied them the opportunity to compete for retention with other non-disabled employees by placing them on retention registers containing only themselves or other similarly re-employed, classified, and segregated disabled employees when their jobs were eliminated by reduction-in-force. . . .

The third count of the Plaintiffs' second amended consolidated complaint claims that the classification and reduction-in-force polices of TVA bore an adverse impact on its disabled clerical, secretarial and aide workers, because those policies "resulted in a statistically significant greater number of non-disabled clerical/secretarial/aide type workers . . . being retained" than their disabled counterparts in reductions-in-force undertaken by TVA in 1996 and 1997. The Plaintiffs' disparate impact claim is grounded, apparently, in both § 501 and § 504 of the Rehabilitation Act, 29 U.S.C. §§ 791 & 794.[13]

On June 9, 1999, the Defendants filed a fifth motion for summary judgment.[14] In the fifth motion for summary judgment, the Defendants seek to have the Court dismiss

---

[13] The Defendant moved to strike the second consolidated amended complaint on March 25, 1999. The Court denied the motion on April 2, 1999. The Defendants answered the second amended consolidated complaint on April 13, 1999.

[14] This motion was entitled a "Second Motion for Summary Judgment," although, counting the prior motions for partial summary judgment, or summary judgment with respect to particular parties, it is the fifth such motion filed.

the claims of those parties who were consolidated into this action after the Defendants' fourth motion for summary judgment was filed.

On June 22, 1999, in response to the opinions of the Supreme Court in *Sutton v. United Air Lines, Inc.*, — U.S. —, 119 S.Ct. 2139 (1999), *Albertsons, Inc., v. Kirkingburg*, — U.S. —, 119 S.Ct. 2162 (1999), and *Murphy v. United Parcel Service, Inc.*, — U.S. —, 119 S.Ct. 2133 (1999), this Court entered an order requesting the parties to file briefs by June 28, 1999, analyzing the impact of those opinions on the instant action. In their response to the Court's order, the Plaintiffs again asserted a reliance on *working* as the major life activity in which they were substantially limited by their impairments. *See* Plaintiffs' Brief [on Supreme Court Cases] at 2 (stating that all Plaintiffs, except Hovater, suffer physical impairments substantially limiting them from working in trades and labor positions).

On July 6, 1999, the Plaintiffs filed their response in opposition to the Defendants' fifth motion for summary judgment. In their response, the Plaintiffs asserted that "[t]hey sustained permanent physical impairments that affected their ability to *work*." Plaintiffs' Brief in Opposition to Defendants' [Fifth] Motion for Summary Judgment at 1 (emphasis added). Also, when describing the facts relevant to each of the four Plaintiffs who is a subject of the fifth motion for summary judgment, the Plaintiffs state that each "has a permanent physical impairment which substantially limits his ability to work." Plaintiffs' Brief in Opposition to Defendants' [Fifth] Motion for Summary Judgment at 7-11.

However, that is where the similarity between that brief in opposition to summary judgment and the briefs in opposition to the earlier motions for summary judgment end. In footnotes explicating each of the four most recent Plaintiffs' limitations on work, those Plaintiffs detail specific physical limitations and, breaking with assertions made in their second amended consolidated complaint, do not restrict themselves to arguing a single major life activity in which they are substantially limited by their impairments. In

addition, further into their brief, the four Plaintiffs seem to indicate, though not clearly, that the demonstration of each of the new Plaintiffs that he is substantially limited in the major life activity of working is only employed as an aide to showing that he is substantially limited in performing major life activities other than working.[15]

The Court, on July 22, 1999, entered an order stating that it had reached the tentative conclusion that working does not constitute a major life activity for the purposes of the Rehabilitation Act and that, as a consequence, the Plaintiffs' claims should likely be dismissed.[16] Attaching a proposed memorandum opinion to its order, the Court disclosed the reasoning behind its tentative conclusion. The Court, offering the parties an opportunity to respond to the proposed memorandum opinion in careful and concise fashion before July 29, 1999, stated:

> The crux of the proposed opinion attached to this order is that, as a consequence of the Supreme Court's opinion in *Sutton v. United Air Lines, Inc.*, — U.S. —, —, — S.Ct. —, —, 1999 WL 407488 (June 22, 1999), "working" is no longer to be considered a major life activity within the scope of the Rehabilitation Act of 1973. The parties are to focus their attention on whether this conclusion is correct, in light of the statute and subsequent caselaw. The Plaintiffs are also advised to explain whether, if this Court were to conclude that working is not a major life activity, any of the Plaintiffs could be considered disabled and, in *very specific* terms, *why*.

Court's Order of July 22, 1999 at 8.

Unsurprisingly, the Defendants' reaction was favorable. They concurred with the Court's tentative opinion that working does not constitute a major life activity for purposes of the Rehabilitation Act. The Defendants, however, wished the Court to go further in its

---

[15] On July 9, 1999, in an attempt to bolster their case, the Plaintiffs filed a motion for leave to submit a 1990 decision of the EEOC. The following Tuesday, on July 13, 1999, the Plaintiffs filed a motion to submit an affidavit of Plaintiff Dutton out of time. A motion to dismiss Plaintiff Dutton without prejudice to re-file as a party plaintiff with Jackie L. Foster was filed on July 20, 1999. All of these motions are presently pending.

[16] More than anything, the order and the proposed opinion attached thereto were attempts to stir the hornet's nest and prod the Plaintiffs to do a better job of explicating their claims.

opinion, first, by distinguishing and explaining away those cases that, since the Supreme Court's decision in *Sutton*, continue to hold that working is a major life activity under either the Americans with Disabilities Act of 1990 or the Rehabilitation Act and, second, by demonstrating why each Plaintiff would fail to be disabled, were working to constitute a major life activity. Finally, the Defendants, exercising some prescience, argue that Plaintiffs should not be permitted, at this late date, to claim that they were substantially limited with regard to any other major life activity than working.

In contrast to favorable reaction it garnered from the Defendants, the Court's order raised alarm among the Plaintiffs. In response to the order and proposed opinion, the Plaintiffs first argue — as an initial matter and contrary to their earlier representations to the Court that they were relying solely on working as a major life activity substantially limited by their impairments — that the Plaintiffs suffer substantial limitations in major life activities other than working.[17]   Second, the Plaintiffs contend that they should be permitted to submit additional evidence to show that they are substantially limited in other major life activities than the major life activity of working.[18]   Third, the Plaintiffs contend that the Court suffers a skewed vision of the law regarding the import of *Sutton*. Several days later, on August 5, 1999, and again on August 9, 1999, the Plaintiffs filed two motions with essentially the same purpose: to permit them to modify their theory of the case to include major life activities other than working in demonstrating that they are individuals with disabilities within the scope of the Rehabilitation Act.

---

[17]  Suspecting that summary judgment would ultimately be granted, the Plaintiffs also filed, on June 29, 1999, a motion to include the parties' briefs on summary judgment as a part of the record.

[18]  The Plaintiffs filed a motion to the same effect contemporaneous with their response.

Facts [19]

The Plaintiffs assert the following claims, boiled down to their bones:

The Plaintiffs are former employees of TVA who suffered job related injuries, qualified for and began receiving full federal workers' compensation benefits, and were then rehired and specially classified and segregated for RIF purposes, by TVA, in new jobs structured to accommodate their physical impairments and medical limitations. All of the Plaintiffs, except for Plaintiff Hovater who was a clerk word processor, are former craft employees — carpenters, painters, iron workers, steamfitters, etc — who, because of their physical impairments and medical limitations, can no longer work in trades and labor positions. Plaintiffs Putman's and Gothard's situations are unique in that they were hired in permanent positions prior to the establishment of the REIN and Reentry Programs and their budget and headcount were carried by the organization for which they worked. Plaintiff Hovater's situation is unique in that she was able to work as a clerk word processor, but was discharged and then reemployed after and not under the REIN or Reentry Program, but under circumstances that indicate TVA considered her to be disabled and reemployed her solely to terminate her by reduction-in-force. The Plaintiffs are suing under both § 501 [29 U.S.C. § 791(b)] and § 504 [29 U.S.C. § 794(a)] of the Act based on the way TVA segregated and classified them for reduction-in-force purposes, on the fact that TVA placed them on retention registers containing only themselves or other REIN employees when TVA terminated them by reduction-in-force, and on the fact that TVA's reduction-in-force policies and procedures had a disparate impact on them as qualified individuals with disabilities under the Act.

---

[19] "The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record." *Underwood v. Life Ins. Co. of Georgia*, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998). The factual narrative presented here is developed in the light most favorable to the plaintiff and with all *reasonable* inferences drawn in support of the plaintiff's position. *See Hunt v. Cromartie*, 526 U.S. —, 119 S.Ct. 1545, 1550 (1999). Whether this narrative would be borne out in the facts developed at trial is another matter. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994).

The facts in this case were hard for the Court to come by. It was required to comb the record in scrupulous pursuit of evidence describing the histories of the Plaintiffs and their varied impairments. Indeed, in attempting to craft a statement of facts, the Court found the briefs of the Defendants often more favorable to the Plaintiffs than their own explications of the facts. This is particularly true with regard to the descriptions of the impairments suffered by each Plaintiff. This case would have been well served by better preparation, foresight and care on the part of the Plaintiffs.

Plaintiff's Brief in Response to the Court's Order of June 22, 1999, at 2.[20] Each Plaintiff incurred an injury or injuries at some time while they were employed by TVA and each was granted benefits under the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. §§ 8101-8193 (1994 & Supp. III 1997), from the Department of Labor's Office of Workers' Compensation Programs ("OWCP"). After receiving benefits, each Plaintiff was given the opportunity to come back to work with TVA, either through one of TVA's re-employment programs or individually. The rehired workers were each classed, for purposes of seniority and retention, with recipients of FECA benefits, or were isolated into single-member categories, in which each Plaintiff competed only with himself or herself. After some time, each Plaintiff was terminated from TVA. Each Plaintiff asserts that non-disabled individuals who were not separately categorized, but who performed similar work, were not terminated.

All of the Plaintiffs received, at some point in their careers as employees of TVA, FECA benefits from OWCP. While OWCP pays those benefits to former employees injured on the job, TVA reimburses OWCP for disbursed compensation payments. In September of 1983, TVA entered into an agreement with the OWCP under which TVA, when attempting to fill vacant positions, would give special consideration to qualified former employees being paid OWCP benefits.[21] The ostensible purpose of this agreement was twofold — first, to aid those prior unemployed workers who were receiving benefits by giving them the opportunity to return to work and, second, to permit TVA to save money by reducing the reimbursement paid to OWCP for payments made to recipients of FECA benefits.

---

[20] This statement, does not appear to capture some of the Plaintiffs' alleged secondary claims. This further buttresses this Court's conclusion that the Plaintiffs dispensed with those claims in their second amended consolidated complaint.

[21] *See* September 12, 1983, Letter of Understanding.

In rehiring employees off of the OWCP register, representatives of TVA generally told the prospective employees that choosing to refuse the position offered would result in the termination of the FECA benefits. Usually, as an assurance that their FECA benefits were not imperiled, each Plaintiff was also told that if his or her position became temporary or did not work out, that he or she would return to full FECA benefits. Given TVA's history of placing the Plaintiffs back on full FECA benefits after dismissal from work,[22] TVA avers that it felt secure in making this representation to the rehired employees.[23] However, the policy of placing terminated employees back onto full FECA benefits allegedly changed in 1992, when it became the exceptional case that an individual rehired into more than a temporary position would regain full FECA benefits after termination, absent a further deterioration in the FECA applicant's health based upon the work related injury or the existence of a new work-related injury. When each Plaintiff was hired, his or her FECA benefits were reduced in proportion to the amount of salary he or she received. However, when the Plaintiffs were terminated, none of the Plaintiffs, except for Bailey, Coats, and Tucker,[24] were returned to full FECA benefits.

Initially, TVA hired employees for then-vacant positions from a TVA/OWCP reemployment register, and whichever department hired the employee from the register

---

[22] This is evidenced from the facts relayed with regard to each of the Plaintiffs. Prior to their most recent employment with TVA, many of the Plaintiffs were hired back to work for extended periods of time after they were injured and had received FECA benefits. Subsequently, they were laid off from work. With apparent consistency, when these Plaintiffs lost their prior jobs in earlier reductions in force or terminations, they regained their full FECA benefits.

[23] In fact, Dallas Scherck, allegedly an employee of OWCP in Jacksonville, Florida, informed some of the Plaintiffs that, if furloughed in a reduction in force, they would return to full FECA benefits.

[24] At the time of his deposition, J. Chandler had filed for FECA benefits due to a recurrence in his back injury. The outcome of that claim is unknown. It is unclear in the record whether Mullins is receiving full or partial compensation after being terminated by TVA.

carried that person's budget and headcount.[25]  In the instant case, there are three such employees rehired by TVA, two of whom were rehired by TVA's Widows Creek facility and one of whom was hired by the Muscle Shoals Facility.

## A. Widows Creek Plaintiffs.

The two Widows Creek Plaintiffs, Gothard and Putman, were hired directly by Widows Creek as Materials Clerk-Store, SB-3, in 1989 and placed on a separate retention register from five other non-disabled employees doing the same work at Widows Creek. The Plaintiffs allege that they were hired under a program at Widows Creek which was a predecessor to the REIN and Reentry programs executed by NHR and Health Services, respectively.

### 1. Jerry Gothard.

Gothard was hired in 1975 as a carpenter helper at TVA's Bellefonte facility in Hollywood, Alabama.   Roughly two years later, he was selected for a pipefitter's apprenticeship and by 1981, was a journeyman pipefitter with TVA.  In November of 1986, while descending a staircase in a Bellefonte reactor, Gothard's knee twisted beneath him.  Although he had some expectation that the resultant swelling in his knee would subside, it did not, and within two months of the injury, Gothard submitted to surgery. He returned to the pipefitter position two months later, restricted by his doctor from climbing, squatting and kneeling.  He continued to work, with occasional surgeries, at Bellefonte until May 17, 1988, when he was terminated in a reduction in force.  Although Gothard sought counseling for disability discrimination, the counseling ended without

---

[25]  Later, to increase the number of FECA recipients rehired, TVA initiated the REIN and Reentry programs.

resolution and Gothard chose not to pursue a complaint of discrimination, believing it to be futile. Gothard also applied for and obtained FECA benefits from OWCP.

On May 10, 1989, Gothard received a letter from TVA's Widows Creek Fossil Plant, offering him "temporary annual employment not to extend past 90 days from [the] day of employment as a Materials Clerk-Stores (Toolroom Clerk) SB-2 . . . in the Division of Power Production, Widows Creek Fossil Plant, Stevenson, Alabama." Letter to Jerry Gothard of May 10, 1989, at 1. One year after his earlier termination, on May 17, 1989, Gothard returned to work. His position extended past the ninety-day temporary period and soon thereafter, Gothard received a pay grade increase to SB-3. As a toolroom clerk, the function of Gothard's job was issuing tools to workers.

On August 11, 1995, Gothard was transferred to the TVA Services Organization ("TVAS") in Huntsville, Alabama.[26] At TVAS, Gothard, like many other Plaintiffs in this action, was told to apply for a lineman position that he was unable to perform because of his medical restrictions. On July 24, 1996, Gothard was informed of an impending reduction in the workforce, in which his position was targeted for elimination. On September 30, 1996, Gothard was terminated. According to Gothard, he was told by the plant manager at Widows Creek, David Howell ("Howell"), that his knee disability had progressed to the point where his restrictions would prevent him from being able to perform the essential functions of his job.

On August 26, 1996, the EO office at TVA received a letter in which Gothard ostensibly requested counseling. In his letter, Gothard asserted that he had been the subject of discrimination when he was terminated in the September, 1996, reduction in force. The EO counselor had some difficulty contacting Gothard for counseling. On

---

[26] Gothard states in his deposition that after he was transferred to TVAS, an injured boilermaker foreman, Dick Richardson ("Richardson"), was permitted to perform his job duties. He does not state whether Richardson filled his position after he was transferred or whether Richardson's duties were expanded to include Gothard's work.

September 10, 1996, after two prior attempts to contact Gothard, the EO counselor sent Gothard a certified letter indicating that if Gothard did not reply within five days of receipt of the letter, his file would be closed. The letter was received by Gothard on September 14, 1996, as evidenced by his signing the certification card on the letter, but he chose not to contact the EO counselor until November 25, 1996.[27]

On November 25, 1996, Gothard met with an Equal Opportunity ("EO") counselor for TVA, who listened to Gothard's complaints and then informed him of his rights and responsibilities. Gothard's complaints of discrimination went unresolved and counseling ceased after a final interview on December 16, 1996. In that interview, Gothard was informed that TVA had responded unfavorably to Gothard's complaints of discrimination and that the corrective actions sought by him would not be granted. Gothard was sent notice of the completion of counseling on December 23, 1996.

Gothard sent an Equal Employment Opportunity ("EEO") complaint to TVA's EO office on February 1, 1997, which was received by TVA on February 7, 1997. In his complaint, Gothard contends that TVA discriminated against him by transferring him to TVAS and by terminating him in the reduction in force. In an incorporated attachment authored by his attorney,[28] Gothard claims to have been subjected to discrimination on the basis of his disability when he was to be terminated in the September 30, 1996, reduction in force, to have been classified in a discriminatory fashion; to have been transferred to TVAS for discriminatory reasons; and apparently, to have been denied adequate training on a discriminatory basis. On April 17, 1997, TVA's EO office informed Gothard through letter that the investigation of his complaint had been completed and that a final agency

---

[27] Apparently, Gothard asserts that he left a voice mail message with either the EO counselor or Willie Harvey. However, according to the counselor's report, neither received any such message on their telephone answering machines.

[28] A similar attachment was made to several other of the EEO complaints filed by Plaintiffs in the present action.

decision would be forthcoming. After one hundred eighty days passed from his filing of his EEO complaint, Gothard filed his initial complaint in the present action on August 4, 1997.

Gothard contends that while employed as a toolroom clerk at Widows Creek, his knee injury was an impairment which substantially limited him in the major life activity of working. He avers that because of his impairment, he was (and is) incapable of performing a broad class of jobs including those of pipefitter welder and boilermaker, and any work requiring climbing on scaffolding and other heavy craft work. Belying the degree of his limitations, Gothard states that he could carry a forty pound bag of cement on his shoulder and walk fifteen feet if careful. However, he also states that he can only climb to a limited extent. He also claims that TVA had a record of his disability and that it regarded him as having such a disability in that, in a list of material clerk-stores terminated in 1996 drafted by TVA, Gothard is listed, under the heading "handicap condition" as having "[n]o movement/use of 1/both legs." Response to Request for Information Regarding Alleged Discrimination Complaint of Jerry W. Gothard of March, 27, 1997, Attachment #3, at 1.[29]

## 2. Halbert Putman.

Putman was hired into an apprentice welding position at TVA's Muscle Shoals service shop in 1977, after graduating from a welding school run by TVA. In 1979, Putman went to work at TVA's Yellow Creek facility. While working there, on December 19, 1978, Putman's right hand was injured when a pipe fell on it. The seriousness of the injury was not apparent until he discovered, in 1981, while working at Bellefonte Nuclear

---

[29] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Gothard avers, for the first time, that, as a consequence of his injuries, he is substantially limited in the major life activities of standing, squatting, climbing and crawling, that TVA has a record of his being so disabled and that he is regarded by TVA as having such a disability.

Plant, that he had damaged an artery in his hand. After discovering the damaged artery, Putman underwent surgery to prevent blood clots from forming in the artery and moving through his bloodstream. Putman spent between four and six months recovering from the surgery. After recovering, he returned to work with a physician-imposed restriction that he not be required to operate vibrating tools that would require the use of his right hand.

Putman returned to his job in 1982 and continued in his work as a journeyman pipefitter. In the later part of 1986, while pulling on a wrench, Putman suffered a recurrence of his injury, which caused him to lose some use of his right arm, in addition to his hand.[30] He remained out of work recovering from surgery to his hand and arm until 1987, when he was terminated in a reduction in force.

In 1989, Putman returned to work for TVA at Widows Creek Fossil Plant as a Materials Clerk-Stores SB-2 in the Division of Power Production. Soon after starting work as a Material Clerk-Stores, he received a pay grade increase to SB-3. In his deposition, Putman described the responsibilities of his job as getting supplies and distributing them to other TVA employees.

In 1995, Putman was transferred to TVAS. Nearly one year later, on July 24, 1996, he received notice of a reduction in the workforce that would become effective on September 30, 1996. He was terminated from TVA on the date listed in the notice.

On August 26, 1996, the EO office at TVA received a letter from Putman requesting assistance in resolving a complaint of discrimination related to his termination. A counselor met with Putman and discussed Putman's complaints with him. He then informed Putman of his rights and responsibilities. On October 17, 1996, the EO counsel informed Putman, in a final interview, that resolution of his complaints with TVA was not forthcoming. Putman was given a notice of the completion of counseling on the same day.

---

[30] There is no clear explanation in the record of what caused Putman's arm, in addition to his hand, to lose some of its functionality.

On November 16, 1996, Putman sent an EEO complaint to TVA's EO office, which was stamped "received" on November 22, 1996. There are no incorporated attachments to Putman's EEO complaint; rather, Putman states, as his claim of discrimination, "Handicap and when [I] returned to work in 1989 that [I] had all-time job." EEO Complaint of Halbert E. Putman of November 22, 1996, at 2. On December 11, 1996, in a notice of receipt and acceptance of discrimination complaint, TVA's EO office characterized Putman's claim to be that he was discriminated against in the September 30, 1996, reduction in force in which he was terminated.

On April 4, 1997, Putman was informed in a letter from TVA's EO office that the investigation of his complaint had been completed and that a final agency decision would be forthcoming. One hundred eighty days after filing of his EEO complaint, on September 16, 1997, Putman filed his initial complaint in the present action.

Putman contends that at the time he was employed at Widows Creek, his injured hand and arm constituted impairments which substantially limited him in the major life activity of working. Putman alleges that because of his impairment, he could not (and cannot) lift more than ten pounds with his right hand and arm and he could not (and cannot) use tools that vibrate. Further, he claims, he was (and is) unable to perform a broad class of jobs such as those of pipefitter, boilermaker, steamfitter, carpenter, or ironworker. He also claims that TVA had a record of such a disability and that it regarded him as having such a disability.[31]

---

[31]  In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Putman avers, for the first time, that, as a consequence of his injuries, he is substantially limited in the major life activities of lifting, reaching, grasping, climbing and performing manual tasks, that TVA has a record of his being so disabled and that he is regarded by TVA as having such a disability.

## B. Muscle Shoals Plaintiff, Barbara Hovater.

Hovater came to work for TVA in May of 1984 as a clerk work processor, SB-2, at the Muscle Shoals records center. She received a grade increase in salary to SB-3 not long after being employed by TVA. On January 11, 1988, while exiting her automobile, Hovater slipped on a patch of ice and began to fall. In an effort to right herself, she twisted her back, causing lumbar strain with mild spondylolisthesis of L5-S1. As a result, Hovater was off from work for three weeks and, when she returned to work, she was restricted from lifting in excess of twenty pounds. Originally meant as a temporary restriction to give her back time to recover, the limitations remained in place, as Hovater's back problems allegedly refused to improve.

On December 14, 1989, Hovater's supervisor, frustrated with Hovater's limitations, informed her that occasional lifting of seventy-five pounds was an essential function of her job that she had best begin performing, else she would be terminated. Hovater was still on lifting restrictions from her physicians, when, on November 23, 1990, she was told that, because of her medical restrictions, she would be terminated from her job on December 31, 1990. After her termination, Hovater received benefits from OWCP starting in January of 1992.

Hovater was hired back to work in February of 1994 as a Clerk-Word Processor, SB-3, the same level and category of position she occupied prior to her December, 1990, termination.[32] Her job was, she avers, a special OWCP position created in the Printing Service at the Muscle Shoals facility. Although she was to be a word processing clerk, Hovater states that she had nothing to do at her job and was not given a word processor on which to perform her ostensible job. Indeed, soon after her employment by TVA, she

---

[32] She was informed of the position in a letter dated January 31, 1994.

was told by her manager that she was likely to by laid off because there were insufficient funds in his budget to pay her salary.

In January of 1996, Hovater received notice that she was being transferred to TVAS. On July 24, 1996, she was informed that she would be terminated in a reduction in force on September 30, 1996. That date came, and Hovater was terminated.

Hovater contacted a counseling specialist at TVA's EO office on August 1, 1996, requesting assistance in resolving a complaint of discrimination related to her termination. That counseling specialist transferred the issue to another counselor, who contacted Hovater on August 2, 1996. On August 6, 1996, the counselor met with Hovater in Muscle Shoals, Alabama, and discussed Hovater's complaints with her. The counselor noted Hovater's complaints that because of her age and disability, TVA had terminated her in the 1996 reduction in force, denied her training and productive work, and caused her to suffer workplace resentment. On August 28, 1996, Hovater also sent a letter requesting assistance to the director of EO compliance. After confronting management with Hovater's concerns and receiving an unfavorable response, the EO counselor conducted a follow-up interview with Hovater on September 24, 1996, to inform her that her complaints had gone unresolved. On October 16, 1996, the EO counselor sent Hovater written notice of the completion of counseling.

On October 22, 1996, Hovater completed an EEO complaint and sent it to TVA's EO office. The complaint was received on November 22, 1996. In that complaint, Hovater first references the pre-complaint counseling report as providing the description of her claims. Also, in an attachment drafted by her counsel, she reiterates her earlier claims of discrimination based on age and disability. On November 14, 1996, a notice of receipt and acceptance of discrimination complaint that lists only the reduction in force claims was sent to Hovater. She did not object to the characterization.

On March 7, 1997, Hovater was informed in a letter from TVA's EO office that the investigation of her complaint had been completed and that a final agency decision would be forthcoming. The EO office issued a final agency decision on September 29, 1997. In that decision, TVA determined that Hovater failed to state claims of disability and age discrimination. While TVA determined that Hovater was part of a protected class for purposes of the Age Discrimination in Employment Act, it concluded nonetheless that it had a legitimate non-discriminatory reason for her termination.

With respect to Hovater's claims that TVA discriminated against her because of her disability — her back injury and depression — TVA determined that those claims failed due to the absence of a disability. First noting Hovater's claims that her back injury "substantially limits her ability to sit, walk, vacuum and work" and that her depression substantially limits her ability to work, the decision states that no substantial limitations ensued from the impairments and even questions the sustained existence of those impairments:

> To determine if an employee is disabled under the Rehabilitation Act, the factfinder must evaluate whether the employee is "significantly restricted" in her ability to perform a major life activity, as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity. In making this determination, the factfinder may consider the nature and severity of the impairment, its duration or expected duration, and any permanent or long-term impact.
>
> The complainant's extensive medical record indicates that she suffered mild lumbar strain when she slipped on the ice in January 1988. As a result of the injury, her physician recommended a 20 to 25 pound lifting limitation. Despite the complainant's assertions that her injury limited her ability to sit, stand, vacuum, bend over, etc; the medical record indicates that the injury did not significantly restrict her ability to perform such major life activities. Indeed, the complainant's doctor cleared her to return to work, albeit with a lifting restriction. He also repeatedly urged her to walk and exercise so as to strengthen her lower back. She was also advised to lose weight.
>
> * * *
>
> Although the complainant alleges that she suffers from clinical depression, she has produced no medical evidence to demonstrate that her condition

> substantially limits a major life activity. The only documentation of her mental
> impairment is a psychologist's note, dated February 20, 1985, which states that
> prior treatment was effective. Moreover, the complainant has not demonstrated
> that she informed her supervisors that she was under treatment for depression, nor
> has she demonstrated that she requested an accommodation for this condition.
> It is telling that the Statement of Complaint, filed by the complainant's attorney,
> refers only to her back injury as the basis for handicap discrimination; it does not
> mention her depressive condition. The complainant's immediate supervisor, John
> Williams, . . . stated that he was unaware that she suffered from depression.

TVA Final Agency Decision on Claims of Barbara Hovater of September 29, 1997, at 9-
10. In addition, TVA refused to find that it regarded Hovater's impairment as a disability
or that it had a record of her impairment as a disability. Within thirty days of receipt of
the final agency decision, on October 24, 1997, Hovater filed her complaint in the instant
case. In that complaint, Hovater abandons claims premised on age discrimination. In her
later complaints, she further chooses not to revive those claims.

Hovater does not contend that her injured back and her depression constitute
impairments which actually substantially limit her in the major life activity of working.
She does not state a broad class of jobs that she cannot perform. However, she does claim
that TVA had a record of such a disability and that it regarded her as having such a
disability.[33]

## C. Nuclear Reemployment Initiative Program ("REIN") Plaintiffs.

Allegedly, in spite of attempts to reduce the number of employees receiving
workmens' compensation through direct rehiring of workers by TVA facilities, by 1990,
OWCP "charge backs" — those payments made to OWCP by TVA to reinburse the
former for disbursing benefits to the latter's injured employees — were rapidly rising. The

---

[33] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Hovater avers, for
the first time, that, as a consequence of her impairments, she is substantially limited in the major life
activities of walking, sitting, bending, stooping, and performing household chores, that TVA has a record
of her being so disabled and that she is regarded by TVA as having such a disability.

Plaintiffs contend that to slow the rising costs of OWCP "charge backs," TVA initiated its REIN Program to increase the rehiring of former employees receiving FECA benefits, but capable of working in some capacity. Pointing to an attachment to a July 11, 1990, memo titled "Attachment, Nuclear Power (NP) Reemployment Initiative (REIN) Instruction," the Plaintiffs aver that the REIN Program was set up for the sole purpose of hiring individuals receiving FECA benefits and later terminating them such that TVA would no longer be required to pay those benefits. In particular, the Plaintiffs make reference to the last part of paragraph number 1 in the attachment, which states that:

> [t]he work duties [of the REIN employees] should not be the same primary duties assigned to other employees in the manager's area. This difference is necessary to eliminate future problems with competitive levels for reduction in force purposes. Managers should not consider REIN employees when determining their continued staffing needs. . . .

Although the employees hired under the REIN Program worked at a variety of TVA's facilities, the Program itself was funded entirely through the Operations and Management budget of the Corporate Nuclear Human Resources ("NHR") Program existing in Chattanooga, Tennessee. According to the Plaintiffs, TVA created jobs specifically for the REIN employees out of "bits and pieces" of work previously assigned to employees occupying non-REIN positions. In so doing, TVA called into existence competitive areas and levels composed only of those employees rehired off of its OWCP "charge back" roster.

As part of the REIN Program, at various times, TVA offered Plaintiffs Bailey, L. Chandler, Coats, Crow, Desruisseaux, Dutton, Greene, Mansell, Massey, Miles, Mullins, Rainer, Shores, Speer, Smart, Smith and Williams reemployment with TVA, which they accepted. The REIN Plaintiffs were initially assigned to work on Nuclear Power programs. As their positions were budgeted out of NHR, the REIN Plaintiffs did not compete for retention in reductions in force against individuals doing similar work in the TVA facilities at which the Plaintiffs were employed.

"Budget reductions were imposed on TVA's Nuclear Corporate Human Resources department in 1994 and 1995. . . ." *Mullins v. Crowell*, Lead case no. CV 97-S-1897, Memorandum Opinion entered July 1, 1998, at 3 (N.D. Ala.), *affirmed sub nom.*, *Hill v. Crowell*, 98-6603 (11th Cir. March 5, 1999) (unpublished opinion). Many of the REIN Plaintiffs were continuously employed in their positions for periods ranging from two to four years until, "in the summer of 1995 [or 1996], [they] were informed that their positions in the REIN Program had been identified as at risk, and were targeted for surplus." Defendants' Brief in Support of their Motion for Summary Judgment at 22. Thereafter, the REIN Plaintiffs were transferred to TVAS, the ostensible purpose of which was to give those individuals whose jobs were eliminated an opportunity to apply for different positions in the TVA system and to obtain skills that would permit them to become qualified for other positions with TVA. While at TVAS, however, the REIN Plaintiffs allegedly remained untrained and were offered no positions that they were qualified to accept. The REIN Plaintiffs continued to receive the same salary they had received in their REIN positions and remained in the same competitive areas and levels while with the TVAS. Almost one year after being transferred to TVAS, the REIN Plaintiffs were notified that their positions in the REIN Program were to be eliminated in September of either 1996 or 1997. In September of 1996 or 1997, the jobs of the REIN Plaintiffs were eliminated through a reduction in force.

## 1. Thomas L. Bailey.

In September of 1981, Bailey, a maintenance pipefitter for TVA at its Browns Ferry Nuclear Power Plant, ruptured a disc in his back while attempting to open a pipe valve. Although causing him pain in his back, right hip and leg, the injury did not prevent him from returning to his work as a pipefitter, although in a light duty capacity. After his injury, Bailey continued to work as a pipefitter until 1985 and as a pipefitter foreman with

medical restrictions until March 31, 1989, when he was terminated through a reduction in force.[34] According to Bailey, he was terminated because TVA was unable to find another position with TVA in which he could work given his restrictions. From this point forward, Bailey alleges, he was incapable of resuming work as a pipefitter and he became unable to perform work in other craft fields, including construction.

Following the 1989 reduction in force, Bailey applied for and received full compensation benefits from OWCP. In 1991, he was hired through the REIN Program as an Engineering Aide, SE-3;[35] TVA did not hire him into any position which involved his skills as a pipefitter. As an Engineering Aide, SE-3, Bailey's work first consisted of logging documents and hand delivering documents to different sections of the Browns Ferry Nuclear Plant.[36] Bailey next worked in a materials supply room providing materials to plant workers. Purportedly, while employed in the REIN Program, he was referred to by a superior, Greg Pickleton, as a "crippled secretary." Bailey successfully performed the relatively unimposing duties and functions of his Engineering Aide, SE-3, position until in 1995, when he was transferred to TVAS. One year later, on September 30, 1996, Bailey was terminated in a reduction in force of which he was notified on July 24, 1996.

---

[34] During this time Bailey apparently underwent three surgeries to correct his back problems and lessen any pain that he suffered. At the time of his deposition, Bailey was taking Tylenol 4 and Flexoril for back pain. In spite of his ability to return to his previous pipefitter job in 1981, Bailey alleges that he is at present utterly incapable of resuming his craft as a pipefitter.

[35] Designations such as "SA-2" or "SE-5" indicate pay schedules and pay grades for various positions within TVA. "SA" indicates an employee on the administrative schedule; "SB" designates an individual on the clerical and general services schedule; "SC" refers to an individual on the engineering and computer schedule; "SD" indicates an individual on the scientific and program schedule; "SE" describes an individual on the aide and technician schedule; "SF" refers to an individual on the custodial schedule; and "SG" refers to an individual on the public safety schedule.

[36] Bailey described his position as "more or less just carrying paperwork from one place to another." Bailey Deposition of June 17, 1998, at 46.

Throughout the period of his employment in the REIN program, Bailey received as "accommodations" the use of a posturepedic chair and an advantageous parking space.

On August 23, 1996, Bailey contacted the EO office at TVA for discrimination counseling. During counseling, Bailey complained not only of his termination in a reduction in force, but also contended that "during the period of his employment he was not provided any productive work or meaningful training." TVA Precomplaint Counseling Report of Thomas L. Bailey at 3. TVA responded, during the counseling period, that Bailey was not the subject of discrimination. Counseling was completed on October 1, 1996, and notice of the completion of counseling was sent to him on October 9, 1996.

Thereafter, on October 15, 1996, Bailey sent an EEO complaint to TVA's EO compliance office, which was received by TVA on October 21, 1996. In his EEO complaint, he asserts that he was subjected to discrimination when he was terminated by TVA. Bailey also attached to his EEO complaint a document drafted by his attorney, which states his claims with more detail. In the attachment, Bailey avers that "when TVA offered Thomas L. Bailey the [engineering aide] job, TVA did not mean to employ him permanently, or train him, or place him in a regular TVA position. . . ," contrary to earlier assertions. Attachment to EEO Complaint of Thomas L. Bailey of October 21, 1996, at 2. TVA sent Bailey a copy of the notice of receipt and acceptance of his discrimination complaint on November 1, 1996, which lists only Bailey's termination claim as a challenged employment action. Bailey did not contest TVA's characterization of his claims. However, Bailey gave affirmed affidavit testimony on November 13, 1996, in which he complained, again, that TVA did not give him training and did not provide him the opportunity to transfer into non-REIN positions.

On March 24, 1997, Bailey was informed by TVA that it had completed its investigative report. No final agency decision was issued within one hundred eighty days

of his filing of his EEO complaint. Therefore, on August 18, 1997, Bailey filed his first complaint in the present action.

Bailey alleges that, as a consequence of his back injury, he was advised by a physician to lift no more than twenty pounds and was told to avoid climbing stairs and ladders. In the Plaintiffs' brief in opposition to the Defendants' fourth motion for summary judgment and in the Plaintiffs' assorted complaints, Bailey claims to be disabled because his back injury substantially limits him in the major life activity of working, he has a record of such a disability and he is regarded by TVA as being so disabled.[37] To demonstrate that he suffers a substantial impairment to his ability to work, Bailey claims that he is unable to perform his craft, pipefitting, because of his impairments and that pipefitting constitutes a class of jobs.

## 2. Lonner T. Chandler.

At some time in 1986, TVA employed L. Chandler at its Browns Ferry Nuclear Plant. On June 26, 1989, while building some scaffolding, L. Chandler strained his back. Following the injury to his back, L. Chandler returned to light-duty work, until he was terminated in 1989 during a reduction in force.[38] After his reduction from the workforce, L. Chandler started receiving FECA benefits from OWCP.

In June of 1991, L. Chandler was offered a position as a Clerk Monitor, SB-2, in the Radiological Chemistry department at the Browns Ferry facility through the REIN Program, which he accepted. He was placed with a crew of laborers and, to the degree to

---

[37] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Bailey also, for the first time, contends that as a consequence of his back injury, he is substantially limited in the major life activities of walking, sitting, lifting and climbing, that he has a record of such disability and that he is regarded by TVA as having such a disability.

[38] L. Chandler also suffers from uncorrectable degenerative disk disease. Because of his back impairments, L. Chandler avers that he has been restricted to work requiring no bending, no lifting more than 20 pounds, and no climbing or stooping.

which he was capable, performed his job successfully.   L. Chandler worked in the Radiological Chemistry department for six years, during which time he received favorable ratings on his performance reviews and was promoted to an SB-3 classification.

On September of 1996, L. Chandler was transferred to TVAS.  Ten months after his transfer to TVAS, on July 25, 1997, he received notice that his job would be eliminated in a reduction in force to become effective on September 26, 1997.  After he was terminated, two laborers were hired into the work crew at the Browns Ferry plant in which L. Chandler worked; however, L. Chandler stated that he was unqualified for the positions occupied by those laborers.

After receipt of the reduction in force notice, L. Chandler decided to challenge the elimination of his job through TVA's administrative discrimination complaint process.  On October 16, 1997, L. Chandler contacted the EO office at TVA for discrimination counseling concerning his September 26, 1997, termination and was interviewed by the EO counselor over the telephone.  Counseling was completed on October 28, 1997, with an unresolved result, and notice of the completion of counseling was sent to L. Chandler on the same day.

Thereafter, on November 4, 1997, L. Chandler drafted an EEO complaint that was filed with TVA on November 10, 1997. In his EEO complaint, L. Chandler states that TVA discriminated against him on the basis of his disability when it denied him training for positions in which he could work, given his medical restrictions, and when he was terminated in the reduction in force.  TVA sent L. Chandler notice of the receipt of his EEO complaint on November 14, 1997, in which TVA states only that the termination claim is accepted for investigation.  On March 25, 1998, L. Chandler was informed by TVA that it had competed its investigative report and that if he wished to add anything to the investigative report, he had fifteen days in which to do so.  L. Chandler did not

respond to the EO compliance office within fifteen days to correct any alleged oversight by it.

L. Chandler received a final agency decision on his claims of disability discrimination on December 17, 1998. In its decision, TVA states that the sole issue before it is the claim of L. Chandler pertaining to his termination in the reduction in force. The decision does not address his lack of training claim. As presented in the final agency decision, TVA found that L. Chandler suffered from degenerative disk disease that could not be corrected by surgery and that the impairment was a permanent restriction that would limit his capacity to bend, climb, stoop and lift objects weighing in excess of twenty pounds. Based on this determination, TVA concluded that "the Complainant has provided sufficient evidence to establish that he was a qualified individual with a disabling condition." Lonner T. Chandler Final Agency Decision at 3-4. Nonetheless, TVA found against L. Chandler because he could not demonstrate either that the reduction in force fell more harshly upon him or other disabled individuals than non-disabled individuals or that he was replaced with a non-disabled employee. Dissatisfied with the conclusions of TVA, on January 13, 1999, L. Chandler filed his first complaint in the present action.

L. Chandler primarily asserts that he is substantially limited in the major life activity of working by the injury he sustained to his back. In his response to the Defendants' fifth motion for summary judgment, he further asserts, in a footnote, that he was substantially limited by his impairment in the major life activities of bending, climbing, stooping and lifting. He also claims that he has a record of such disability and was regarded by TVA as having such a disability.[39]

---

[39] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, L. Chandler reiterates that he is substantially limited in performing the major life activities of bending, stooping, climbing and lifting.

### 3. Ricky S. Coats.

In October of 1979, TVA employed Coats as an ironworker at its Yellow Creek facility. Aside from a single six-month period, Coats worked at Yellow Creek until he was injured on February 22, 1982. On that date, Coats received a lumbar sacral sprain when he slipped while attempting to step over a pile of metal bars. Although he was not required to undergo surgery for the back injury, he was informed by his physician that he should perform stretching exercises and that he should refrain from lifting, bending and twisting. He returned to work, but one month later, he was laid off from employment. After he was dismissed from work, he applied for and received FECA benefits from the OWCP. The OWCP also paid for him to return to college, where he obtained an associate's degree in applied electrical technology.

In 1987, he applied for and received a position as an Engineering Aide, SE-5, at TVA's Browns Ferry Nuclear Plant. In that position, Coats bore the responsibilities of providing to laborers the bare-bones technical requirements for electrical jobs, of writing work instructions, and of verifying that electrical work was performed in accordance with the work instructions. In 1989, Coats was again laid off from work and once more began to receive full compensation benefits from the OWCP. Again he returned to school, this time taking classes in physics to pursue a bachelor of science degree in the same subject. After six months out of work, he was called back to TVA and reemployed in the same position, Engineering Aide, SE-5. In March of 1991, Coats was out of a job, having fallen prey to yet another reduction in force.

Prior to the March, 1991, reduction in force, Coats was approached with the opportunity of working in the REIN program. He expressed interest in the program and not long after the March, 1991, reduction in force, on July 25, 1991, Coats was hired back by TVA through the REIN Program into the position of an Engineering Aide, SE-3, a position with a two-grade reduction from the prior positions in which Coats had worked

for TVA. The duties of the engineering aide position included coordinating records, work instructions, and work requests. After four years, on September 15, 1995, his position fell into jeopardy and he was transferred to TVAS. On September 30, 1996, Coats was terminated in a reduction in force.

On August 28, 1996, after receiving notice of the reduction in force, Coats contacted the EO office at TVA for discrimination counseling. In his initial interview conducted on September 11, 1996, Coats complained that he was wrongfully terminated and denied meaningful training because of his disability. TVA responded that Coats was being terminated due to budget cuts rather than discrimination. The counseling having lead to no resolution, counseling was concluded on October 1, 1996. Notice of the completion of counseling was sent to Coats on October 9, 1996. Thereafter, on October 15, 1996, Coats filed an EEO complaint with TVA, in which he avers that TVA discriminated against him on the basis of disability (1) by placing him in a separate "retention register" from non-disabled employees; (2) by not offering him training such that he could occupy other, permanent positions; and (3) by terminating him in the September 30, 1996, reduction in force.

While Coats's claims were originally rejected as untimely in a final agency decision on November 6, 1996, this decision was rescinded on February 18, 1997, in a notice of receipt and acceptance of Coats's discrimination complaint. In the February 18, 1997, notice, the TVA EO compliance office indicated that it only accepted Coats's complaint that he was terminated because of disability discrimination. Coats did not rebut this assertion. In the course of the investigation into his EEO complaint, Coats gave affidavit testimony to the EO investigator relating to training. When asked what occurred regarding training by the EO investigator, Coats responded by stating that while in TVAS, he inquired multiple times about computer training that was denied him but given

to employees who were not injured. He reiterated his complaint more than once during the composition of the investigation affidavit.

On June 13, 1997, Coats was informed by TVA that it had completed its investigative report and that he had fifteen days in which to add additional material, if he so desired. No final agency decision was issued within one hundred eighty days of Coats's filing of his EEO complaint. Therefore, on September 15, 1997, Coats filed his initial complaint in the present action.

Coats claims that, as a consequence of his lumbar sacral strain, he was substantially limited in the major life activity of working. He claims to be unable to perform his craft, pipefitting, because of his impairments and that pipefitting, as a craft, constitutes a class of jobs. He also claims that he has a record of such a disability and was regarded as having such a disability by TVA.[40]

### 4. Thomas A. Crow.

TVA initially hired Crow to work as a construction pipefitter during 1981 and 1982 during outages at TVA's Muscle Shoals facility. In 1983, Crow was hired by TVA to work at its Browns Ferry Nuclear Plant as a combination steamfitter and pipefitter. Crow was first injured after falling fifteen or twenty feet from a ladder in 1984. As a consequence of his fall, Crow twisted his right knee, hurt his back and injured his left shoulder. Because of his knee injury, Crow was required to undergo surgery. While recovering from the surgery on his right knee, Crow was laid off from employment during a reduction in

---

[40] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Coats also, for the first time, contends that as a consequence of his lower back injury, he is substantially limited in the major life activities of stooping, bending, lifting and climbing, he has a record of such disability and is regarded as having such a disability.

force.[41] After Crow recovered from his knee surgery, he continued to work as a pipefitter for various non-TVA contractors, without restriction.

Crow was later reemployed by TVA, apparently as a pipefitter, at the Browns Ferry plant.[42] Crow injured his right wrist in 1986, but returned to his work as a pipefitter soon thereafter, although confined to light duty work.[43] With time, the injury to Crow's wrist grew worse, requiring him to undergo two surgeries for the damage done. Crow again hurt his right knee while lifting a desk at work in 1988; although he visited a physician who suggested surgery, no operation was performed. In 1989, apparently, Crow was prohibited from pipefitting by his physician and was then laid off from work in a reduction of force.[44] He made an application based upon his wrist injury for full workmen's compensation benefits, which he received.[45]

On February 22, 1991, Crow was hired into TVA's REIN program as a rehabilitation maintenance mechanic (or steamfitter), TB, assisting instructors with the Mechanical Apprentice Program at the Browns Ferry Nuclear Plant. His job required little more of him than drafting, filing and carrying paperwork. On October 19, 1993,

---

[41] From the record, it appears that Crow's being laid off had little to do with his injury, but was instead prompted by his being an "11/29" employee. Employees who are hired "11/29" are hired to work for eleven months and twenty-nine days and then are laid off in order to prevent those employees from gaining seniority at TVA.

[42] This employement was not "11/29." Crow was hired as an annual employee.

[43] The record contains no indication of the cause of the wrist injury.

[44] It is uncertain from the record the date on which Crow received the restriction on pipefitting from his doctor. As the Court reads the record, the restriction was not imposed until 1989, as Crow continued to work as a pipefitter for TVA until that time and Crow's deposition appears to indicate that his leaving work was a consequence of his no longer being able to perform his duties as a pipefitter. However, the record could also support the conclusion that pipefitting was forbidden to Crow by his physician in 1986.

[45] At some time between 1989 and 1991, Crow underwent surgery for cataracts. He states in his deposition that because of his eyes, he cannot read for any significant amount of time.

Crow, while walking, suffered a meniscus tear in his right knee, twisting his leg and causing it to give way. The injury to the right knee required Crow to have surgery.[46] Following the surgery on his knee on November 9, 1993, and a recovery period lasting until October 26, 1994, Crow was permitted by his physician to return to full duty work in his job.[47]   On March 17, 1995, one of Crow's physicians, Dr. John M. Cuckler, indicated that Crow suffered from depression and prescribed antidepressants, which alleviated some of his symptoms. Crow continued to work, however, from the time of his recovery from surgery until he was terminated in a reduction in force. In addition to his other impairments, since 1995, Crow has apparently suffered from osteoarthritis of the back and from degenerative disk disease.

A TVA physician advised the TVA on July 8, 1996, that Crow should not be required to walk for prolonged periods, that he should be limited in his stair climbing and that he should not be required to lift more than ten pounds. In September of 1996, Crow was notified that his position as a rehabilitation maintenance mechanic was at risk and he was being reassigned to the TVAS organization. Crow received notice of an impending reduction in force on June 16, 1997. On September 26, 1997, Crow was terminated in that reduction in force.

While assigned to TVAS, on May 20, 1997, Crow applied for total disability compensation from the Social Security Administration. On December 1, 1998, Crow was adjudged disabled and was awarded disability benefits from the Social Security Administration. Crow testified that, in his application for social security benefits, he stated that he was totally disabled from working. He clarified the representation made in the social security application during his deposition by stating that, with some

---

[46] Crow has undergone, subsequent to this injury, two surgeries on his right knee.

[47] In January of 1994, Crow was permitted to return to light duty work. Crow's doctors during this period noted that Crow suffered from a degenerative joint disease.

accommodation, he could perform various jobs within his medical restrictions, including those of a toolroom clerk, a pipefitter scheduler, a planner or a mailroom clerk.[48]

Crow contacted the EO complaince office at TVA for discrimination counseling on August 8, 1997, specifically complaining of his receipt of a reduction in force notice and of his impending termination. Those complaints being unresolved, counseling was completed on September 19, 1997, and a notice of the completion of counseling was sent to Crow on October 3, 1997. Thereafter, on October 21, 1996, Crow filed an EEO complaint with TVA's EO compliance office, in which he indicates that he was subjected to discrimination, first, when TVA refused to provide him with training with which he could secure a permanent position with TVA and, second, when he was terminated by TVA in a reduction in force. The only issue accepted for investigation was Crow's claim that the reduction in force was discriminatory, as stated in the notice of receipt and acceptance of Crow's complaint sent to Crow's attorney on November 3, 1997. Crow did not challenge this characterization of his claims. On March 3, 1998, Crow was informed by TVA that it had completed its investigative report. No final agency decision was issued within one hundred eighty days of Crow's filing of his EEO complaint. Therefore, on November 24, 1998, Crow filed, in tandem with Plaintiff Rainer, his initial complaint in the present action.

Crow claims that his impairments present a substantial limitation on his ability to work and that, as such, he is disabled within the compass of the Rehabilitation Act. In addition, Crow claims, he has a record of a disability or was regarded as disabled by the TVA for similar reasons. Although in the Plaintiffs' second amended consolidated complaint, "working" is listed as the only major life activity significantly limited by Crow's

---

[48] The Supreme Court has recently held that a representation that one is totally disabled before the Social Security Administration is not a bar to recovery under the Americans with Disabilities Act. *See Cleveland v. Policy Management Systems Corp.*, — U.S. —, 119 S.Ct. 1597, 1602 (1999).

impairments, in the Plaintiffs' brief in opposition to the Defendants' fifth motion for summary judgment, Crow obliquely indicates that he is also substantially limited in engaging in the major life activities of bending, lifting, climbing and stooping. *See* Crow, Rainer, Chandler and Dutton's Response in Opposition to Defendants' Second [Fifth] Motion for Summary Judgment at 8 n.50 & 25.[49]

### 5.  Michael D. Desruisseaux.

Desruisseaux was hired by TVA on April 12, 1978, as an outside machinist, a position requiring him to travel to different TVA locations to install, repair and maintain TVA equipment.  In 1983, Desruisseaux became a maintenance machinist at the Browns Ferry Nuclear Plant, working during intermittent power outages.  On December 10, 1985, Desruisseaux, while attempting to remove a brake drum from a trailer, injured himself, straining his back and causing a protruded disc in his spine.  A lower vertebrae was fragmented to the inside and pressed against his nerves.  Following his injury, Desruisseaux returned to TVA to perform his maintenance machine work on light duty. Desruisseaux was laid off from work ten months after his injury, on October 10, 1986. On the advice of Robert Mullins, his general foreman (and another Plaintiff in this action), Desruisseaux then applied for and received full OWCP benefits.

On June 25, 1991, Desruisseaux was hired into the REIN program as an Engineering Aide, SE-3, at the Browns Ferry Nuclear Plant.   Prior to starting employment, Desruisseaux's work restrictions were evaluated and he was given the following limitations:

---

[49]  In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Crow states that as a consequence of his injured wrist, degenerative joint disease and degenerative disk disease (among other impairments) he is substantially limited in the major life activities of walking, standing and climbing, he has a record of such disability and is regarded as having such a disability.

Sitting four hours a day. Walking four hours a day, not continuously now. Lifting one hour a day. Bending one hour. Squatting one hour. Climbing less than one hour a day. Kneeling less than one hour a day. Twisting less than one hour a day. Standing four hours a day. Lifting requirement 10 to 20 pounds. Maximum hours per week 50, which meant 10 hours a week overtime.

Deposition of Michael D. Desruisseaux of June 19, 1998, at 28-29.

Desruisseaux's first position in the REIN program involved performance tracking for the start up of one of the nuclear reactor units at the Browns Ferry plant. Although lacking prior experience with a computer, Desruisseaux, with the assistance of other employees, soon learned the requirements of the job. Thereafter, he successfully performed his job duties for two years. After the two years, he was transferred to the scheduling department, where he worked as a maintenance scheduler. He remained in this position until September of 1996, when he received notice of his transfer to TVAS. He was terminated in a reduction in force on September 26, 1997.[50]

On June 23, 1997, Desruisseaux contacted the EO office at TVA for discrimination counseling. In his initial contact with the EO counselor, Desruisseaux complained only of his termination in the September 26, 1997, reduction in force. Because no final resolution was reached, counseling ended on June 27, 1997, and a notice of the completion of counseling was sent to Desruisseaux on June 30, 1997. Thereafter, on July 11, 1997, Desruisseaux filed his EEO complaint with TVA, in which he claims to have been subjected to disability discrimination when he was terminated. Desruisseaux also attached to his EEO complaint a further explanation of his claims that was drafted by his attorney. In the statement attached to his complaint, Desruisseaux expresses his belief that TVA created the REIN program with the secret intent to reduce the amount of OWCP benefits being paid to disabled workers. In addition, Desruisseaux indicates that he was separately classified in specific retention registers for purposes of ease in later termination.

---

[50] Notice of the termination was provided to him on June 16, 1997.

Desruisseaux also asserts that, contrary to representations of TVA supervisors, "TVA did not mean to employ him permanently, or train him, or place him in a regular TVA position." Attachment to EO Complaint of Michael D. Desruisseaux of July 11, 1997, at 2. Finally, Desruisseaux alleges that his transfer to TVAS was similarly discriminatory, in that disabled individuals had been disproportionately transferred to that organization as a percentage of TVA's total workforce.

TVA's EO compliance office sent Desruisseaux a notice of receipt and acceptance of discrimination complaint on July 29, 1997, in which it indicates that only his complaints of discriminatory termination from TVA were then being accepted for investigation.   Desruisseaux did not challenge the limitation of his complaints of discrimination in any subsequent response to the EO compliance office.   In the investigation of his complaint, Desruisseaux did not add any matters to his claim beyond those accepted by the EO compliance office.  On July 29, 1997, Desruisseaux was informed by TVA that it had completed its investigative report.  As no final agency decision was issued within one hundred eighty days of his filing of his EEO complaint, Desruisseaux, on January 23, 1998, joined in the present action in federal court as a Plaintiff in the lead case.

Desruisseaux claims that, as a consequence of his lower back injury, he is substantially limited in the major life activity of working.  He avers that he can no longer work as a machinist or in construction and, as such, is substantially limited in his ability to work.  He also claims a record of such a disability and claims that TVA regarded him as having such a disability.[51]

---

[51]   In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Desruisseaux states that as a consequence of his injured back he is substantially limited in the major life activities of walking, standing, bending, squatting, climbing, kneeling, twisting, and lifting, that he has a record of such disability with TVA and that he is regarded by TVA as having such a disability.

## 6. Richard B. Dutton.

Dutton, by education, training, and experience, was a carpenter. From 1980 until 1990, he was occasionally hired by TVA to work as a carpenter on assorted projects, usually working for a number of months or for a year or so before being laid off when the particular job for which he was hired was completed. On August 15, 1988, while employed by TVA on an "outage" job, Dutton slipped on a slick floor while carrying pieces of scaffolding. His legs separated and his knee twisted beneath him. For two years after his injury, Dutton was unable to pay for surgery to his knee and so delayed it. During that time, Dutton continued at his work on light duty. In August of 1990, surgery was performed on Dutton's knee, after which he was unable to return to work for twelve weeks. A few weeks after returning to work, on December 21, 1990, he was laid off in a reduction in force.

Then unemployed, Dutton sought and received benefits from the OWCP; however, he only received FECA benefits for six or seven months, as he soon was hired into the REIN program on July 13, 1991. Prior to starting work, Dutton received a vocational assessment on April 18, 1991, as a consequence of which he was limited to work at TVA that required no squatting, no working on catwalks and limited climbing. He was also told that he could no longer perform carpentry. Given his restrictions, TVA hired Dutton to work as a Clerk-Monitor, SB-2. As a part of his job, Dutton operated personnel contamination monitors; eventually, Dutton testified, he acquired such sufficient knowledge of his position that he began to perform the duties and functions of a higher SE-4 technical position. Eventually, because of his skill at performing his job, Dutton was elevated from an SB-2 pay grade to a SB-3 pay grade.

On February 12, 1996, Dutton was urged, in a memorandum from Mike Doyle ("Doyle"), the Manager for Health and Safety at Nuclear Human Resources, to search for a permanent position either "within TVA or outside the agency." Memorandum of

February 12, 1996, by M. J. Doyle to REIN Employees at 1. The memorandum encouraging Dutton to search for other work was drafted to inform the REIN employees of the likelihood of funding reductions for the REIN Program.[52] The memorandum did not spur Dutton to action. Thus, on October 1, 1996, Dutton was reassigned to TVAS. While in TVAS, Dutton's application and résumé were sent to about fifty positions by TVAS and he received two favorable responses from supervisors requesting interviews. Dutton obtained neither of those two positions. On June 16, 1997, Dutton received notice that his position with TVA would be terminated in a reduction in force occurring on September 26, 1997. On the stated date, he was terminated.

Unlike other Plaintiffs in this action, Dutton chose not to inform TVA of his belief that TVA had discriminated against him when he was downsized from the workforce. Although when he received his notice of the reduction in force in June of 1997, Dutton concluded that his termination was prompted by discrimination, he chose not to undergo discrimination counseling with one of TVA's EO counselors or to file a subsequent formal administrative complaint with TVA. On February 11, 1999, Dutton joined the action filed on January 13, 1999, by L. Chandler, *Chandler v. Crowell, et al.*, CV 99-BU-0061-S, and in so doing, tried to overcome his alleged failure to exhaust his administrative remedies before the TVA by "piggybacking" onto L. Chandler's action. Dutton was joined into L. Chandler's case fifty-four days after L. Chandler received notice of an unfavorable final ruling from TVA on December 19, 1998.

Dutton claims that he is disabled in that his injured knee is an impairment which substantially limits him in the major life activity of working. The substantial limitation on working is the consequence of his inability to engage in carpentry as a class of jobs. In addition, Dutton claims to have a record of such disability and to have been regarded by

---

[52] Copies of the memorandum were also sent to Plaintiffs L. Chandler, Crow, Desruisseaux, Miles and Rainer.

TVA as having such a disability. Although in the second amended consolidated complaint Dutton nowhere suggests that he is substantially limited in any major life activity other than working, he indicates in his brief in response to the Defendants' fifth motion for summary judgment, albeit indirectly, that he is substantially limited in the major life activities of squatting and climbing.[53] In the same opaque manner, Dutton contends that TVA had a record of him being so disabled and that TVA regarded him as being so disabled.

## 7. Noonan Greene.

Greene was, apparently, employed as an ironworker foreman at TVA's Browns Ferry Nuclear Plant on a full-time basis in 1987. In 1988, Greene slipped and fell from some steps, injuring his left shoulder and tearing the rotator cuff in the joint. He returned to work without incident. Greene suffered another injury on June 30, 1989, falling in the shop and rupturing a tendon in his left ankle.[54] He returned to work the day after the injury wearing a brace. In that state, Greene continued to work as an ironworker foreman, although he primarily spent his time thereafter handling paperwork. According to Greene, he had a fifteen to twenty-five percent impairment to his shoulder and a ten percent impairment to his left ankle. In addition, his physician restricted him from prolonged walking, from climbing without guardrail protection, and from lifting objects to a height above the waist with his left hand. On December 21, 1990, Greene was laid off from work in a large reduction in force. He then applied to OWCP for FECA benefits, which he received.

---

[53] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Dutton reiterates his position that as a consequence of his injured knee, he is substantially limited in the major life activities of squatting and climbing, that he has a record with of such disability and that he is regarded by TVA as having such a disability.

[54] In January of 1991, Greene had surgery on the ruptured tendon, in which it was replaced with a tendon extracted from one of his toes.

Greene was approached by Ed Wells ("Wells") six months later, on June 3, 1991, about a position with the REIN program. Having shown interest in the REIN program, he was soon hired as an engineering aide, SE-3. For the first eighteen months in the REIN program, Greene worked in the maintenance planning department at the Browns Ferry Nuclear Power Plant, essentially, he claims, as a "gopher." In November and December of 1992, the job in the maintenance planning department developed into a work order coordinator position, which provided Greene with the opportunity to work with a labor crew. In August of 1993, the members of Greene's crew were sent to training, which Greene was not permitted to attend. Left out, Greene filed a charge of disability discrimination with TVA's EO compliance office on October 23, 1993. He asserts that in retaliation for filing the charge, he was moved from his position with the maintenance planning department to a position with the operations department, where he worked until his employment with TVA ended. Performing the responsibilities of the new job, Greene filed documents, made copies of documents, and performed similar clerical chores.

On June 26, 1995, Greene received a copy of a favorable final determination from TVA on his complaint of discrimination stemming from TVA's failure to provide him with training. In the decision of the agency, TVA concludes, with regard to Greene's averment that he was disabled, that Greene was "handicapped . . . in that [he has] a physical impairment which substantially limits [his] ability to *lift with {his} left hand above {his} waist, climb without protection*, and *engage in prolonged walking*. . . [and has] a record of such an impairment, and [was] regarded by management as having a disability." TVA Final Agency Decision on Complaint of Greene of June 26, 1995, at 2-3 (emphasis added). TVA never appealed the final decision of the agency.[55]

---

[55] In the record there is also a decision of an Administrative Law Judge of the EEOC favorable to Greene which was entered on a claim of disability discrimination. This decision was entered prior to the final decision of TVA.

In 1995, Greene injured his left knee;[56] by that time, his right shoulder was also worn, requiring a joint replacement. At some point in the same year (it appears to have been September), Greene was transferred to TVAS. On July 24, 1996, Greene received a notice that effective September 30, 1996, his position with TVA would be eliminated. Subsequent to his termination, on October 26, 1997, Greene was deemed "disabled" by the Social Security Administration as of July 5, 1997, and was awarded disability benefits.

After receiving notice of the reduction in force, Greene contacted the EO compliance office at TVA for disability discrimination counseling on August 28, 1996. An initial meeting was held on September 11, 1996, in which Greene was advised of his rights and responsibilities under the complaint processing procedure. In the meeting, Greene complained of being terminated, being denied genuine work and being denied meaningful training. TVA responded that its decisions were motivated by budgetary concerns. Because Greene's complaints of discrimination were not resolved through counseling, counseling ceased October 1, 1996 and a notice of the completion of counseling was sent to Greene on October 9, 1996.

On October 21, 1996, Greene filed his EEO complaint with TVA, in which he claims to have been subjected to disability discrimination when he was terminated in the September reduction in force. In a "Statement of Complaint" attached to the body of his EEO complaint, Greene contends, first, that TVA created the REIN program with the tacit intention of reducing the amount of OWCP benefits being paid to disabled workers who received large amounts of benefits. Second, Greene states that he was separately classified in a separate retention register from non-disabled employees to make it easier for TVA to later terminate him. Green further asserts that he was denied placement in non-REIN program positions and that he was denied training by TVA. Finally, Greene argues

---

[56] There is no indication in the record as to the cause of the knee injury, or its specific date. Greene has undergone two surgeries to improve the state of his knee.

that his transfer to TVAS was discriminatory, in that disabled individuals had been disproportionately transferred to that organization.

In notifying him of receipt of his complaint on November 1, 1996, the EO compliance office informed Greene that, based upon averments in pre-complaint counseling and in his EEO complaint, the EO compliance office was investigating only his claim of discriminatory termination. During the investigation of his complaint, on November 14, 1995, Greene gave affidavit testimony to an EEO investigator. In that testimony, Greene asserts that he was denied training by TVA and that in June, July or August of 1996, he applied for a maintenance technician position outside of the REIN program and he was denied that position. On March 24, 1997, Greene was informed by TVA that it had completed its investigative report. After one hundred eighty days from the his filing of his EEO complaint, Greene, on August 4, 1997, filed his initial complaint in the instant action.

Greene claims that his left ankle injury, his knee injury, and limitations on the functioning of each shoulder constitute impairments which substantially limit him in the major life activity of working. He also claims that TVA had a record of such a disability and that it regarded him as having such a disability.[57]

### 8. Timothy L. Mansell.

Mansell was employed by TVA in 1980 as an ironworker at its Yellow Creek Nuclear Plant. After two years of employment, Mansell was furloughed, but he returned to work eight months later, in 1983, as an ironworker at the construction service branch of the facility at Muscle Shoals, Alabama. On December 6, 1983, Mansell was injured

---

[57] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Greene states, for the first time, that as a consequence of his injuries, he is substantially limited in the major life activities of walking, climbing, and lifting, he has a record of such disability and is regarded as having such a disability.

when he struck the top of his left knee on a step protruding out from a diesel truck. For seven to ten days thereafter, Mansell was placed on sedentary duty at work on the mistaken belief that his knee injury was a mere bruise; by the second week, the extent of Mansell's injury was discovered. He was sent to a physician, who diagnosed Mansell as having a contusion, atrophy and lesions in his knee joint. He underwent surgery on the left knee in January or February of 1984 and began to draw FECA benefits from OWCP. Since the time of the knee injury, Mansell's physician has restricted Mansell from lifting over an unspecified weight, from walking at heights without protection, from extensive walking, from climbing stairs regularly and from squatting.[58]

For the next few years, Mansell attended college, obtaining a technical degree in electronics, electrical and computer technologies. In 1987, Mansell was rehired to work as an electrical engineering aide in the electrical modifications department of the Browns Ferry Nuclear Plant. In February of 1989, Mansell was dismissed during an agency-wide reduction in force. He again received OWCP benefits and returned to school, taking courses in mathematics and physics and working toward a bachelor's degree in instrumentation science. He was unable to complete the degree program, as TVA rehired him, somewhat against his wishes, in 1991.

In 1991, Mansell reluctantly accepted a position at TVA under the REIN program as a Project Control Specialist, SD-3. Throughout his employment from 1991 until he was terminated in a reduction in force, Mansell performed a number of different jobs in the REIN program without difficulty.

Mansell received notice of his transfer to TVAS in June or July of 1995 and was transferred to TVAS on September 15, 1995. While at TVAS he was told to apply for a position as a lineman, a job for which he knew in advance he could not qualify. On March

---

[58]  According to Mansell, he has undergone six surgeries to correct his knee problems.

4, 1996, Mansell filed a complaint of disability discrimination based on the denial of certain positions for which he had applied. In a final decision by the TVA issued on March 27, 1996, his complaint was denied for untimeliness and, on appeal to the Equal Employment Opportunity Commission ("EEOC"), TVA's decision was affirmed on December 23, 1996. Mansell chose not to appeal those claims to federal court. TVA notified Mansell on July 24, 1996, that his position with TVA would be eliminated effective September 30, 1996. On that date, Mansell was terminated from TVA in an agency-wide reduction in force.

On August 28, 1996, Mansell contacted the EO office at TVA to receive disability discrimination counseling. In counseling conducted on September 11, 1996, Mansell complained that his impending termination was motivated by his disability. The Counselor's report also indicates that Mansell complained that "he was not provided any productive work or meaningful training." Mansell's complaints of discrimination went unresolved, resulting in the termination of counseling on October 1, 1996, and in a notice of the completion of counseling being sent to Mansell on October 9, 1996.

On October 26, 1996, Mansell filed his EEO complaint with TVA, in which he claims to have been subjected to disability discrimination when he was terminated in the September reduction in force. Through a notice of receipt of the discrimination complaint sent to Mansell on November 1, 1996, he was informed that his claim of discriminatory termination based on disability had been accepted by the EO compliance office for investigation. On March 24, 1997, Mansell was informed by TVA that it had competed its investigative report. One hundred eighty days after his filing of his EEO complaint, on September 3, 1997, Mansell filed his initial complaint in the instant action.

Mansell claims that his knee injury is an impairment which substantially limits him in the major life activity of working.[59]  He also claims that TVA had a record of such a disability and that it regarded him as having such a disability.[60]

## 9. Bobby Massey.

Massey worked intermittently for TVA at various facilities as a jouneyman electrician from 1980 until January of 1990.  The last period of his employment began in May of 1989 at TVA's Colbert Steam Plant.  In January of 1990, Massey was "pulling wire" in an area in which a broken valve was leaking water onto the floor.  Massey slipped on the wet floor and fell, rupturing a disc in the lumbar region of his spine.  Although his physician advised surgery, Massey refused and, apparently, has to this date not had any corrective surgery to remedy his injury.  After being diagnosed with the spinal injury, Massey returned to his position with TVA as an electrician in a light duty capacity; he remained in the job until he was furloughed in November of 1990.  His physician restricted him from lifting no more than ten to twenty pounds at a time.  In his testimony, Massey states that he is not employable as a heavy construction worker, steamfitter, painter, scaffold worker, carpenter or any other labor worker on a construction site.

After he was laid off in 1990, Massey received FECA benefits from OWCP for nearly seven months.  In July of 1991, Massey was hired as an assistant instructor for TVA's electrical apprenticeship program through TVA's REIN program.  According to Massey, the entire time that he occupied the instructor position, he was not permitted to

---

[59] Mansell also indicates that he suffers from a hiatal hernia and high blood pressure, but does not include these as impairments supporting his claims of disability discrimination.

[60] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Mansell states, for the first time, that as a consequence of his knee injury, he is substantially limited in the major life activities of walking, sitting, bending, stooping, and climbing, that he has a record of such disability with TVA and that he is regarded by TVA as having such a disability.

assist in anyone's instruction, much less instruct anyone himself. In addition, he asserts, he was not permitted the training that would have allowed him to be an instructor. Rather, he was relegated to doing paperwork for the instructors teaching the electrical apprenticeship classes.

In August or September of 1995, Massey was transferred to TVAS. Then, on July 24, 1996, he received notice of an impending reduction in force. He was terminated on September 30, 1996. At the time of his deposition in June 1998, Massey was employed in New Jersey in a position he acquired shortly after he was terminated in the reduction in force doing "take-offs" from blueprints for electrical contractors.

On August 22, 1996, Massey contacted the EO office at TVA to obtain disability discrimination counseling. He was interviewed by an EO counselor on September 11, 1996. In the interview, he complained of discriminatory termination, of the denial of productive work and of the refusal of training on the basis of his disability. Because Massey's complaints of discrimination were unresolved, his counseling was completed on October 1, 1996 and a notice of the completion of counseling was sent to Massey on October 9, 1996.

On October 21, 1996, Massey drafted an EEO complaint to TVA that was filed on October 25, 1996. In that complaint, he claims that his termination in the reduction in force was undertaken by TVA for the purpose of disability discrimination. In an incorporated attachment drafted by his attorney, Massey also avers that he was classified in a discriminatory fashion, that his transfer to TVAS was discriminatory, that he was not offered any non-REIN position with TVA that he could perform and, apparently, that he was denied adequate training. The EO compliance office sent Massey confirmation of the receipt of his EEO complaint on November 4, 1996, in which it recognized only his claim of discriminatory termination for investigation. If this was an unfortunate mischaracterization, Massey sent nothing to the EO compliance office to correct it.

During the investigation, Massey gave affidavit testimony, during the taking of which he was asked by the EO investigator whether discriminatory termination was the proper characterization of his claim, to which he answered affirmatively. Elsewhere in his recorded testimony, Massey complains briefly about being refused training, but does not focus on the issue. On November 4, 1997, TVA informed Massey that it had competed its investigative report. Over one hundred eighty days after his filing of his EEO complaint, on September 16, 1997, Massey filed his initial complaint in the instant action.

Massey asserts that his herniated disk is an impairment which substantially limits him in the major life activity of working. He also claims that TVA had a record of such a disability and that it regarded him as having such a disability.[61]

### 10. Thomas Miles.

TVA hired Miles intermittently beginning in 1977 to perform carpentry work at its various plants. On March 11, 1981, while working at the Yellow Creek Nuclear Plant, Miles's left leg slipped through the rebar[62] in the nuclear reactor hole, striking a dish underneath and twisting his left knee. Following his injury and approximately two weeks of recuperation, Miles returned to work on light duty until he was terminated in a reduction in force occurring in May 1982. Miles was rehired in August of 1982 by TVA as a carpenter without any medical restrictions resulting from his earlier knee injury. He continued to work as a carpenter for TVA on a periodic basis without restriction until his knee gave way on him while he was playing basketball in January of 1987. It was then that Miles learned, through arthroscopic surgery, that in 1981 he had suffered a broken

---

[61] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Massey states, for the first time, that as a consequence of his back injury, he is substantially limited in the major life activities of bending and lifting, that TVA has a record of his being so disabled and that he is regarded by TVA as having such a disability.

[62] "Rebar" is a form of reinforced metal bar used in supports.

anterior cruciate ligament. Miles underwent surgery on the knee; eight weeks later he returned to work with restrictions proscribing running, climbing, kneeling and crawling. Returning to work in the carpenter shop at the Browns Ferry Nuclear Plant, he continued to work as a carpenter under those restrictions until May of 1991, when he was laid off in a reduction in force. Until he was laid off, Miles would occasionally endure further problems with his knee, which would cause his leg to collapse beneath him. Over time, Miles's reliance on a knee brace became regular. Further, according to Miles, after his knee gave way in 1987, he often would be required to undergo surgery to repair cartilage damage to his knee. Each period that he was off work, Miles would receive FECA benefits from OWCP.

On July 22, 1991, Miles was offered, and he accepted, a position with TVA in the REIN Program as a Nuclear Engineering Aide, SE-3, in the instruments and control department at Browns Ferry Nuclear Plant. The duties of the job included the expediting of work orders. Miles occupied the position for three years, and then acted as a materials coordinator until September 1996, when he was notified that his position was at risk and that he would be transferred to TVAS in October of 1996.[63] On June 16, 1997, Miles was informed that his job would be eliminated through a reduction in force effective September 26, 1997.

Miles contacted the EO compliance office at TVA on June 23, 1997, to obtain disability discrimination counseling. In an interview with an EO counselor conducted on June 27, 1997, Miles complained that his impending termination from TVA was discriminatory in nature. Miles's complaints of discrimination were denied by TVA. On

---

[63] As with Greene, Miles applied for maintenance training with TVA, but his request was denied. He did not file any complaint. In addition, at some point during his employment in the REIN program, Miles applied for and was a favorable candidate for a position with the Live Well Center in Muscle Shoals, but a supervisor at Browns Ferry Nuclear Plant denied the transfer for the ostensible reason that Miles would not be any more secure in a position with the Live Well Center, although the opposite was, in fact, true.

June 27, 1997, the EO counselor conducted a final interview with Miles, in which the counselor told Miles of TVA's response to his complaint. Miles was sent notice of the completion of counseling on June 30, 1997.

On July 11, 1997, Miles drafted his EEO complaint with TVA's EO compliance office, which was filed July 16, 1997. In his complaint, Miles claims to have been discriminated against on the basis of his disability when he was to be terminated in the September 26, 1997, reduction in force. In an incorporated attachment drafted by his attorney, Miles avers that he was classified in a discriminatory fashion, that his transfer to TVAS was discriminatory, that he was not offered a non-REIN position with TVA and that he was denied adequate training. On July 29, 1997, the EO compliance office informed Miles of its receipt of his complaint, stating that it had accepted for investigation his claim that he was terminated by reason of his disability. Miles did not rebut this characterization of his claim.

Miles did not await completion of the investigation into his complaint. On January 23, 1998, Miles sought to be joined in the instant action, as more than one hundred eighty days had passed from the time he filed his claim of discrimination. On January 30, 1998, Miles was permitted to join into the lead case in the present action.

Miles asserts that his knee injury is an impairment which substantially limits him in the major life activity of working. He avers that because of his knee injury, he is prevented from climbing, squatting, kneeling, extended walking and heavy lifting. As a consequence of his impairment, Miles claims to be incapable of performing a broad class of jobs, including craft positions in carpentry, boilermaking, bricklaying, ironworking, painting, plastering, and roofing. He also claims that TVA had a record of such a disability and that it regarded him as having such a disability.[64]

---

[64] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Miles contends, for the first time, that as a consequence of his knee injury, he is substantially limited in the major life

## 11. Robert Mullins.

Mullins was hired by TVA in 1976 to perform some temporary machine work on a steam relief valve. Because of the quality of the work performed, TVA offered him a permanent position as a maintenance specialist on the SD scale. By 1980, Mullins was promoted to the position of mechanical general foreman, which he occupied for eight to nine years. In 1981, Mullins stepped into a hole while maintaining a piece of TVA equipment, injuring his back. After the injury, Mullins's physician temporarily restricted him from lifting or bending. The temporary restrictions grew to be permanent. In spite of his restrictions, however, Mullins returned to his work as a general foreman and continued in that position until he was laid off in a reduction in force occurring on March 10, 1989. After he was furloughed in the reduction in force, Mullins applied for FECA benefits from OWCP, which he received. At that time, Mullins avers, he was not permitted by his physician to lift over twenty pounds, to climb, to bend or to stoop.

For the two years and three months that he was off from work at TVA, Mullins's health condition improved somewhat. When, in March of 1991, Mullins accepted employment with TVA as a maintenance mechanic, TB, under the REIN program, he was able to lift up to fifty pounds under the restrictions given him by his physician. After working as a maintenance mechanic for four years, in 1995, Mullins was transferred to TVAS. After being transferred to TVAS, on February 20, 1996, Mullins filed an EEO complaint with TVA's EO office, contending that the transfer was motivated by a discriminatory animus. His complaint was rejected by the EO office as being untimely. Apparently, Mullins did not appeal within the permitted time period. On July 24, 1996, Mullins received notice of an impending reduction in force in which his position was targeted. He was terminated in a reduction in force that occurred on September 30, 1996.

---

activities of walking, kneeling, squatting, climbing and lifting, that TVA has a record of his being so disabled and that he is regarded by TVA as having such a disability.

Mullins contacted the EO office at TVA on August 23, 1996, seeking disability discrimination counseling. In an interview conducted on August 29, 1999, Mullins informed the EO counselor assigned to him that because of his disability, TVA had terminated him, denied him training and refused to give him meaningful work. As with all other Plaintiffs in this action who sought counseling, the complaints of discrimination by Mullins went unresolved. His counseling ended on October 1, 1996, and he was sent a notice of the completion of counseling on October 9, 1996.

Mullins sent an EEO complaint to TVA's EO compliance office on October 23, 1996, that was received by the office on November 4, 1996, in which he claims to have been subjected to discrimination on the basis of his disability when he was to be terminated in the September 30, 1996, reduction in force. Mullins's attorney authored for Mullins an attachment to the EEO complaint which asserts that Mullins was classified into the REIN program in a discriminatory fashion, that he was transferred to TVAS for discriminatory reasons,[65] that he was not offered any non-REIN positions for which he was qualified and on which he applied and that, while in the REIN program, he was denied training that he earlier had been promised. Mullins was sent a notice of the receipt and acceptance of his discrimination complaint on November 6, 1996, through which he was informed that his complaint had been received. In the notice, the EO compliance office only states that the complaint of discriminatory termination is to be investigated. The notice makes no reference to any other claim. Mullins did not respond to this characterization.

On March 24, 1997, Mullins was informed by mail that the investigation of his complaint had been completed and was told that a final agency decision would be

---

[65] His complaint includes this contention, despite the fact that an earlier complaint on the same subject matter was rejected for untimeliness.

forthcoming. One hundred eighty days having passed from the filing of his EEO complaint, on July 24, 1997, Mullins filed his initial complaint in the present action.

After his termination in the reduction in force, Mullins discovered that he was experiencing respiratory problems as a result of exposure to asbestos prior to his working for TVA. At present, the ruptured disk in his back has deteriorated to the point that he is regularly required to wear a back brace. Mullins has also, apparently, applied for Social Security disability benefits.

Mullins asserts that his back injury is an impairment which substantially limits him in the major life activity of working. He also claims that TVA had a record of such a disability and that it regarded him as having such a disability.[66]

## 12. Marion G. Rainer.

In April 1975, Rainer began working for TVA as a plumber at Guntersville Dam. In August of the same year he was hired as a steamfitter/plumber at TVA's Bellefonte Nuclear Plant. On August 21, 1984, Rainer, while attempting to tie a length of rope to a scaffold, slipped, twisting his back. As a consequence, his back was pulled and a lower vertebrae was rendered, in Rainer's terms, "improper." After his injury, Rainer applied for and briefly received FECA benefits from OWCP. Rainer returned to work on September

---

[66] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Mullins contends that as a consequence of his back injury, he is substantially limited in the major life activities of walking, sitting, standing, and sleeping, that TVA has a record of his being so disabled and that he is regarded by TVA as having such a disability. Curiously, in his affidavit drafted August 28, 1998, at 3, Mullins states that "It is my understanding that the defendants do not contest that the craft plaintiffs in this lawsuit, including me, have permanent impairments that substantially limit our ability to stoop, bend, lift and climb." If such was the impression of the Plaintiffs, it is an issue of questionable judgment why the Plaintiffs have not simply asserted from the beginning that such substantial limitations comprise the substance of their disability, rather than getting into the rather messy and complicated issue of work. It appears that this argument was made because it could be asserted generally and did not entail attentiveness to the specific claims of each Plaintiff.

10, 1984, and continued to work, with varying limitations, until he was terminated in a reduction in force on January 4, 1985. He resumed receiving FECA benefits.

On September 17, 1987, TVA offered Rainer a position as a transmission lines clerk through an earlier program created by TVA to reemploy some of its workers who were receiving FECA benefits. Prior to taking the position, Rainer was required to undergo a residual functional capacity evaluation to determine those things that he could no longer do. In most areas of mental functioning, Rainer was rated somewhat above average. However, the physician examining him determined that Rainer could lift no greater than twenty pounds and perform no work involving climbing or repeated stooping or bending without risking further injury. Not being prevented by his restrictions from taking the job, Rainer accepted the position, which was operated out of TVA's Power System Operations in Huntsville. In this position his responsibilities included, among other things, receiving materials and using a laptop computer to handle performance evaluations and other personnel files of employees. He worked in this position for just over three years.

In December of 1990, Rainer was informed that he was soon to be laid off from his position as transmission lines clerk. However, rather than terminate him, TVA instead transferred him into the REIN program at the Browns Ferry Nuclear Plant. He was employed in the position of a Clerk, SB-3, in the operations department, performing the responsibilities of a work order coordinator, tracking, filing, and updating work orders. Until October of 1994, Rainer remained in the Clerk job; then he accepted employment as a maintenance mechanic, still through the REIN program. As a maintenance mechanic, Rainer was responsible, among other things, for inspecting and repairing tools, for locating tools, and for maintaining work areas.

Rainer was never sent to TVAS. Rather, on July 25, 1997, Rainer received a notice that he would be terminated in an impending reduction in force. He was terminated on

September 26, 1997. One day after the reduction in force, on September 27, 1997, Rainer accepted a temporary position as a tool room clerk and tool repairman with an independent contractor, Stone & Webster, to do work during an outage at TVA. That position expired on October 26, 1997. After he completed his work for the contractor, Rainer obtained a job as a sales associate in the automotive and sporting goods department at a local Wal-Mart retail store.

Rainer contacted the EO office at TVA on October 7, 1997, to obtain disability discrimination counseling. In a counseling interview conducted on October 10, 1997, Rainer stated that he had been terminated on the basis of his disability. His complaints of discrimination in his employment went unresolved and counseling was closed on October 9, 1997. He was sent a notice of the completion of counseling on October 14, 1997.

October 27, 1997, Rainer filed his EEO complaint with TVA, in which he claims to have been discriminated against on the basis of his disability and age, stating:

> On September 26, 1997, I was terminated from employment with TVA in what was termed as a "reduction in force" while younger and/or non-disabled/handicapped employees were retained doing the same jobs I had successfully performed during my previous 10 years of employment. I had worked as a disabled employee since 1987 when I returned to work after an on-the-job disabling back injury.

Rainer's EEO complaint of October 27, 1997, at 2. The EO compliance office, on November 6, 1997, informed Rainer that it had received his complaint and that it had accepted his allegation that he was terminated on the basis of his *disability* for investigation. On March 3, 1998, Rainer was informed that TVA had completed its investigation into his complaint of discrimination and that a final agency decision would be forthcoming. On November 24, 1998, more than one hundred eighty days after he had filed his claim of discrimination, Rainer, along with Plaintiff Crow, filed a complaint against the Defendants.

Rainer primarily asserts that his back injury causes a substantial limitation on his ability to work in that he is incapable of doing a broad class of jobs, including pipefitting and steamfitting, and that, as such, he is disabled within the compass of the Rehabilitation Act. In addition, Rainer claims, he has a record of a disability or was regarded as disabled by the TVA for similar reasons. Although in the Plaintiffs' second amended consolidated complaint, working is listed as the only major life activity significantly limited by Rainer's back injury, he implies, in the Plaintiffs' brief in opposition to the Defendants' fifth motion for summary judgment, that he is also substantially limited from engaging in the major life activities of bending, lifting, climbing and stooping. *See* Crow, Rainer, Chandler and Dutton's Response in Opposition to Defendants' Second [Fifth] Motion for Summary Judgment at 8 n.62 & at 25.[67]

### 13. Marc Shores.

Shores started his employment with TVA in 1978, working on Plant Vogel, a nuclear plant that TVA purportedly was building for Georgia Power. He worked for TVA as a carpenter on a periodic basis until 1986, when he went to work as a carpenter foreman at the Browns Ferry Nuclear Plant. He continued in that position until February of 1989, when he was terminated in an agency-wide reduction in force. On July 17, 1989, Shores was rehired as a carpenter at Browns Ferry Nuclear Plant; ten or eleven days later, on July 28, 1989, Shores injured himself when he fell thirteen feet from a ladder in the turbine building at the plant. As a consequence of the fall, Shores suffered a crushed elbow, injured shoulder, hip, and back. Although he returned to TVA in September 1989 for a short period of time, he was a nominal employee, appearing at the office only to read

---

[67] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Rainer states that as a consequence of his injured back he is substantially limited in the major life activities of stooping, bending and lifting, that TVA has a record of his having such a disability and that he is regarded by TVA as having such a disability.

or return home. This continued until August of 1989, when the injury to his elbow required him to undergo additional surgery.

After he underwent his second surgery, Shores left his employment and successfully applied for FECA benefits from OWCP. In May of 1991, Shores received a phone call indicating that TVA wished to offer him a job. Prior to being hired, however, Shores would be required to undergo vocational testing to determine what jobs he could perform and he was suited to perform. The vocational assessment received by Shores, while noting his restrictions on bending, squatting, climbing, kneeling, and twisting, developed a non-exhaustive list of twenty-nine jobs that he was *potentially* capable of performing, with appropriate training.

On July 21, 1991, Shores accepted an offer of employment from TVA as an engineering aide, SE-3, in the REIN Program, at the Browns Ferry Nuclear Plant. According to Shores, in his position, he would be responsible for training and supervising carpentry work orders, keeping the logbook of all scaffolds that were erected by TVA, and taking charge of some remodeling. This was, he states, essentially the same thing he had done for TVA in the past as a carpenter foreman. At some point during this period, while working in the REIN program, Shores was increased in grade to SE-4.

In September of 1995, Shores received notice that his position was at risk and that he was to be transferred to TVAS. He approached his supervisors about the notice and they told him to ignore it, that they wanted him to remain where he was and continue performing his job, and that they were trying to find him a permanent position. Shores then threw the notice away and continued working, without impediment, until April 1996, when he was actually transferred to TVAS. On July 24, 1996, he received his reduction in force notice and on September 30, 1996, he was terminated in a reduction in force.

Shortly after his termination, Shores was contacted by one of his supervisors at the Browns Ferry Nuclear Plant and offered a temporary job with an independent contractor, Stone & Webster, performing the same work he had done for TVA, for the length of an outage. Shores refused. Later, he was again offered a position with the independent contractor, which he once more refused. At the time of his deposition, Shores was in the process of setting up his own a plant nursery business. Apparently, in the course of setting up his business, Shores is regularly required to violate his medical restrictions.

Shores contacted the EO office at TVA on August 23, 1996, seeking disability discrimination counseling. In a counseling interview conducted on August 29, 1996, Shores stated that TVA discriminated against him on the basis of his disability by not paying him the same amount it paid other employees who performed the same work and by terminating him in the September 30, 1996, reduction in force. As with nearly all other Plaintiffs in this action, the complaints of discrimination by Shores went unresolved. His counseling ended on October 1, 1996 and he was sent a notice of the completion of counseling on October 9, 1996.

On October 21, 1996, TVA's EO compliance office received an EEO complaint drafted by Shores, in which Shores claims to have been subjected to discrimination on the basis of his disability throughout the time that he was employed in the REIN program because he was given unequal pay when compared to non-disabled employees and to have been the target of discrimination based on disability when he was terminated in the September 30, 1996, reduction in force. In an incorporated attachment, Shores claims to have been classified in a discriminatory fashion, discriminatorily transferred to TVAS, denied jobs outside of the REIN program and denied adequate training.

In a notice of receipt and acceptance of discrimination complaint sent to Shores on November 25, 1996, TVA's EO compliance office noted two claims of Shores:

. . . In the precomplaint counseling and report and the complaint, you alleged that
you were discriminated against because of your handicap (arm and back injuries)
when:

1.     you received a reduction in force (RIF) notice on or about July 24, 1996,
       which resulted in the elimination of your Engineering Aide-Mechanical,
       ES-4 position by RIF on or about September 30, 1996; and

2.     you were unfairly paid from 1994 through 1996 at the engineering aide
       rate (SE) instead of a management rate (PG) for management-level work
       done in TVA's REIN program.

Notice of Receipt and Acceptance of Discrimination Complaint, Equal Opportunity File
Reference No. 1016-97006, of November 25, 1996, at 1.  Both charges were accepted,
but TVA limited the time period of Shores's pay disparity complaint to two years prior to
his filing of a discrimination complaint on "October 16, 1996." *Id*. at 2.  Shores did not
dispute this characterization.

On March 26, 1997, Shores was informed by mail that the investigation of his
complaint had been completed and informing him that a final agency decision would be
forthcoming.  One hundred eighty days having passed from the filing of his EEO
complaint, on September 3, 1997, Shores filed his initial complaint in the present action.
That complaint does not list a claim that Shores was denied equal pay on the basis of his
alleged disability.  However, Shores amended his complaint on October 15, 1997, stating
that "Plaintiff was subjected to further discrimination by the fact that he was working at
the functional level of 'PG' (commonly paid for management-level work) but was only
paid at an 'SE' rate (the rate commonly paid to an Engineering Aide), pursuant to his
status as a REIN employee."  First Amended Complaint of Marc W. Shores, filed October
15, 1997, at 7.  Later consolidated amended complaints that supercede the earlier
complaints do not specifically refer to this claim.

Shores asserts that the injuries he sustained as a consequence of his fall — his
crushed elbow, injured shoulder, damaged hip and injured back — are impairments which
substantially limit him in the major life activity of working.  He states that as a

consequence of these injuries he has been restricted from climbing, from lifting over thirty pounds (apparently, with his left arm), to limited motion of the left arm, from twisting more than one hour per day, from kneeling more than one hour per day, from squatting more than one hour per day, from bending more than one hour per day, from walking more than four hours per day and from sitting more than four hours per day. The total limitation on the use of his left arm, Shores asserts, is seventeen percent; he is incapable of fully extending it. Also, as a consequence of his back injury, Shores asserts, his physicians have stated that he is forty-eight percent disabled. As a result, he is unable to perform a broad class of jobs. For example, he asserts, he can no longer work as a carpenter. He also claims that TVA had a record of such a disability and that it regarded him as having such a disability.[68]

## 14. Edward Smart.

Smart was hired in August of 1977 to work at TVA's Bellefonte Nuclear Plant as a laborer, but switched to the painters' apprenticeship program in 1978. Soon after entry into the apprenticeship program, Smart suffered a head injury:

> Well, I remember the date was January the 19th. But January the 16th of [1979], [TVA] had the lights off . . . in the auxiliary building and the stairs [were] replaced by scaffolding, wooden stairs to get down to the next level, sixty-eight to sixty-nine. I went up and down those stairs all morning with no problem at all. And that day the bloodmobile was out there. So I went and gave blood and I took all the regular precautions. I ate something and drank to get my blood level built back up. I went back up to the makeshift scaffolding there to the next level and went back to work.
> And then right after lunch I was at the top of the stairs . . . and other painters were there . . . and I wasn't exactly right. I didn't feel right . . . and all the other painters said, ["]Ed, watch it.["]  And I passed out. That was the last

---

[68] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Shores, for the first time, contends that as a consequence of his injuries, he is substantially limited in the major life activities of walking, sitting, squatting, standing, bending, reaching, lifting and climbing, that TVA has a record of his being so disabled and that he is regarded by TVA as having such a disability.

> thing I remember. And the next thing I remember is — faintly remember being
> in an ambulance on the way to the hospital. And then I went into a coma [until]
> February 3rd. . . . I found out later I had two blood clots on my brain. And I got
> a place right there and right there where they went in to get those blood clots out
> and . . . [I] couldn't keep my balance and [my] speech pattern wasn't right.

Deposition of Edward Smart of June 18, 1998, at 26-28. The physician who performed
surgery on Smart stated to a physician with TVA that as a consequence of his fall, Smart
suffered "a cerebral contusion [and] multiple skull fractures on each side with bilateral
epidural and subdural hematomas. . . ." Letter of Dr. Frank P. Haws to Dr. Samuel
Lizarraga of March 3, 1981, at 1. The physician also noted that "x-rays of the skull show
the linear left skull fracture and the cranial defects which are present from his previous
surgery in the posterior frontal and parietal areas of the skull from the craniectomies and
the evacuation of [blood] clots." *Id.* Smart, according to the physician, likely suffered, as
a consequence of his brain injury, "persistent organic brain syndrome secondary to
trauma." Among other difficulties actually suffered by Smart as a consequence of his
injury, he suffers from extremely poor balance, a lack of coordination, a speech
impediment, some mental diminution, and headaches. He is entirely restricted from
climbing or working with any equipment which might cause injury.

In June of 1979, after recuperating from his brain injury, Smart returned to work
as an apprentice painter and, in 1983 or 1984, graduated to the position of a journeyman
painter. Although tied by medical restrictions to ground level work and by the sense of
his supervisors to non-hazardous work, Smart acted as a journeyman painter at TVA,
applying fire retardant paint with a roller to temporary wood scaffolding, until he was
terminated in a 1988 reduction in force. Because of his brain injury, OWCP awarded
Smart FECA benefits.

Smart, after being terminated by TVA, did not search for work; he found his
limitations — his inability to climb, his poor balance and headaches — to present too
great a difficulty to his finding good work. However, on July 15, 1991, Smart returned

to work with TVA as an employee in its REHN program. He was employed in a position in the document control records management department at the Browns Ferry Nuclear Plant. Smart was responsible for "[c]ounting documents, numbering the pages, [and] preparing them for the microfilming."

In 1992, at his own request, Smart was transferred to the document control department at the Bellefonte Nuclear Plant, where his responsibilities changed to document verification. Smart, capable at his job, received promotions and an expansion of his responsibilities to include duties in the mailroom. Even though able to perform his job, Smart was nonetheless limited in what he could physically and mentally do, as he was required to take care when moving about the plant and to hold on to the railing whenever he climbed stairs.

On a Friday, February 11, 1994, while climbing steps at the Bellefonte plant, Smart lost his balance and began to stumble. Although he caught himself before falling, he pulled his knee. The next day, because the pain from the injury had grown worse, Smart went to the hospital to have the knee examined. Although there is no indication in the record of what the knee injury consists, the injury required surgery. Subsequent to the surgery, Smart was required to wear a knee brace and Smart has testified that unless he exercises his knee, the injury will begin to cause him pain during the day.

On September 20, 1995, Smart was transferred to TVAS. On July 26, 1996, Smart received a reduction in force notice. He was terminated in the reduction in force on September 30, 1996. After his termination, Smart worked on an assignment for Manpower, the temporary employment agency. At the time of his deposition, Smart was working at least forty hours per week, though not as a full-time employee with benefits, at a compact disk manufacturing plant.

Within a month after receiving his reduction in force notice, on August 22, 1996, Smart contacted the EO office at TVA to obtain mandatory pre-complaint disability

discrimination counseling.   In an interview with the EO counselor conducted on September 29, 1996, Smart alleged that he had been terminated, denied productive work and refused training because of his disability.  Smart's complaints of discrimination were unresolved by TVA and his counseling ended on October 1, 1996.  He was sent a notice of the completion of counseling on October 9, 1996.

On October 23, 1996, Smart sent an EEO complaint to TVA's EO office,[69] in which he claims to have been subjected to discrimination on the basis of his disability when he was terminated in the September 30, 1996, reduction in force.   In an incorporated attachment drafted by his attorney, utilizing much the same rote language used in several other attachments made by Plaintiffs in this suit to their EEO complaints, Smart claims to have been classified in a discriminatory fashion, discriminatorily transferred to TVAS, denied employment in a non-REIN position and denied adequate training.  On November 1, 1996, Smart was sent notification of acceptance of his EEO complaint, in which the EO compliance office characterizes his claim as one for discriminatory termination.  Smart did not respond to this characterization of his claim.  On March 24, 1997, Smart was informed by mail that the investigation of his complaint had been completed and was given notice that a final agency decision would be forthcoming.  Over one hundred eighty days having passed from the filing of his EEO complaint, on September 3, 1997, Smart filed his initial complaint in the present action.

Smart claims that the injury to his head and his knee injury are impairments which substantially limit him in the major life activity of working.  As a consequence of the appreciable physical and mental limitations caused by his impairments, he is unable to perform a broad class of jobs.  For example, Smart asserts, he can no longer work as a

---

[69] The EEO complaint was stamped received by the EO compliance office on October 28, 1996.

painter. He also claims that TVA had a record of such a disability and that it regarded him as having such a disability.[70]

### 15. Lanny Smith.

Smith started work on a temporary basis as an ironworker with TVA at its Yellow Creek facility in 1980. Thereafter, Smith was employed in various temporary positions with TVA, until on March 28, 1989, while working at TVA's Fossil and Hydro Construction at Muscle Shoals, Smith was injured. While attempting to move a piece of heavy equipment, Smith caught his foot in a length of pipe and fell. As a consequence, he suffered low chronic back strain, characterized by him as "[s]pondylolisthesis at L-5." After the injury, Smith did not return to his employment until he was hired into the REIN program.

Smith successfully applied for FECA benefits from OCWP in 1989, which he received until he was released to return to work in January or February of 1991. At that time, TVA sent Smith for a vocational assessment which identified a number of areas in which Smith was suited to work. Smith discovered that he could obtain and profit from a degree in industrial technology and was, initially, encouraged by TVA to return to college and obtain the degree. However, prior to embarking on his academic career, Smith was presented with a Hobson's choice, with the inevitable conclusion that his further education be put aside. Required to accept a position in the REIN program or lose his FECA benefits (which would have helped pay for the college education), Smith chose to accept a position in the REIN program as a clerk-receptionist, SB-3, at the Browns Ferry Nuclear Plant. He went to work for TVA on July 8, 1994.

---

[70] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Smart, for the first time, contends that as a consequence of his injuries, he is substantially limited in the major life activities of thinking, speaking, maintaining balance, walking, reaching, stooping, kneeling and climbing, that TVA has a record of his being so disabled and that he is regarded by TVA as having such a disability.

Smith was employed by TVA as a clerk-receptionist for the next four years. While employed as a clerk-receptionist in the human resources department, Smith realized an interest in human resources management and attended night courses at a local community college to obtain some of the necessary training. In November of 1993, Smith re-injured his back and was required to abstain from his work until February of 1994.[71]

In the late Spring of 1995, Smith became aware that he soon would be transferred to TVAS, where he would be prepared for an impending 1996 layoff. Smith took the information poorly and began drinking heavily. To prevent a descent into alcoholism he enrolled at Bradford Health Services in Madison, Alabama. He recovered from his alcohol abuse and was released on July 15, 1995. During the recovery, it was discovered that Smith suffered from depression, for which he was prescribed medication. After returning to work, Smith received notice that his position was at risk and he was subsequently transferred to TVAS. On July 24, 1996, he was informed of an impending reduction in force in which his position was targeted; he was terminated on September 30, 1996. At the time of his deposition, Smith was trying to start an ironwork construction company.

On September 10, 1996, Smith contacted the EO office at TVA to obtain mandatory pre-complaint disability discrimination counseling. In an interview with the EO counselor conducted on September 18, 1996, Smith stated his belief that TVA discriminated against him because of his disability by terminating him, by not providing him purposeful work and by denying him meaningful training. His complaints of discrimination went unresolved and his counseling was completed on either September 24, 1996, or October 1, 1996.[72] TVA sent final notice of the completion of counseling to Smith on October 9, 1996.

---

[71] Smith was, on his return, placed in a "full body brace" to permit him to work without having to undergo surgery.

[72] The EO counselor's report is internally conflicting on this point.

On October 25, 1996, Smith filed an EEO complaint with TVA's EO office, in which he claims to have been the target of disability discrimination when he was terminated in the September 30, 1996, reduction in force. In an amendment attached to his EEO complaint and authored by his attorney, Smith claims to have been classified in a discriminatory fashion, transferred to TVAS for discriminatory reasons, refused positions outside of the REIN program and denied training that would permit him to find other work.

TVA's EO compliance office sent by certified mail on November 1, 1996, notification of receipt and acceptance of Smith's claim of discrimination, stating that it had accepted for investigation his claim that he was terminated on the basis of disability. Smith did not respond to this characterization of his claim. However, in an interview conducted by the EO investigator on November 14, 1996, Smith consistently reiterated his complaint that he was denied training.

On March 24, 1997, Smith was notified through mail by TVA's EO that the investigation of his complaint had been completed and that a final agency decision would be forthcoming. One hundred eighty days having passed from the filing of his EEO complaint, on October 17, 1997, Smith filed his initial complaint in the present action.

Smith's claim is that the injury to his back and his depression are impairments which substantially limit him in the major life activity of working. Because of his back injury, Speer asserts, he is incapable of performing a broad class of jobs. For example, he asserts that he is incapable of performing any work as an ironworker, carpenter, millwright, boilermaker or electrician. In addition, he states that he has limitations on bending, stooping, twisting, climbing and sitting that affect his ability to work. Smith

further claims that TVA had a record of such a disability and that it regarded him as having such a disability.[73]

### 16. Frank Speer.

Speer was originally hired by TVA in May or June of 1970 to work at its Browns Ferry Nuclear Plant. After a four-year period there, he went to work at the Sequoyah Nuclear Plant, returned to the Browns Ferry plant and, in 1978, went to work at the Bellefonte Nuclear Plant, as a pipefitter. On August 1, 1988, while attempting to lift an oxygen bottle, Speer pulled a disc in his back. As a consequence of his injury, Speer left his employment at TVA for two years. During this period, he drew FECA benefits from OWCP.

Subsequent to his injury, Speer spent two semesters attempting, with the help of the OWCP, to obtain a college degree, but, after this failed, he was approached to enter the REIN program in late 1990. Prior to entering the program, Speers underwent a medical evaluation in which it was determined by a physician that he should be restricted from bending, twisting and climbing and that he should lift no more than twenty to thirty pounds at a time.[74] Believing that he was being offered a permanent position, in November 1990, Speers started employment at the Browns Ferry plant as a Storage Clerk,

---

[73] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Smith, for the first time, contends that as a consequence of his back injury, he is substantially limited in the major life activities of bending, stooping, twisting, climbing and sitting, that TVA has a record of his being so disabled and that he is regarded by TVA as having such a disability. Curiously, Smith makes nothing of his depression in attempting to demonstrate that he suffers a disability because none of his substantial limitations are related to that impairment. The Court believes this to be a consequence of the Plaintiffs' narrow-sighted focus on work-related injuries as being the only bases for proving the existence of a disability.

[74] In a January 26, 1993, examination, Speer was found to have the same restrictions on him as existed in 1990, which imposed upon him a medium to limited physical demand classification.

SB-2, where he received shipments on the loading dock at the facility. During this time and with success in his position, Speer obtained a pay grade increase to SB-3.

Shores again injured his back in January of 1995, shattering a disc in his spine. He underwent surgery to remove the disc and was unable to return to work until June 13, 1995.[75] Shortly thereafter, in mid-July of 1995, he received notice that his position was at risk and he was being transferred to TVAS. After receiving notice on July 24, 1996, of an impending reduction in force, Speer was terminated on September 30, 1996. Since his termination, Speer has found two jobs. Not long after his termination, Speer was employed as a sales clerk at an Ace Hardware store but subsequently quit. He was, at the time of his deposition, employed as a security guard at Wells Fargo.

On August 6, 1996, Speer contacted the EO office at TVA to obtain mandatory pre-complaint disability discrimination counseling. The next day, Speer was interviewed by an EO counselor, to whom Speer complained that he was terminated on the basis of his disability. His complaints of discrimination going unresolved, Speer's counseling ended on September 1, 1996. TVA sent final notice of the completion of counseling to Speer on October 9, 1996.

On October 18, 1996, Speer sent to TVA's EO compliance office his EEO complaint, in which he claims to have been subjected to discrimination on the basis of his disability when he was terminated in the September 30, 1996, reduction in force. In an attachment to his EO complaint authored by his attorney, Speer claims to have been classified in a discriminatory fashion, transferred to TVAS for discriminatory reasons, refused a non-REIN position and denied adequate training. On November 1, 1996, the EO compliance office sent Speer a notification that it had received his complaint, in which the EO compliance office only states that Speer's claim that he was terminated on the basis

---

[75] Although Speer's disk was ruptured, his medical restrictions remained unchanged, as noted in a September 9, 1998, medical evaluation.

of disability was accepted for investigation. Speer did not contest this characterization of his claim.

On March 24, 1997, Speer was notified through mail by TVA's EO compliance office that the investigation of his complaint had been completed and that a final agency decision would be forthcoming. Over one hundred eighty days having passed from the filing of his EEO complaint, on September 3, 1997, Speer filed his initial complaint in the present action.

Speer claims that the injury to his back is an impairment which substantially limits him in the major life activity of working.[76] Because of his back injury, Speer asserts, he is incapable of performing a broad class of jobs. For example, he is incapable of performing any construction-type work. Speer also states that a thirty-pound limitation on his ability to lift and other limitations on his ability to squat, to sit and to stand render him unable to perform a spectrum of work. In addition to his argument that he has such a disability, Speer claims that TVA had a record of such a disability and that it regarded him as having such a disability.[77]

## 17. James R. Williams.

In 1976, Williams was hired as a boilermaker, primarily working at TVA's Cumberland City, Tennessee, Coal-Fired Plant. At some point, he moved to TVA's

---

[76] From the deposition testimony of Speer, in which he states that he is taking insulin, there is some indication that Speer, in addition to the back injury alleged as a disabling condition, also suffers from diabetes. However, Speer has failed to bring this out a basis for his claims of disability. The court is confused and troubled by this fact. This is a result, as this Court has notice, of the Plaintiff's single minded focus on work-related injuries as bases for establishing disability.

[77] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Speer, for the first time, contends that as a consequence of his back injury, he is substantially limited in the major life activities of sitting, standing, bending, kneeling, squatting, climbing, twisting, and lifting, that TVA has a record of his being so disabled and that he is regarded by TVA as having such a disability.

Colbert Steam Plant, where he sprained his right ankle, resulting in his having to place the ankle in a cast for six to eight weeks. He again injured the ankle in 1984, while again working at the Cumberland City facility. Arriving at work, Williams was required to step over some crossties as he entered the gate. He misstepped, severely spraining his ankle. After recovering from his injury, Williams attempted to return to work, but failed a welding test. He then attempted to work as a mechanic for TVA, but it would not hire him into a mechanic position with his restrictions.[78]

After failing to secure a job with TVA, Williams collected FECA benefits from the OWCP. At the same time that he was receiving benefits, he applied for a number of positions, including welding positions, to no avail. Williams also received a vocational assessment which identified a number of positions that he could perform, including welder, postal clerk, materials clerk, and sales clerk.

In 1991, Williams was contacted by John Bryson ("Bryson") at the Browns Ferry Nuclear Plant about the REIN program. On February 4, 1991, Williams began to work for TVA as an Engineering Aide, SE-3. As an Engineering Aide, Williams was responsible for maintaining TVA vehicles and for keeping the Maintenance department's training up to date and coordinated. In 1992 or 1993, Williams received a grade scale increase to SE-4. In Summer of 1995, Williams was notified of his transfer to TVAS, but at the plant management's request he continued to work at his then-current job for an additional six months. On September 30, 1996, Williams was terminated in a reduction of force, of which he received notice on July 24, 1996.

---

[78] About TVA's refusal to hire him into a mechanic position, he states:

I filed a complaint with EEO. **I won that suit**. TVA said I would never be discriminated against because of my handicap, and now I've [been subject to discrimination] again. . . .

Deposition of James R. Williams of June 17, 1998, at 19 (emphasis added). However, neither the Plaintiffs nor the Defendants have produced a copy of any decision of the TVA favorable to Williams. The Court is at a loss to see why this was not produced, as Williams's claim that he is disabled could be established as a matter of collateral estoppel.

On August 29, 1996, Williams contacted the EO office at TVA to obtain mandatory pre-complaint disability discrimination counseling. During counseling, conducted on August 29, 1996, Williams expressed his belief that his impending termination was due to disability discrimination. His counseling ended on October 1, 1996, and was classified "unresolved" by the EO counselor. Final notice of the completion of counseling was sent to Williams on October 9, 1996.

On October 20, 1996, Williams filed an EEO complaint with TVA's EO compliance office, in which he claims to have been subjected to discrimination on the basis of his disability when he was terminated in the September 30, 1996, reduction in force. In a formulaic attachment to his EEO complaint drafted by his attorney, Williams claims to have been classified in a discriminatory fashion, transferred to TVAS for discriminatory reasons, refused a non-REIN position and denied adequate training. In a letter sent to Williams by TVA's EO compliance office, the EO office explicitly confines his claim to one for discriminatory termination. In an interview conducted on November 13, 1996, by the EO investigator, Williams confirmed that the EO compliance office's characterization of his claim was correct.

On March 24, 1997, Williams was notified through mail by TVA's EO that the investigation of his complaint had been completed and that a final agency decision would be forthcoming. After one hundred eighty days had passed from the filing of his EEO complaint, Williams filed his initial complaint in the present action on August 4, 1997.

Williams claims the injury to his ankle is an impairment which substantially limits him in the major life activity of working. Williams asserts that his ankle injury renders him incapable of performing a broad class of jobs. According to Williams, he cannot walk on uneven ground or make turns while walking because his ankle will give way beneath him. Further, he states, he has been restricted by doctors from climbing at unprotected heights, from prolonged walking, and from lifting in excess of twenty to thirty pounds.

Finally, he claims to be unable to perform any work "pertaining to construction." Deposition of James R. Williams of June 17, 1998, at 84. He also claims that TVA had a record of such a disability and that it regarded him as having such a disability.[79]

## D. Fossil and Hydroelectric Power Reentry Program.

With the REIN program enjoying some success in re-employing workers receiving FECA benefits, in June of 1992, TVA created another, similar program to be funded through TVA's Health Services Organization and to be offered through TVA's Fossil and Hydroelectric Power Program. As with the REIN program, the new program, named the "Reentry program," rehired individuals receiving FECA benefits, representing to them that, if they later lost their jobs, they would return to full compensation. However, after termination, none of the Reentry Plaintiffs was returned to full FECA benefits. Ten people were hired into the program, four of whom, after they were terminated in a 1996 reduction in force, filed suit.

### 1. Jerry Chandler.

J. Chandler was hired by TVA in 1982 and worked at a Muscle Shoals plant on a demolition job and at the Browns Ferry Nuclear Plant as a construction laborer. While working at the Muscle Shoals plant, J. Chandler injured a muscle in his back. However, the injury was dismissed as a pulled muscle. Later, when working at the Browns Ferry plant, J. Chandler was attempting to unload a truck when he injured his back once more. It was then determined that J. Chandler had a herniated disk in his back. He underwent surgery on December 23, 1984, and in May or June of 1985, J. Chandler returned to

---

[79] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Williams, for the first time, contends that as a consequence of his ankle sprain, he is substantially limited in the major life activities of walking, standing and climbing, that TVA has a record of his being so disabled and that he is regarded by TVA as having such a disability.

work. He stayed at the job three days before he concluded that his back would not permit him to continue working as a construction laborer. He then left his employment with TVA.

After his operation and before returning to work at the Browns Ferry plant, J. Chandler successfully applied for FECA benefits from OWCP. He was restored to those benefits after he left work in 1985. While on FECA benefits, J. Chandler, in an attempt to receive training that would make him again employable, enrolled at Muscle Shoals Technical College in February of 1987. There he obtained an associate's degree in applied sciences and electronics.

On February 26, 1990, J. Chandler was rehired by TVA into its REIN program at Muscle Shoals as an electrical aide, SE-3. In that position, he received and issued blueprints, made coordinating construction work and tracked work through its completion. By February of 1991, he was promoted to an SE-4 position. In February of 1992, J. Chandler was laid off in a reduction of force due to a lack of funding for the REIN program. After he was laid off, J. Chandler was hired by an independent contractor to work on a project at TVA. That employment lasted six months, until July of 1992, when he was terminated.

In January of 1993, after he had been furloughed for six months, J. Chandler had a recurrence of his injury and he returned to full FECA benefits in April of 1993. On October 1, 1993, J. Chandler was hired into TVA's Reentry program to work as an electrical aide at the Colbert Fossil Plant in Tuscumbia, Alabama. According to J. Chandler, he was hired to work through an "outage," performing essentially the same work that he had performed while working as an electrical aide at Muscle Shoals. He worked at Colbert for sixteen months and, in February 1995, he was sent to work in the Health and Safety department at the Live Well Center in Muscle Shoals, where he was responsible for repairing and calibrating air, noise, gas and air monitors. Six months later,

on October 1, 1995, he was transferred to TVAS. On July 24, 1996, J. Chandler was notified of an impending reduction in force. In that reduction in force, he was terminated on September 30, 1996. J. Chandler alleges that after his termination, he suffered a recurrence of his injury on December 2, 1997, when it was determined that he was suffering from a narrowing in the spine and degenerative disk disease.

J. Chandler contacted the EO office at TVA by letter on August 23, 1996, seeking disability discrimination counseling. Counseling was initiated on August 29, 1996. During that counseling, J. Chandler complained only of discrimination relating to the reduction in force. The complaints of discrimination by J. Chandler were not resolved by TVA and the EO counselor informed J. Chandler of such on September 18, 1996. His counseling ended then and he was sent a notice of the completion of counseling on October 9, 1996.

On October 21, 1996, J. Chandler sent an EEO complaint to TVA's EO office, which was received on October 25, 1996, in which he claims to have been subjected to discrimination on the basis of his disability when he was terminated in the September 30, 1996, reduction in force. In an incorporated attachment written by his attorney, J. Chandler claims to have been classified in a discriminatory fashion, to have been transferred to TVAS for discriminatory reasons, to have been denied a non-Reentry position because of his disability and to have been denied adequate training on a discriminatory basis. A letter informing J. Chandler of the receipt of his EO complaint was sent on November 1, 1996; as regards his claims, the letter states only that his claim of discriminatory termination had been accepted for investigation. J. Chandler did not challenge that characterization. On March 7, 1997, J. Chandler was informed by mail that the investigation of his complaint had been completed and was told him that a final agency decision would be forthcoming. After one hundred eighty days passed from the

filing of his EEO complaint, on August 4, 1997, J. Chandler filed his initial complaint in the present action.

J. Chandler asserts that, at the time he was in the Reentry program, his back injury constituted an impairment which substantially limited him in the major life activity of working. At the time that he was rehired into the REIN program in 1990, J. Chandler allegedly was restricted from bending and climbing. He was limited in the amount of walking he could perform. Finally, he was advised not to lift in excess of fifty pounds.[80] As a consequence, he asserts, he is unable to perform a broad class of jobs. He also claims that TVA had a record of such a disability and that it regarded him as having such a disability.[81]

## 2. Michael Murks.

Murks came to work for the first time at TVA's Browns Ferry Nuclear Plant in 1974, as a laborer. In 1976, he left TVA to work at Ford Motor Company, but he was rehired at the Browns Ferry plant in 1979 as a steamfitter. On September 1, 1988, while attempting to lift a ten-foot long shaft, Murks slipped, twisting and injuring his back. As a consequence of the injury, Murks claims to suffer two herniated discs in his lower back, impairing his use of his lower back and left leg. Because of his injury, Murks was unable to return to his job and he received FECA benefits from the OWCP. While receiving those benefits, Murks returned to college and obtained a bachelor of science degree in

---

[80] J. Chandler states that the amount he was permitted to lift has subsequently been lowered, though he does not state to what degree it has been lowered.

[81] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, J. Chandler avers that as a consequence of his injury, he is substantially limited in the major life activities of walking, sitting, bending, lifting and climbing, that TVA has a record of his being so disabled and that he is regarded by TVA as having such a disability.

management.    In 1991, Murks was adjudged disabled by the Social Security Administration.

Murks was hired into the Reentry program on June 1, 1993, to work as a training specialist, PG-1. According to Murks, "It was a position that was created where my duties were to perform training, facilitate training, but the only catch to it was . . . that . . . the training was strictly voluntary." As the training provided by Murks was voluntary, Murks would often spend long periods of time at TVA with no work to perform. In May of 1994, Murks suffered a recurrence of his injury, necessitating emergency surgery on his back. While recuperating from his surgery, in October of 1994, Murks was informed that, upon his return to TVA, he would be transferred to TVAS. In May of 1995, upon returning to work, Murks was transferred into TVAS. On July 24, 1996, Murks received notice that he was to be terminated because of budgeting concerns. On September 30, 1996, Murks was terminated.

Murks sent a letter to the EO office at TVA on August 23, 1996, asserting a belief that he had been the subject of discrimination and seeking counseling. Murks met with a counselor on August 29, 1996, who listened to Murks's complaints and informed Murks of his rights and responsibilities. Murks informed the counselor of his belief that he had been discriminated against on the basis of his disability when TVA denied him a non-Reentry job and subsequently terminated him. His complaints of discrimination by Murks went unresolved, as TVA denied taking any action against him on the basis of a discriminatory motive. Counseling ceased after a final interview on September 17, 1996 and Murks was sent a notice of the completion of counseling on October 9, 1996.

On October 22, 1996, Murks sent an EEO complaint to TVA's EO office, which was stamped "received" on October 25, 1996. In an incorporated attachment, Murks claims to have been subjected to discrimination on the basis of his disability when he was terminated in the September 30, 1996, reduction in force, classified in a discriminatory

fashion, transferred to TVAS for discriminatory reasons, refused a position in a non-Reentry position and denied adequate training on a discriminatory basis. Through a notice of receipt and acceptance of his complaint sent to him by TVA's EO compliance office on November 4, 1996, Murks was informed that the EO compliance office had accepted for investigation his complaint that he was terminated for a discriminatory reason. He was not informed of the investigation of any other claims. Although he did not provide a written response to this characterization of his complaint, during the investigation of his complaint by the EO investigator, Murks discussed at length the positions for which he applied without success — including a safety technician position for which he applied — as a basis for his complaint.[82]

On March 4, 1997, Murks was informed in a letter from TVA's EO compliance office that the investigation of his complaint had been completed and informing him that a final agency decision would be forthcoming. One hundred eighty days after the filing of his EEO complaint, on August 4, 1997, Murks filed his initial complaint in the present action.

Murks asserts that at the time he was in the Reentry program, his back injury constituted an impairment which substantially limited him in the major life activity of working. Murks alleges that because of his impairment, his physician has restricted him to jobs in which he can sit, stand or walk as needed, in which he is required to lift no more than ten pounds and in which he is not required to squat, climb or bend. As a consequence, Murks asserts, he is unable to perform a broad class of jobs. He also claims

---

[82] During the interview, Murks states that TVA provided him with adequate amounts of training, however.

that TVA had a record of such a disability and that it regarded him as having such a disability.[83]

### 3. Millard Shelton.

In 1968, Shelton started work for TVA as an ironworker. He worked on an intermittent basis until he was employed as a structural ironworker at TVA's Browns Ferry Nuclear Plant in 1979, where he remained employed until October of 1982, when a piece of steel fell and crushed his left hand. Injured, Shelton left work and received FECA benefits from the OWCP. By May 18, 1983, Shelton was released to perform light duty work, with limited climbing, no gripping and no lifting in excess of twenty-five pounds.[84]

In 1984, Shelton was hired into a clerical position in TVA's Energy Use and Distributor Relations Department located in Florence, Alabama. While there, Shelton's duties mainly included running errands, keeping the library straightened and servicing automobiles. In 1988 or 1989, he was terminated from the clerical position in a reduction in force. In 1990, OWCP sent Shelton to school to learn the upholstery trade. After completing one and one-half years at the school, Shelton stepped on a wooden board and twisted his right knee, injuring it.

After recovering from his knee injury, Shelton was hired through the Reentry program as a clerk, SB-2, at the Colbert Steam Plant on September 13, 1993. Prior to being reemployed by TVA, his doctor increased his restrictions to no bending, limited

---

[83] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Murks avers, for the first time, that, as a consequence of the two herniated discs in his lower back, he is substantially limited in the major life activities of walking, sitting, standing, stooping, squatting, bending, reaching, and lifting, that TVA has a record of his being so disabled and that he is regarded by TVA as having such a disability.

[84] At the time of his deposition on June 16, 1998, Shelton's hand injury had improved somewhat. Nonetheless, he still lacked the strength to grip objects. Further, he claims that his hand bothers him during cold weather.

standing, and limited climbing. He remained in the clerk position at Colbert Steam Plant until 1994, when he began to have a breathing problem. Because of that problem, he was then transferred to the Live Well Center in Muscle Shoals, where he continued working as a clerk. His responsibilities included making coffee, keeping exercise equipment clean, and showing others how to operate equipment. In October of 1995, Shelton was transferred to TVAS. On July 24, 1996, Shelton received a letter informing him of an impending reduction of force at TVA of which he was a target. Shelton was terminated on September 30, 1996.

On August 26, 1996, Shelton sent a letter to the EO office at TVA, in which he complains that he had been the subject of discrimination when he was terminated and in which he asserts that he seeks counseling. On August 29, 1996, Shelton met with a counselor in Muscle Shoals, who listened to Shelton's complaints and then informed Shelton of his rights and responsibilities. In the counseling session, Shelton informed the counselor of his belief that he was being terminated because of his disability. Because Shelton's complaints of discrimination went unresolved, counseling ceased after a final interview conducted on September 11, 1996. Shelton was sent a notice of the completion of counseling on October 9, 1996.

On October 21, 1996, Shelton sent an EEO complaint to TVA's EO compliance office, which was stamped "received" on October 25, 1996. In an incorporated attachment authored by his attorney, Shelton claims to have been subjected to discrimination on the basis of his disability when he was terminated in the September 30, 1996, reduction in force, classified in a discriminatory fashion, transferred to TVAS for discriminatory reasons, denied a non-Reentry position because of his disability and denied adequate training on a discriminatory basis. The EO compliance office sent Shelton notice of receipt and acceptance of his discrimination complaint on November 1, 1996, accepting

for investigation his complaint of discriminatory termination. Shelton did not challenge the action accepted to be investigated by the EO compliance office as discriminatory.

On March 4, 1997, Shelton was informed in a letter from TVA's EO office that the investigation of his complaint had been completed and informing him that a final agency decision would be forthcoming. After more than one hundred eighty days passed from the filing of his EEO complaint, on August 4, 1997, Shelton filed his initial complaint in the present action.

Shelton contends that at the time he was in the Reentry program, his injured hand and knee constituted impairments which substantially limited him in the major life activity of working. Shelton alleges that because of his impairment, he is unable to perform a broad class of jobs such as those of ironworker, steamfitter, sheet metal worker, operating engineer or laborer. He also claims that TVA had a record of such a disability and that it regarded him as having such a disability.[85]

### 4. Troy Tucker.

Tucker was hired as a carpenter to work at TVA's Yellow Creek facility in August of 1978. On August 7, 1979, Tucker fell into a dial pin, which pierced through his left knee, leaving him with chondromalacia of his left patella. Despite his injury, Tucker continued to work as a carpenter for TVA, on light duty, until he was laid off in a reduction in force in April of 1982. He then successfully applied for FECA benefits from OWCP. He remained out of work until 1988. While out of work, Tucker also applied for disability benefits from the Social Security Administration. While initially denied

---

[85] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Shelton avers, for the first time, that, as a consequence of his injuries, he is substantially limited in the major life activities of walking, standing, stooping, squatting, kneeling, climbing, lifting, reaching, grasping and performing manual tasks, that TVA has a record of his being so disabled and that he is regarded by TVA as having such a disability.

benefits, he eventually was determined to be "disabled" by the Social Security Administration and began to draw benefits.

In 1988, Tucker was contacted by OWCP and informed that it sought to send him to rehabilitation training. He spent two years in the training until October of 1990, learning to type and taking high school equivalency courses. Soon after he completed his training, on November 1, 1990, Tucker was employed as a clerk receptionist, SB-2, in the personnel department at Browns Ferry Nuclear Plant through the REIN program, where he worked for nearly two and one-half years.[86] He was then transferred to the Browns Ferry Nuclear Training Center, where he worked for a few months more than a year. Dissatisfied with his job because it required him to be located far from his family home, located in Southaven, Mississippi, Tucker inquired about a transfer to another location.[87]

In February of 1993, Tucker received a transfer to TVA's Cordova Substation, located near Memphis, Tennessee, where he worked as a clerk in the Customer Group. The position was funded through the Reentry program. Four months later, on June 15, 1993, Tucker was removed from the position, apparently because of performance problems.[88] Tucker was then sent on a sixty-day temporary assignment to Muscle Shoals

---

[86] Upon being re-employed by TVA, the Social Security Administration ceased to pay Tucker disability benefits.

[87] Tucker's contention about the length of time he spent at the two jobs at Browns Ferry in Decatur, Alabama, cannot be correct, because if he spent two and one-half years at one position and over one year at another, Tucker would have spent at least three and one-half years at the Browns Ferry facility. If that were the case, his transfer would have occurred in May of 1994, rather than in February of 1993, when the transfer actually occurred.

[88] Tucker alleges to have no knowledge of any problems with his performance. He states that he was removed from that position without explanation. Tucker also avers that he remained in that position for one year.

in an attempt to rehabilitate him for future employment. While there, in July of 1993, Tucker was required to undergo psychometric testing.[89]

On August 17, 1993, Tucker received notice that his position as a clerk-receptionist, SB-2, was being "surplused" as of August 23, 1993, due to an absence of work and that he was being transferred to the employee transition program.

Tucker contacted TVA's EO office on August 18, 1993, complaining that he was subjected to discrimination on the basis of disability and age when he was required to undergo psychometric testing, when he was transferred into the employee transition program and when he was denied either other positions with TVA or disability retirement benefits. Tucker's complaint was not resolved through counseling and he filed a EEO complaint with the EO on October 27, 1993. On August 24, 1994, in a final agency decision, TVA determined that Tucker had not been the victim of discrimination with respect to any of his claims. Nonetheless, TVA made the following determination about Tucker's disability:

> In order to determine whether the complainant [Tucker] is a handicapped individual, the evidence regarding the complainant's medical condition must be reviewed. As a result of his fall in 1979, the complainant suffered permanent damage to his left knee which necessitates the wearing of a knee brace and walking with the assistance of a cane. He has numerous medical constraints which include no bending, squatting, climbing, or operating vehicle foot controls, and limited lifting (0-10 lbs.). The complainant is approved to do sedentary work with the opportunity to move and rest. The foregoing evidence is sufficient to establish that the complainant is a handicapped person since he has a documented

---

[89] The testing report references a functional capacities evaluation dated January 20, 1993, in which Tucker is limited to six hours continual sitting, two hours walking and two hours of standing in an eight hour work day; to a maximum lifting capacity of ten pounds for one hour per day; to no bending, squatting, or climbing; and to intermittent kneeling or twisting. The testing report also notes a moderate to severe hearing loss in high tones in both ears and possibly mild hearing loss in low tones in both ears. While this would constitute an impairment which might substantially limit Tucker in the major life activity of *hearing*, Tucker never raises this impairment as a basis for his claim that he is disabled under the Rehabilitation Act.

history of physical impairment which substantially limits a major life activity and he was perceived by management as having such an impairment.

TVA Final Agency Decision on Claims of Troy Tucker of August 24, 1994, at 4. Apparently, Tucker did not appeal the decision.

Eventually, in 1995,[90] Tucker landed in TVAS. On July 24, 1996, Tucker received notice that his job with TVA would be eliminated in an impending reduction in force. On September 30, 1996, Tucker was terminated from his employment with TVA. In 1997, Tucker began to draw benefits from the Social Security Administration for a second time.

On September 20, 1996, the EO compliance office at TVA received a letter from Tucker, in which he complains that he had been the subject of discrimination when he received notice of his impending termination and in which Tucker asserts that he desires counseling. On the same day, Tucker met with a counselor in Muscle Shoals, who listened to Tucker's complaints that he was terminated on the basis of his disability, and denied training and a meaningful job for the same reason. The counselor then informed Tucker of his rights and responsibilities. He also told Tucker that he was required to have initiated contact within forty-five days of TVA's decision to terminate him. Tucker's complaints of discrimination went unresolved and counseling ceased after the EO counselor conducted a final follow-up meeting with Tucker on October 3, 1996. Tucker was sent notice of the completion of counseling on October 9, 1996.

On October 21, 1996, Tucker sent an EEO complaint to TVA's EO office, which was stamped "received" on October 25, 1996. Tucker included two attachments to his complaint of discrimination. In the first attachment, drafted by Tucker himself, Tucker states that he was denied a meaningful job, given lessened wages, denied training, transferred to TVAS and terminated because of his disability. In an incorporated attachment authored by his attorney, Tucker claims to have been subjected to

---

[90] Other information indicated that he might have been transferred to TVAS in 1994.

discrimination on the basis of his disability when he was terminated in the September 30, 1996, reduction in force, to have been classified in a discriminatory fashion, to have been transferred to TVAS for discriminatory reasons, to have been denied a position outside of the Reentry program because of disability discrimination and to have been denied adequate training on a discriminatory basis. In its notice of receipt and acceptance of Tucker's discrimination complaint sent to Tucker on November 4, 1996, the EO compliance office states that based upon "the precomplaint counseling report and the complaint, you alleged that you were discriminated against because of your handicap . . . when you received a reduction in force notice on or about July 24, 1996, which resulted in the the elimination of your clerk-receptionist, SB-2, position. . . ." Notice of Receipt and Acceptance of Discrimination Complaint of Troy J. Tucker of November 4, 1996, at 1. Tucker never contested this characterization of his claim. On March 7, 1997, Tucker was informed through a letter from TVA's EO office that the investigation of his complaint had been completed and informing him that a final agency decision would be forthcoming.

A final agency decision was issued on September 26, 1997. In that decision, TVA primarily addresses Tucker's claims concerning the elimination of his position with TVA. In its decision, TVA notes that Tucker alleged "that he is limited in his ability to sit, bend, climb, stoop, squat or walk, he tends to fall when his knee gives way under him, and he is unable to lift anything heavy or perform any carpentry work." TVA Final Agency Decision on Claims of Troy Tucker of September 26, 1997, at 3. TVA also states in the decision that while Tucker had likely not satisfied his initial burden of demonstrating a *prima facie* case, TVA would assume that Tucker had carried his initial burden. TVA nonetheless found that Tucker had failed to carry his ultimate burden by failing to demonstrate that TVA's reasons for discharging him were pretextual. Thus, TVA determined, Tucker's claims of disability discrimination failed. Tucker, just prior to

receiving the final agency decision, on September 19, 1997, filed his initial complaint in the instant case.

Tucker contends that at the time he was in the Reentry program, his injured knee constituted an impairment which substantially limited him in the major life activity of working.[91] Because of his impairment, Tucker states, he is required in order to prevent his left leg from giving way, to keep his left leg in a brace and to use a cane. Further, Tucker's leg, as a consequence of his knee injury, has atrophied. In addition, he contends, he is restricted from kneeling, stooping, crawling, climbing ladders, heavy lifting and walking over rough terrain. Unable to perform a broad class of jobs, such as those of ironworker or carpenter, Tucker contends that he is substantially limited in his ability to work. He also claims that TVA had a record of his disability and that it regarded him as having a disability.[92]

With some exceptions, all Plaintiffs present two factual constants in their cases of discrimination. The first of these, at least until this Court's entry of its order and proposed opinion, is a common basis for the conclusion that the Plaintiffs are all disabled as defined in 29 U.S.C. § 705(9)(B): Every plaintiff claims *solely* that he or she (1) suffers from an impairment that substantially limits him or her in the major life activity of *working*; (2) has a record of an impairment that substantially limits him or her in the major life activity of *working*; or (3) was perceived by TVA as suffering from an impairment that substantially limits him or her in the major life activity of *working*. More clearly, these Plaintiffs allege

---

[91] While giving affidavit testimony to the EO compliance investigator, Tucker also stated that he suffered from a hip injury and back injury resulting from a slip and fall that occurred in a bathroom at TVA in 1994. He does not elaborate on the physical consequences of those injuries.

[92] In the Plaintiffs' Brief in Response to the Court's Order of July 22, 1999, Tucker avers, for the first time, that, as a consequence of his knee injury, he is substantially limited in the major life activities of walking, standing, sitting, climbing, bending, squatting, stooping, and lifting, that TVA has a record of his being so disabled and that he is regarded by TVA as having such a disability.

that they are disabled in *no other way* than with regard to the major life activity of *working*, to the exclusion of other grounds for demonstrating disability *available at the time they filed their complaints.*[93]

The second important commonality among all Plaintiffs' claims involves the asserted scheme by which all Plaintiffs were hired back to TVA and terminated, and the purported underlying reason for the scheme. The Plaintiffs seek to link the hiring of the Plaintiffs into separate classifications to their terminations in order to imply from the segregation of the Plaintiffs into these classifications that the apparently neutral reduction in force was, in fact, a discriminatory scheme. The hiring and the termination are pulled into an elaborate scheme, the ultimate purpose and motivating force of which was a desire to cut the costs that TVA was paying to OWCP on FECA benefit charge backs. These two commonalities — the Plaintiffs' reliance on *working* as the major life activity impacted by their impairments and the theory that Plaintiffs' hiring and termination were part of an overall scheme to reduce OWCP charge backs — form both the loci and nadirs of their claims of disability discrimination.

## Contentions & Analysis

To a substantial degree, the claims relevant to all Plaintiffs in this case are the same: Each Plaintiff contends that he or she was a qualified individual with a disability who was segregated into a separate job retention classification from other non-disabled TVA

---

[93] The Court has given these Plaintiffs three opportunities, after the initial motion for summary judgment was filed, to focus upon those facts on which they base their assertions that they are "individuals with disabilities." In each case, the Plaintiffs have failed to do so, reiterating in each case the sole argument, without elaboration, that they either are, have a record of being or are regarded as substantially limited in the major life activity of *working*. Only after entry of this Court's order of a proposed opinion did the Plaintiffs seek to change their theory of the case.

employees and that because of that separation, he or she was terminated because he or she could not compete against similarly situated employees not separately classified when TVA decided to eliminate that Plaintiff's position in a reduction in force. In the second amended complaints, the Plaintiffs assert three primary claims, all related to their terminations in the 1996 and 1997 reductions in force at TVA. First, the Plaintiffs all claim, TVA's segregation of them, which ultimately led to their termination, violates its duty set forth in § 501 of the Rehabilitation Act not to disparately treat disabled individuals by segregating them. *See* Plaintiffs' Second Amended Consolidated Complaint at 16-17. Second, the Plaintiffs claim that TVA intentionally discriminated against them in violation of § 504 of the Rehabilitation Act when it terminated them in a reduction in force because, although the reduction in force seemed neutral on its face, the classifications into which the Plaintiffs were herded were designed such that the Plaintiffs would, in fact, be terminated in TVA's next wide scale reduction in force.[94] *See* Plaintiffs' Second Amended Consolidated Complaint at 17-18. Third, the Plaintiffs claim that, even if unintentional, the segregated classifications caused the reduction in force to bear a disproportionate impact upon individuals with disabilities in violation of §§ 501 & 504 of the Rehabilitation Act. *See* Plaintiffs' Second Amended Consolidated Complaint at 18-19.[95]

---

[94] At separate points in their arguments, the Plaintiffs contend either that the classification and termination were part of an integrated scheme, with the ultimate termination being the final discriminatory act or that their classification alone was itself violative of the Rehabilitation Act. In an attempt to be thorough, the Court will treat these claims as though the Plaintiffs had stated them separately.

[95] The three general claims listed in the text are the sole claims alleged in the counts of the Plaintiffs' Second Amended Consolidated Complaint. As such, these will be the only claims of the Plaintiffs to be addressed in this memorandum opinion. While it appears that in previous briefs and arguments, the Plaintiffs have attempted to assert other claims, it was by no means clear that they had done so. In any case, the Second Amended Consolidated Complaint supercedes all prior complaints in the instant action and governs the claims that have been pled. *See Varnes v. Local 91, Glass Bottle Blowers Association of the United States and Canada*, 674 F.2d 1365, 1370 n.6 (11th Cir. 1982) ("As a general rule,

In analyzing the Plaintiffs' claims, the Court will first examine whether all of the Plaintiffs have met the jurisdictional and procedural prerequisites to bringing their claims in federal court. Second, the Court will examine the threshold issue for each Plaintiffs' claim — that is, whether each Plaintiff is disabled under the Rehabilitation Act. Resolving this issue will require this Court not only to examine what the Plaintiffs have, in the past, presented as reasons for finding them to be disabled but also whether each Plaintiff may assert other grounds for being determined an "individual with a disability" under the Rehabilitation Act. Finally, the Court will turn to the substantive aspects of each of the claims asserted by each Plaintiff.

## A.  Jurisdictional and procedural prerequisites to Plaintiff's claims.

In the instant case, the Defendants challenge the Plaintiffs' ability to bring any non-reduction in force disparate treatment claim under the Rehabilitation Act on the grounds that the Plaintiffs did not timely raise their claims with TVA's EO compliance office and that they failed to exhaust their administrative remedies on those claims that were raised. With respect to Dutton, who never complied with the administrative procedures of the EO compliance office, the Defendants argue that Dutton's attempt to "piggyback" onto L. Chandler's action is barred because Dutton joined L. Chandler's action outside of the thirty-day limitations period.

The Plaintiffs respond first that their disparate impact claim is not barred because, even if not presented as such to the EO compliance office at TVA either in counseling or in the Plaintiffs' complaint, given the numerosity of complaints by Plaintiffs of the same termination, TVA should have investigated the disparate impact issue.  Second, the

---

an amended complaint supersedes and replaces the original complaint unless the amendment specifically refers to or adopts the earlier pleading."). It also appears that at the administrative level before TVA, these claims were not exhausted. As such, all claims not related to discriminatory classification or termination, to the extent that any were previously pled, will be DISMISSED, with prejudice.

Plaintiffs contend, they timely raised their complaints of disparate impact with the EO compliance office, as their disparate impact claim is related to their ultimate termination, not their original classification.[96]

Regarding their special classification claims, the Plaintiffs state that those claims are not barred, first, because their remaining in the special classification is a continuing violation and second, because the classification scheme is a seniority system and, as such, their termination under the system is an event permitting them to challenge the classification system.

The Plaintiffs contend that the applicable limitations period should be tolled for Dutton to permit him to join in the present action. The Plaintiffs further request that if the Court chooses not to toll the limitations period on Dutton's behalf, that it dismiss Dutton without prejudice to refile within the limitations period within another case.[97]

The court, in evaluating administrative and procedural bars to the Plaintiffs' claims will address each general type of claim advanced by the Plaintiffs and, where necessary, the specific claims of a Plaintiff within the general heading regarding a type of claim. In so doing, the court will examine issues that have, apparently, "slipped through the cracks" in the presentation of the case by the parties.

---

[96] The Plaintiffs admit that they "may not have framed [the disparate impact] issue in just this way [as a termination issue] before. . . ." Plaintiffs' Reply Brief in Opposition to Defendants' [Fourth] Motion for Summary Judgment at 56. In this sense, as they have done throughout the litigation of this case, the Plaintiffs have presented a "moving target," altering the theory of their case on each occasion that it was pointed out that a previously explicated theory was not viable. While the Court permitted the Plaintiffs to later amend their complaint to ensconce their new theory of their disparate impact claim into the action, it is hesitant to permit any new reconstructions by the Plaintiffs of the meaning of their case.

[97] The Court will not address the motions to dismiss Dutton for failing to properly piggyback onto L. Chandler's action, as his claim is due to be dismissed, in any case. The motions specifically concerned with the dismissal of Dutton's claims will be DENIED as moot.

1.  **Administrative and procedural prerequisites to bringing Rehabilitation Act claims, generally.**

The provision of the Rehabilitation Act under which a plaintiff proceeds has numerous consequences in the types of remedies that a plaintiff may obtain and the administrative and procedural avenues he or she may travel. The two sections of the Rehabilitation Act under which the Plaintiffs in this action travel carry with them diverse remedies and procedural requirements. First, under section 505(a)(1) of the Rehabilitation Act, 29 U.S.C. § 794a(a)(1), claims brought against a federal agency pursuant to section 501 of the Rehabilitation Act, 29 U.S.C. § 791, must comply with the administrative and procedural requirements and can receive the variety of remedies "set forth in section 717 of the Civil Rights Act of 1964 [42 U.S.C. § 2000e-16], including the application of sections 706(f) through 706(k) [42 U.S.C. §§ 2000e-5(f)-(k). . . ." *See Doe v. Garrett*, 903 F.2d 1455,1459 (11ᵗʰ Cir. 1990) (quoting *Treadwell v. Alexander*, 707 F.2d 473, 475 (11ᵗʰ Cir. 1983)) (stating that "section 794a(a)(1) 'created a private right of action under [section 791] in favor of persons subjected to handicap discrimination by employing agencies of the federal government. . .'" which "incorporated Title VII's requirement of exhaustion of administrative remedies"), *cert. denied*, *Doe v. Garrett*, 499 U.S. 904 (1991) and *Lengen v. Department of Transportation*, 903 F.2d 1464, 1467 (11ᵗʰ Cir. 1990).[98] Thus, plaintiffs traveling under section 501 of the Rehabilitation Act must also satisfy the statutory requirements set forth in 42 U.S.C. § 2000e-16 and adhere to the EEOC regulations promulgated pursuant to subsection 2000e-16(b). *See also* 29 C.F.R. § 1614.104. Although circuit courts have split on the issue, the Eleventh Circuit Court of Appeals has stated that, as with claims brought under section 501, claims brought against federal agencies under section 504 of the Rehabilitation Act must satisfy the administrative

---

[98]  While a plaintiff prevailing on an intentional discrimination claim under § 501 may receive the full range of remedies set forth in 42 U.S.C. §§ 1981a(a)(2) & 2000e-5(g), a plaintiff averring a disparate impact claim under that section can only receive the relief set forth in 42 U.S.C. § 2000e-5(g).

exhaustion requirements set forth in 42 U.S.C. § 2000e-16. *See Doe v. Garrett*, 903 F.2d at 1461 (quoting *Milbert v. Koop*, 830 F.2d 354, 357 (D.C.Cir. 1987)) (stating that "private actions against federal government employers under the Act, whether brought under section 791 or 794, must satisfy 'the requirement of exhaustion of administrative remedies in the manner prescribed by section [794a(a)(1)] and thus by Title VII.'"). *See also Mitchell v. Crowell*, 966 F.Supp. 1071, 1078 n.6 (N.D. Ala. 1996) (same).[99]

The administrative requirements imposed on plaintiffs proceeding under the Rehabilitation Act are set out at 29 C.F.R. §§ 1614.101-1614.110 & 1614.408. Under those regulations, within forty-five days of an alleged discriminatory action, a plaintiff must seek pre-complaint counseling within the agency in an attempt to informally resolve the matter. 29 C.F.R. § 1614.105. *See Clark v. Runyon*, 116 F.3d 275, 276 (7th Cir. 1997). Unless that time is extended by the aggrieved employee, counseling is to conclude within thirty days of original contact with the counselor and notice is to be provided to the aggrieved employee informing the employee of his of her right to file a complaint within fifteen days of receipt of notice. 29 C.F.R. § 1614.105. The aggrieved employee has fifteen days from receipt of notice of the completion of counseling to file a complaint with the agency that allegedly discriminated against the employee. 29 C.F.R. § 1614.106. Upon receipt of the complaint, the agency is required to advise the complainant of its receipt. *Id.* The agency is then to investigate the issues in the complaint, and create a factual record from its investigation. 29 C.F.R. § 1614.108. The investigation is to be completed within one hundred eighty days of the filing of the complaint and a copy of the investigative report is to be provided to the complainant, who may then elect to have a hearing on his or her claims. 29 C.F.R. §§ 1614.106 & 1614.108. "Within 60 days of

---

[99] The issue of what remedies can be obtained under section 504, particularly in a claim against a federal agency, remain "murky." *Wood v. President and Trustees of Spring Hill College in City of Mobile*, 978 F.2d 1214, 1219 (11th Cir. 1992).

receiving notification that a complainant has requested an immediate decision from the agency, within 60 days of the end of the 30-day period for the complainant to request a hearing or an immediate final decision where the complainant has not requested either a hearing or a decision, or within 60 days of receiving the findings and conclusions of an administrative judge, the agency shall issue a final decision." 29 C.F.R. § 1614.110. Within ninety days of receipt of the final decision by the agency or, if there is no final decision, within one hundred eighty days of the filing of the initial complaint with the agency, the plaintiff has the right to file an action in the federal district court. 42 U.S.C. § 2000e-16(c) and 29 C.F.R. 1614.408. *See Robbins v. Bentsen*, 41 F.3d 1195, 1198-1200 (7th Cir. 1994) (discussing the issue of what constitutes a final agency decision under 42 U.S.C. § 2000e-16 and the EEOC regulations implemented thereto). If there is no final agency decision, once a civil action is filed in federal court, the complaint with the agency is to be dismissed. 29 C.F.R. § 1614.107(c).[100]

---

[100] As stated in *Brown v. General Services Administration*, 425 U.S. 820, 831-32 (1976):

Sections 717(b) and (c) establish complementary administrative and judicial enforcement mechanisms designed to eradicate federal employment discrimination. Subsection (b) delegates to the Civil Service Commission [after 1978 amendments to the Civil Rights Act, the EEOC] full authority to enforce the provisions of subsection (a) "through appropriate remedies, including reinstatement or hiring of employees with or without back pay," to issue "rules, regulations, orders and instructions as it deems necessary and appropriate" to carry out its responsibilities under the Act, and to review equal employment opportunity plans that are annually submitted to it by each agency and department.

Section 717(c) permits an aggrieved employee to file a civil action in a federal district court to review his claim of employment discrimination. Attached to that right, however, are certain preconditions. Initially, the complainant must seek relief in the agency that has allegedly discriminated against him. He then may seek further administrative review with the [EEOC] or, alternatively, he may, within 30 days [now, ninety days] of receipt of notice of the agency's final decision, file suit in federal district court without appealing to the [EEOC]. If he does appeal to the [EEOC], he may file suit within [ninety] days of the [EEOC's] final decision. In any event, the complainant may file a civil action if, after 180 days from the filing of the charge or the appeal, the agency or [EEOC] has not taken final action.

## 2. Disparate treatment claims related to termination under sections 501 and 504 of the Rehabiltiation Act.

There is no indication that any of the Plaintiffs, other than Dutton and Gothard, failed to timely present their disparate treatment claims based on their termination to the TVA for agency counseling and complaint investigation.[101] As such, failure to exhaust administrative remedies is not a basis for dismissing the claims of the Plaintiffs.

## 3. Disparate treatment claims related to alleged discriminatory classification under sections 501 and 504 of the Rehabilitation Act.

The Defendants contend that any claim by the Plaintiffs that they were discriminated against simply by being separately classified for purposes of payment and retention from other employees of TVA who performed similar work and irrespective of their ultimate termination is barred as untimely and as not having been administratively exhausted. First, the Defendants claim, the Plaintiffs failed to raise their claims of discriminatory classification when they were so classified between 1989 and 1993, and as such, complained, to the extent that they did so, outside of the forty-five day period in which they were required to complain of any discriminatory action under 29 C.F.R. § 1614.105. The Defendants further claim that, even if the claims of discriminatory classification could have been timely raised, the Plaintiffs failed to do so, instead bringing only termination-based claims to the attention of TVA's EO compliance office. Upon being informed that the compliance office would only investigate termination based claims, did not make a corrective attempt to expand the scope of the investigation. The

---

[101] Gothard, after ostensibly requesting counseling on August 26, 1996, would not respond to the EO counselor's request for an interview. On September 10, 1996, he was advised that his file would be closed if he did not respond. Gothard did not reply. Rather, he waited until November 25, 1996, to attempt to contact the EO office once more. As such, Gothard failed to timely present his claim to the agency for review and, as such, could be barred from filing an action in federal court. However, the Defendants have not raised this issue in response to Gothard's claims and, as such, Gothard will not be dismissed on this basis.

Plaintiffs respond, first, that their classification claims were timely brought because the classification scheme is a seniority system under which a claim can be brought any time that an adverse action is suffered as a consequence of the system and, second, that the classification claim was within the scope of the investigation that was undertaken by TVA's EO compliance office.

In *Lorance v. AT & T Technologies, Inc.*, 490 U.S. 900, 906 (1989), the Supreme Court concluded that the time within which a plaintiff could challenge a seniority system of his or her employer under Title VII begins to run when the seniority system is put into effect with respect to those plaintiffs.[102] In 1991, in part in response to Supreme Court decisions interpreting the Civil Rights Act of 1964, Congress passed the Civil Rights Act of 1991. In the 1991 Act, Congress included 42 U.S.C. § 2000e-5(e)(2), which reversed the Supreme Court's holding in *Lorance*, insofar as it related to actions against non-federal employers.

> For purposes of this section, an unlawful employment practice occurs, with respect to a seniority system that has been adopted for an intentionally discriminatory purpose in violation of this subchapter (whether or not that discriminatory purpose is apparent on the face of the seniority provision), when the seniority system is adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority system or provision of the system.

While Congress amended 2000e-5(e) to permit suits against employers based upon the adverse consequences of a seniority system, Congress did not include a similar provision in 2000e-16 relating to federal classification schemes. Nor, when it amended that 2000e-

---

[102] *Lorance* was a disparate impact claim in which the plaintiffs asserted that the discriminatory placement of the plaintiffs in a discriminatory seniority system bore a disparate impact upon them. The Supreme Court noted that while a disparate impact claim was asserted, that claim was grounded in an intentionally discriminatory action, the discriminatory introduction of the classification scheme. *Lorance v. AT&T Technologies, Inc.*, 490 U.S. at 906. The Plaintiffs' disparate impact claims challenging the termination and their disparate treatment claims challenging the classification of the Plaintiffs are similar to the claims in *Lorance* because they both rely on, as the source of the claims, the alleged discriminatory event of their being separately classified between 1989 and 1993.

16(c) in 1991 to extend the time within which aggrieved employees could sue a federal agency in district court after receiving an adverse final agency determination and amended section 2000e-16(d) to permit interest to compensate delay in payment, did Congress amend section 2000e-16(d) to make section 2000e-5(e)(2), in addition to sections 2000e-16(f)-(k) applicable to claims against federal agencies.  Further, section 505(a) of the Rehabilitation Act, 29 U.S.C. § 794a(a), limits the applicability of 42 U.S.C. § 2000e-5 to subsections (f) through (k) in actions brought under section 501 of the Rehabilitation Act, 29 U.S.C. § 791.  As Congress, in 1991, clearly had the opportunity to make this correction, but did not, the implication is that *Lorance* continues to apply to federal classification schemes and that a federal employee seeking to challenge a federal classification scheme or its impact are required to do so by seeking EO counseling within forty-five days after becoming subject to the classification scheme or notified that he or she was subject to such scheme.[103]  Therefore, the Plaintiffs in the instant action were required to seek counseling with TVA's EO compliance office within forty-five days of falling under the classification system under which they were allegedly subjected to intentional discrimination.[104]   Plaintiff's disparate treatment claims grounded upon separate classification will therefore be DISMISSED.[105]

---

[103] The Court has found no other cases on this subject.  Presumably, it is the first to decide this issue.

[104] The Court in *Lorance* also held that discriminatory classification under a seniority system was not a continuing violation which extended the time within which a plaintiff could file her complaint.  *See Lorance v. AT&T Technologies, Inc.*, 490 U.S. at 407.  For the same reason, the Plaintiffs' argument that their classification into separate areas and levels was a continuing violation fails.

[105] Dismissal is also appropriate on this issue as the Plaintiffs failed to exhaust their administrative remedies.

**4. Disparate impact claims under sections 501 and 504 of the Rehabilitation Act.**

The Plaintiffs' disparate impact claims, like the claims of the plaintiffs in *Lorance*, grow out of the alleged discriminatory classification of them into separate competitive areas and levels and retention rosters. As with the Plaintiffs' disparate treatment claims based upon segregation into separate competitive areas and levels, the Plaintiffs have failed to timely seek counseling with TVA's EO compliance office. As such, the Plaintiffs' disparate impact claims will be DISMISSED.[106]

## B. Plaintiffs' substantive claims of disparate treatment in the reduction in force under sections 501 and 504 of the Rehabilitation Act.

### 1. General principles.

The liability standards under which a plaintiff seeking to proceed on a claim of employment discrimination under sections 501 and 504 of the Rehabilitation Act are those existing under the Americans with Disabilities Act. 29 U.S.C. §§ 791(g) & 794(d). As such, a plaintiff proceeding under the Rehabilitation Act may prove his or her claim through circumstantial or direct evidence. As the Eleventh Circuit Court of Appeals recently stated in *Wright v. Southland Corp.*, — F.3d —, 1999 WL 688051 at *1-*4 (11th Cir. 1999) (footnotes omitted) (per J. Tjoflat, with two judges concurring in the result):

> The means by which a plaintiff can prove impermissible discrimination have been modified somewhat since the passage of the first anti-discrimination laws. Prior to 1973, employment discrimination cases were tried in the same manner as any other civil action. Cf. *Preface, Employment Discrimination and Title VII of the Civil Rights Act of 1964*, 84 HARV. L. REV. 1109, 1111 (1971) (stating that employment discrimination cases alleging disparate treatment are "analytically easy," and "the only issues are factual"). The plaintiff had the burden of presenting evidence from which the trier of fact could conclude, more probably than not, that the

---

[106] Dismissal is also appropriate because the Plaintiffs failed to raise and exhaust these claims at the administrative level.

defendant-employer took an adverse employment action against the plaintiff on the basis of a protected personal characteristic. If the plaintiff failed to carry this burden, then the employer was entitled to summary judgment or judgment as a matter of law. *See* FED. R. CIV. P. 50, 56. If, however, the plaintiff succeeded in carrying this burden, then the trier of fact had to listen to all of the evidence and determine whether a protected personal characteristic was the cause of the adverse employment action. This traditional method of trying a case will hereinafter be called the "traditional framework."

The nature of discrimination suits, however, rendered the traditional framework inadequate to effect fully Congress' intent to eliminate workplace discrimination. A discrimination suit (unlike, for instance, an action for negligence or breach of contract) puts the plaintiff in the difficult position of having to prove the state of mind of the person making the employment decision. *See United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 [] (1983) (noting difficulty of the issue). Furthermore, unlike some other torts, in which state of mind can be inferred from the doing of the forbidden act, the employer's state of mind cannot be inferred solely from the fact of the adverse employment action — in other words, whereas in an action for battery the defendant's intent to cause harm may be inferred solely from the fact that he was swinging a baseball bat at the plaintiff, an employer's intent to discriminate cannot be inferred solely from the fact that he discharged an individual with a protected personal characteristic.

To make matters somewhat easier for plaintiffs in employment discrimination suits, the Supreme Court, in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [] (1973), developed a presumption that supplemented — but did not replace — the traditional framework. *See Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987). This presumption operates as follows: If a plaintiff chooses to make use of the *McDonnell Douglas* presumption, he initially does not need to present evidence from which the trier of fact could conclude that the adverse employment action taken against him was caused by improper discrimination. Instead, he need only establish that (1) an adverse employment action was taken against him, (2) he was qualified for the job position in question, and (3) different treatment was given to someone who differs in regard to the relevant personal characteristic. For instance, if a plaintiff alleges that he was passed over for a job promotion because of his race, then under *McDonnell Douglas* he must establish that (1) he was in fact passed over for the promotion, (2) he was qualified for the higher position, and (3) an individual of a different race was

given the higher position. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998). If a plaintiff alleges that she was fired because of her sex, then under *McDonnell Douglas* she must establish that (1) she was in fact fired, (2) she was qualified for her position, and (3) she was replaced by a male (or that males with similar qualifications were retained). *See Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir. 1982).

Once the plaintiff has established these elements (in other words, persuaded the trier of fact by a preponderance of the evidence of these facts: adverse employment action, qualifications, and differential treatment), unlawful discrimination is presumed. *See Walker v. Mortham*, 158 F.3d 1177, 1183 (11th Cir. 1998). The defendant-employer can rebut this presumption only by articulating a legitimate, nondiscriminatory reason (or reasons) for the adverse employment action. *See id.* at 1184. If the employer fails to do so, the plaintiff is entitled to judgment as a matter of law. See id. If, however, the employer carries its burden (a burden of production, not persuasion), then the *McDonnell Douglas* presumption "drops from the case." *Id.* At this point, the case is placed back into the traditional framework — in other words, the plaintiff still bears the burden of proving, more probably than not, that the employer took an adverse employment action against him on the basis of a protected personal characteristic. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-08 [] (1993). The *McDonnell Douglas* presumption, however, has made the plaintiff's task somewhat easier: The plaintiff now has evidence of the employer's preferred reasons for the adverse employment action, and can attempt to show that these preferred reasons are a pretext for discrimination. *See id.* at 516-17[] (stating that "proving the employer's [proffered] reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination").

\* \* \*

Also, the elements needed to establish the *McDonnell Douglas* presumption, standing alone, are not sufficient to prove that the plaintiff, more probably than not, was a victim of illegal discrimination. As we have previously stated (in a sex discrimination case):

> [I]n an employment discrimination case, if the plaintiff can establish [the facts triggering the *McDonnell Douglas* presumption] – e.g., that she is female, that she applied for a position with the defendant employer, that she was qualified for the position, and that the position was given to a male – it does not logically follow that the employer discriminated

> against the plaintiff on the basis of her sex. [This evidence],
> standing alone, puts the evidence in equipoise – although one
> could reasonably conclude that the plaintiff was not hired
> because of her sex, one could just as reasonably conclude that
> the plaintiff was not hired because the employer did not like
> the suit she was wearing, or because the employer's son was
> also an applicant, or because another applicant agreed to work
> for half the posted salary, or any number of reasons other than
> sex discrimination.

*Walker v. Mortham*, 158 F.3d 1177, 1183 n.10 (11th Cir. 1998). This point
has been the source of some confusion, because the quantum of evidence
needed to create a jury question under the traditional framework and the
establishment of the facts required to establish the *McDonnell Douglas*
presumption are both known as the "prima facie case." The phrase "prima
facie case," however, has a meaning under the traditional framework very
different from its meaning under *McDonnell Douglas* – in the former case it
means a case strong enough to go to a jury, in the latter case it means the
establishment of a rebuttable presumption. *See Texas Dept. of Community
Affairs v. Burdine*, 450 U.S. 248, 254 n.7 [] (1981).

It is through a *McDonnell-Douglas* burden-shifting analysis that the Plaintiffs attempt to
prove their claims that they were subjected to disability discrimination in the reduction in
force.

## 2. *Prima facie* case.

In *Sutton v. Lader*, — F.3d —, 1999 WL 646798 at *2 (11th Cir. 1999), the
Eleventh Circuit Court of Appeals stated the requirements for a plaintiff seeking to
establish a *prima facie* case of discrimination under section 501 of the Rehabilitation Act:
"To establish a prima facie case of discrimination under the Act, an individual must show
that (1) he has a disability; (2) he is otherwise qualified for the position; and (3) he was
subjected to unlawful discrimination as the result of his disability." The Eleventh Circuit
Court of Appeals has stated much the same standard for presenting a *prima facie* case under
section 504. "For scrutinizing claims under Section 504, first, the individual is required

to show that he is otherwise qualified for the position; second, the individual must show that even though he is otherwise qualified, he was rejected for the position, or discriminated against, solely on the basis of his handicap." *Severino v. North Fort Myers Fire Control Dist.*, 935 F.2d 1179, 1183 (11th Cir. 1991). Largely, the standards for demonstrating a *prima facie* case under section 501 and section 504 of the Rehabilitation Act are coextensive,[107] but in addition to showing the prerequisites to disability discrimination, a plaintiff bringing a claim against an employer under either section of the Rehabilitation Act must demonstrate that it is an employer who can be held liable for violations of that section. An action brought under section 501 must be against a ". . . department, agency, [or] instrumentality . . . in the executive branch. . ." of the federal government. 29 U.S.C. § 791(b). *See Treadwell v. Alexander*, 707 F.2d 473, 475 (11th Cir. 1983). A plaintiff proceeding under section 504 must demonstrate that he or she worked (or works) for a program or activity that receives federal financial assistance or is conducted by an executive agency or the United States Postal Service. *See Jackson v. Veterans*

---

[107] An arguable difference between section 501 and section 504 claims exists in that section 504 prohibits discrimination "solely" on the basis of disability, whereas section 501 contains no such qualifying language. *See Leary v. Dalton*, 58 F.3d 748, 752 (1st Cir. 1995) ("Section 504 alone [as opposed to section 501], however, continues to require a showing that the plaintiff's disability was the sole reason for the defendant's adverse action.") However, as section 504(d) requires the standards used in employment discrimination actions to be those used in claims brought pursuant to the Americans with Disabilities Act, which does not contain the limitation that discrimination be "solely" because of disability, *see McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1074 (11th Cir. 1996), it is arguably the case that to be viable, a plaintiff in an employment discrimination claim brought pursuant to section 504 need not show that disability discrimination was the "sole" factor behind the employment decision.

Generally, the cases on the incorporation (or disincorporation) of the requirement that an adverse employment action be "solely" motivated by disability have run in the other direction — i.e., employers have sought to have the term "solely" introduced through implication into the ADA through the Rehabilitation Act provision. The court has found no instance of the contrary argument, that the Rehabilitation Act's incorporation of ADA standards in employment actions erases the requirement that discrimination be "solely" motivated by disability. Had Congress wished to remove the requirement under section 504 that discrimination be motivated solely by disability it could have expressly done so at the time that the ADA's standards were incorporated into employment discrimination claims brought under section 504.

*Administration*, 22 F.3d 277, 278 (11th Cir.) ("To prove discrimination under the Act, a plaintiff must show that he or she: (1) is 'handicapped' within the meaning of the Act and relevant regulations, (2) is 'otherwise qualified' for the position in question, (3) worked for a Program or activity that received federal financial assistance; and (4) was adversely treated solely because of his or her handicap."), *cert dismissed*, 513 U.S. 1052 (1994), and *Mitchell v. Crowell*, 966 F.Supp. 1071, (N.D. Ala. 1996) (same). The only elements of the *prima facie* case that are at issue in the instant case are (1) whether TVA is a covered entity under the sections 501 and 504 of the Rehabilitation Act and (2) whether the Plaintiffs are individuals with disabilities within the scope of either section 501 or 504 of the Rehabilitation Act.

### i. Did the Plaintiffs sue a covered entity?

In their claims brought pursuant to sections 501 and 504 of the Rehabilitation Act, the Plaintiffs take issue with alleged discriminatory actions undertaken by TVA, a federal agency. As such, the Plaintiffs' claims under section 501 are properly asserted against TVA, as 501(b) prohibits discrimination by federal agencies. The Plaintiffs' claims brought pursuant to section 504(a) of the Rehabilitation Act, 29 U.S.C. § 794(a), however, fail, because the instant plaintiffs cannot bring an action against TVA under that section.

Section 504(a) of the Rehabilitation Act, 29 U.S.C. § 794(a) states, in relevant part:

> No otherwise qualified individual with a disability in the United States, as defined in section 706(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

Prior to 1978, this subsection had generally been held to create a private right of action in favor of disabled employees against employers who are recipients of federal funds. *Prewitt v. United States Postal Service*, 662 F.2d 292, 302 (5th Cir. Unit A 1981). This was

inferred from the requirement contained in section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 974a(a)(2), that a claim brought pursuant to section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), is ostensibly governed by the provisions of Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, *et seq.* 29 U.S.C. § 794a(a)(2) ("The remedies, procedures, and rights set forth in [Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d], shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."). *See Lane v. Pena*, 518 U.S. 187, 191 (1996) (noting that remedies existing under Title VI of the Civil Rights Act of 1964 are recoverable in a suit brought pursuant to section 504 of the Rehabilitation Act, 29 U.S.C. § 794). In *Bossier Parish School Board v. Lemon*, 370 F.2d 847, 852 (5th Cir.), *cert. denied*, 388 U.S. 911 (1967), the predecessor to the Eleventh Circuit Court of Appeals created an implied private right of action for money damages under Title VI against programs and activities receiving federal financial assistance. *See also Cannon v. University of Chicago*, 441 U.S. 677, 696-97 (1979) (noting that the decision of the Fifth Circuit Court of Appeals in *Lemon* created well-established precedent for an implied right of action under Title VI). In *Helms v. McDaniel*, 657 F.2d 800, 806 n.10 (5th Cir. Unit B 1981), *cert. denied, McDaniel v. Helms*, 455 U.S. 946 (1982), the prior Fifth Circuit Court of Appeals extended the implied right of action from Title VI claims to claims brought against programs or activities receiving federal assistance pursuant to section 504, reasoning that section 505(a)(2) extended Title VI remedies to cases brought pursuant to that section.

The issue of whether federal agencies generally can be sued under section 504 has been a matter of some dispute, with the circuit courts splitting on the issue. *See Spence v. Straw*, 54 F.3d 196, 198-201 (3[d] Cir. 1995), and cases cited therein. *See also Rivera v. Heyman*, 157 F.3d 101, 104 (2[d] Cir. 1997) (federal employee unable to bring suit against agency under section 504 of the Rehabilitation Act). In the circuit split, the Eleventh

Circuit Court of Appeals has come down in favor of permitting federal employees to bring suit against covered federal agencies pursuant to section 504 as well as under section 501 of the Rehabilitation Act. *See Doe v. Garrett*, 903 F.2d at 1461 (quoting *Milbert v. Koop*, 830 F.2d 354, 357 (D.C.Cir. 1987)) (stating that "private actions against federal government employers under the Act, whether brought under section 791 or 794, must satisfy 'the requirement of exhaustion of administrative remedies in the manner prescribed by section [794a(a)(1) ] and thus by Title VII.'"). *See also Mitchell v. Crowell*, 966 F.Supp. 1071, 1078 n.6 (N.D. Ala. 1996) (same).

In addition to the questionable nature of presenting claims under section 504 against federal agencies, there are limits on the kinds of relief that a plaintiff bringing an action against a federal agency can obtain due to the bar of sovereign immunity. In *Lane v. Pena*, 518 U.S. 187, the Supreme Court addressed the issue of whether, in the absence of a statutory waiver of sovereign immunity under the Rehabilitation Act or Title VI of the Civil Rights Act, a plaintiff could recover monetary relief from a federal agency. *Lane v. Pena*, 518 U.S. at 189. In resolving the issue, the Court first noted that any remedies for violations of section 504 of the Rehabilitation Act are supplied by Title VI of the Civil Rights Act of 1964, including damages in suits against certain non-federal agency recipients of federal funds. *Id.* at 191. However, the Court noted, there is no explicit waiver of federal sovereign immunity contained in section 504 or 505(a)(2) of the Rehabilitation Act. *Id.* Such a waiver, the Court pointed out, "must be unequivocally expressed in statutory text. . . ." *Id.* at 192. There being no such clear and unequivocal waiver in the statute or in Title VI, the Court concluded that federal agencies are protected from suits for monetary damages brought under section 504 of the Rehabilitation Act. *Id.* at 197 & 200.

The Supreme Court made clear its conclusion by pointing out the contrast between the clear waiver of sovereign immunity contained in section 505(a)(1) pertaining to claims

brought pursuant to § 501 and the absence of any such clear waiver in section 505(a)(2)

pertaining to claims brought pursuant to § 504:

> The lack of clarity in § 505(a)(2)'s "federal provider" provision is underscored by the precision with which Congress has waived the Federal Government's sovereign immunity from compensatory damages claims for violations of § 501 of the Rehabilitation Act, 29 U.S.C. § 791, which prohibits discrimination on the basis of disability in employment decisions by the Federal Government.   In § 505(a)(1), Congress expressly waived the Federal Government's sovereign immunity against certain remedies for violations of § 501:
>> "The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 [which allows monetary damages] ... shall be available, with respect to any complaint under section 501 of this Act, to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint." 29 U.S.C. § 794a(a)(1).
>
> Section 505(a)(1)'s broad language — "any complaint under section 501" — suggests by comparison with § 505(a)(2) that Congress did not intend to treat all § 504(a) defendants alike with regard to remedies.  Had Congress wished to make Title VI remedies available broadly for all § 504(a) violations, it could easily have used language in § 505(a)(2) that is as sweeping as the "any complaint" language contained in § 505(a)(1).
>
> But our analysis need not end there.  In the Civil Rights Act of 1991, Congress made perfectly plain that compensatory damages would be available for certain violations of § 501 by the Federal Government (as well as other § 501 defendants), subject to express limitations:
>> "In an action brought by a complaining party under the powers, remedies, and procedures set forth in . . . section 794a(a)(1) of title 29 [which applies to violations of § 501 by the Federal Government] . . . against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) under section 791 of title 29 and the regulations implementing section 791 of title 29, or who violated the requirements of section 791 of title 29 or the regulations implementing section 791 of title 29 concerning the provision of a reasonable accommodation ... the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section ... from the respondent." Rev. Stat. § 1977A, as added, 105 Stat. 1072, 42 U.S.C. § 1981a(a)(2).

The Act's attorney's fee provision makes a similar point. Section 505(b) provides that, "[i]n any action or proceeding to enforce or charge a violation of a provision of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 29 U.S.C. § 794a(b). This provision likewise illustrates Congress' ability to craft a clear waiver of the Federal Government's sovereign immunity against particular remedies for violations of the Act. The clarity of these provisions is in sharp contrast to the waiver Lane seeks to tease out of §§ 504 and 505(a)(2) of the Act.

*Lane v. Pena*, 518 U.S. at 193-94.[108]

While *Lane* does limit remedies generally obtainable against federal agencies under section 504, it also by implication seems, at the same time, to condone actions against the federal agencies of some sort, either through an action for appropriate injunctive relief against officers of an agency in their official capacities or through an action against an agency that has generally waived sovereign immunity to suits against it in its own name.[109] Thus, the Eleventh Circuit Court of Appeals's conclusion in *Doe v. Garrett*, 903 F.2d at 1461, that federal agencies can be sued under section 504, while perhaps limited by the

---

[108] The Court notes that while the conclusion in *Lane v. Pena* would bar most claims against federal agencies, were the Plaintiffs able to maintain an action against TVA under section 504, sovereign immunity would not be a bar to any action, as TVA is a corporate agency and can sue and be sued in its own name in contract or tort, 16 U.S.C. 831c(b), though punitive damages cannot be recovered. *Painter v. Tennessee Valley Authority*, 476 F.2d 943, 944 (5th Cir. 1973). *See also* WRIGHT , MILLAR & COOPER, FEDERAL PRACTICE & PROCEDURE 2D, § 3655 at 352-54 (1998) (stating that "it seems well-established that Congress is presumed to have waived the sovereign immunity defense when it authorizes a governmental agency to sue and be sued in its own name, although that presumption may not extend to such matters as punitive damages, injunctive relief, pre-judgment interest, and attorney's fees"). In the instant case, TVA is not sued in its own name under section 504, but rather as against the officers of TVA in their official capacities. As such, if an action under section 504 could be maintained against TVA, there would be a further question of whether the waiver provision contained in 16 U.S.C. § 831c(b) applies, or whether the Plaintiffs are limited to non-monetary relief, as no sovereign immunity waiver is implied in actions brought against officials of TVA in their official capacities. As any monetary relief would come from the same pocket, it would be odd to deny relief to the Plaintiffs because they named the officers of the agency in their official capacity rather than the agency itself.

[109] The opposite conclusion could also be drawn. It may be implied from Congress's decision not to waive sovereign immunity in suits against federal agencies that, under section 504, Congress did not intend to provide any private remedy against federal agencies under that section.

Supreme Court's decision in *Lane*, sets forth essentially the implied conclusion that federal agencies can be sued pursuant to section 504.[110] However, the requirements of section 504 do not apply to federal agencies as a whole. Rather, 504(a) prohibits discrimination on the basis of disability "under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794(a). Thus, section 504(a) contemplates suits against a federal agency only by those employees who were participants in a "program or activity" conducted by the agency. For the Plaintiffs to assert a viable claim against TVA, therefore, not only must TVA be an agency covered by the statute — which, according to *Doe*, it is — TVA must also have conducted a "program or activity," as defined by section 504(b) of the Rehabilitation Act, of which the Plaintiffs were participants.

A "program or activity" is defined by section 504(b) of the Rehabilitation Act as:
all of the operations of —
>    (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
>    (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;
>    (2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or
>    (B) a local educational agency (as defined in section 8801 of Title 20) system of vocational education, or other school system;
>    (3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship —
>>        (i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

---

[110] Given that the only relief generally available, however, is injunctive relief (except with respect to agencies acting as corporate entities entitled to sue and be sued) and that the Supreme Court has made a point of referencing Title VI as the harbor-house of requirements and remedies imposed on actions under section 504, the requirement of administrative exhaustion seems, perhaps, misplaced. However, this issue is beyond the scope of this opinion.

> (ii) which is principally engaged in the business of
> providing education, health care, housing, social
> services, or parks and recreation; or
>
> (B) the entire plant or other comparable, geographically separate
> facility to which Federal financial assistance is extended, in the case
> of any other corporation, partnership, private organization, or sole
> proprietorship; or
>
> (4) any other entity which is established by two or more of the
> entities described in paragraph (1), (2), or (3);
>
> any part of which is extended Federal financial assistance.

29 U.S.C. § 794(b). An examination of section 504(b) demonstrates that it was crafted

with entities receiving federal financial assistance, not federal agencies, in mind. For

example, subsection 504(b)(1) refers to departments and instrumentalities of state and

local governments and entities of those governments. It is unclear how a federal agency

could conduct such an entity.

A similar difficulty is met in attempts to interpret other subsections, particularly

with regard to the qualifying clause to all subsections, that the program or activity

conducted by the federal agency at least in part be "extended Federal financial assistance."

The general rule is that "federal financial assistance" is the payment or transfer of funds

as a subsidy or gift. *See DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 911 F.2d 1377,

1382 (10th Cir. 1990), *cert. denied*, 498 U.S. 1074 (1991) ("We apply the ordinary meaning

of the term and conclude that an entity receives financial assistance when it receives a

subsidy."); *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1208-09 (9th Cir.1984), *cert.

dismissed*, 471 U.S. 1062 (1985) (same); *Muller v. Hotsy Corp.*, 917 F.Supp. at 1417 (same);

James Lockhart, *What Constitutes Federal Financial Assistance for Purposes of § 504 of

Rehabilitation Act (29 U.S.C.A. § 794), Which Prohibits Any Program or Activity Receiving

Federal Financial Assistance from Discriminating on Basis of Disability*, 147 Fed. A.L.R. 205,

§ 3 (1998) (same). *See also Arline v. School Board of Nassau County*, 772 F.2d 759, (11th Cir.

1985) (favorably citing *Jacobson v. Delta Air Lines*).    Under this definition, the term

"federal financial assistance" implies some grant of funds, directly or indirectly, by a federal agency to some other entity. *Cf. United States Department of Transportation v. Paralyzed Veterans of America*, 477 U.S. 597, 604 (1986) (discussing who, under the Rehabilitation Act, can be classified as a recipient of federal financial assistance).

Thus, a program or activity defined by section 504(b) must be some entity other than a federal agency providing funds because the agency itself cannot be a program or activity as it is a disburser, rather than a recipient, of a subsidy or gift. Any federal agency that is subject to suit under section 504(a) of the Rehabilitation Act must therefore somehow "conduct" a program or activity separate from itself which is provided funds by either that agency or another agency. In itself, and regardless of whether the Plaintiffs were members of the REIN program or the Reentry program or any other method of rehiring recipients of FECA benefits, this would appear to exempt the claims of the Plaintiffs, who were not participants in an activity that was paid for and run by TVA, but were employees in an operation of TVA.[111]

Nor do the Plaintiffs fall into any of the listed categories of "program or activity" provided in subsection 504(b). The Plaintiffs in this action were clearly not discriminated against in a program or activity as defined in 504(b)(1), as their employer was neither an arm of State or local government nor an entity of that government distributing federal aid. Nor were the Plaintiffs discriminated against in any educational program run by TVA, as described in 504(b)(2). In order for an action to be maintained against TVA under section 504, therefore, the Plaintiffs must have been discriminated against by an entity described in subsection 504(b)(3).

---

[111] There are exceptions to this, as several federal statutes have carved out other programs or activities subject to section 504's prescriptions. Arguably, it is only under certain of these programs conducted by a federal agency that such agency can be sued under section 504(a).

A search of the relevant caselaw has turned up ten district court cases, including one from this district, referring to section 504(b)(3) of the Rehabilitation Act, each of which deals with entities other than federal agencies receiving financial assistance.[112]  In *Leake v. Long Island Jewish Medical Center*, 685 F.Supp. at 1415-16, the district court explained the history of the subsection:

> In *Grove City College v. Bell*, 465 U.S. 555 [] (1984), the Supreme Court interpreted section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (1982), prohibiting sex discrimination in "any education program or activity receiving Federal financial assistance" to mean that only the particular program or activity receiving federal grant money had to comply with the Title IX prohibition against sex discrimination.  *Grove City*, 465 U.S. at 573-74 [].  In *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624 [] (1984), the Supreme Court stated that the ban on discrimination against the handicapped in section 504 was also limited "to the specific program that receives federal funds." *Id.* at 636 [].
>
> On March 22, 1988, Congress enacted the Civil Rights Restoration Act of 1987, Pub.L. No. 100-259, 102 Stat. 28 (1988).  The stated purpose of the statute is to "restore the broad scope of coverage and to clarify the application of . . . section 504 of the Rehabilitation Act of 1973. . . ." Pub.L. 100-259, 102 Stat. 28.  Congress found that the Supreme Court had unduly narrowed the application of section 504 and that it was "necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered."  Restoration Act § 2 (to be codified at §20 U.S.C. 1687 note).  The Restoration Act amended section 504 of the Rehabilitation Act in part by defining the term "program or activity" as "all the operations of . . . an entire corporation, partnership, or other private organization, or an entire sole proprietorship . . . which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation. . . ."  Restoration Act § 4(b)(3)(A)(ii) (to be codified at §29 U.S.C. 794(b)(3)(A)(ii)).  The Restoration Act overrules *Grove City College v. Bell* and

---

[112] *Zamora-Quezada v. HealthTexas Medical Group of San Antonio*, 34 F.Supp.2d 433 (W.D. Tex. 1998);  *Dorer v. Quest Diagnostics Inc.*, 20 F.Supp.2d 898 (D.Md. 1998);  *Bowers v. National Collegiate Athletic Association*, 9 F.Supp.2d 460 (D.N.J. 1998); *Squire v. United Airlines, Inc.*, 973 F.Supp. 1004 (D. Colo. 1997); *Muller v. Hotsy Corp.*, 917 F.Supp. 1389 (N.D. Iowa 1996); *Simenson v. Hoffman*,1995 WL 631804 (N.D. Ill. 1995); *Jones v. Alabama Power Company*, 1995 WL 238338 (N.D. Ala. 1995); *Schrader v. Gulf Oil*, 1994 WL 672640 (E.D. Pa. 1994); *Glanz v. Vernick*, 756 F.Supp. 632 (D. Mass. 1991); and *Leake v. Long Island Jewish Medical Center*, 695 F.Supp. 1414 (E.D.N.Y. 1988), *affirmed and remanded*, 869 F.2d 130 (2$^d$ Cir. 1989).

*Consolidated Rail Corp. v. Darrone* by prohibiting discrimination against the handicapped on an institution-wide basis, instead of only in connection with the limited program or activity actually receiving federal funds, if any federal funds are received by any program or activity of the institution.

To fall under any of the definitions set forth in subsection 504(b)(3), a program or activity must, at a minimum, be an operation of a "corporation, partnership, or other private organization, or an entire sole proprietorship" or "the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship. . . ." 29 U.S.C. § 794(b)(3). *See Squire v. United Airlines, Inc.*, 973 F.Supp. at 1008 ("An entire private corporation will only be covered under the amendments if financial assistance is granted to the corporation 'as a whole' or if it is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation."). TVA falls under neither of these definitions. First, TVA is not a *private* corporation, as is contemplated by the statute. Second, TVA's various facilities do not receive federal financial assistance, as they are part of the government itself and funds are *budgeted* to those facilities, not provided as a part of any grant of assistance. Therefore, the Plaintiffs' claims nder section 504(a) of the Rehabilitation Act are due to be DISMISSED, with prejudice.

### ii. Whether the Plaintiffs are "individuals with disabilities" under the Rehabilitation Act.

The Plaintiffs in the present action have alleged throughout the tenure of this case, until very recently, that they are disabled *solely* because they are substantially limited in the major life activity of working. Only after this court indicated that it was considering dismissing the Plaintiffs' claims in light of the Supreme Court's decision in *Sutton v. United Air Lines, Inc.*, — U.S. —, 119 S.Ct. 2139 (1999), because working did not appear to be a major life activity, did the Plaintiffs attempt to alter their theory of the case. The various

motions of the Plaintiffs seeking to alter their theory of the case will be DENIED. The Plaintiffs had available to them different and, in some cases, such as those of Greene and Smart, more obviously successful theories on which to travel to demonstrate disability. However, rather than exercising caution and attempting to demonstrate disability through limitations on non-work related major life activities, even in light of the Defendants' strong arguments that the Plaintiffs could not demonstrate that they are substantially limited in the major life activity of working, the Plaintiffs chose to assert only work as a major life activity.

*a. Whether working is a major life activity.*

In 1973, when Congress passed the Rehabilitation Act, it defined a "handicapped individual" as "[a]ny individual who (A) has a physical or mental disability which for such individual constitutes or results in a substantial handicap to employment and (B) can reasonably be expected to benefit in terms of employability from vocational rehabilitation services provided pursuant to titles I and III of this Act." Pub. L. 93-112, § 7(6). The limitations of this definition were promptly recognized, as Congress soon discovered that employers under federal contracts were conditioning employment of handicapped individuals on representations of their being able to benefit from vocational services. *See* Thomas Edward Sequine, *What's a Handicap Anyway? Analyzing Handicap Claims under the Rehabilitation Act of 1973 and Analogous State Statutes*, 22 WILLIAMETTE L. REV. 529, 531 (1986). In response to the failure of the definition to promote the Rehabilitation Act's goals, Congress amended the Rehabilitation Act in 1974, creating the precursor to the definition of disability presently ensconced in the statute. The amended language defined a handicapped individual as "[a]ny person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." Pub. L. 93-516.

While the legislative history provides some insight into why the three-pronged test was adopted,[113] that history "does not reveal why actual disabilities are defined in terms of limitations on 'major life activities.'" Eichhorn, 77 N.C.L. REV. at 1428. The regulations promulgated pursuant to the amendments fail to provide any further principled guidance in determining what constitutes a "major life activity" under the Rehabilitation Act, but instead provides a short list of human engagements: "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." There exists neither legislative history nor principled regulatory reason that defines the term "major life activity" or provides a justification for inclusion of the term "working" among major life activities listed in the regulations interpreting the term "major life activity." This being so, the Court turns to the issue of what deference the regulations interpreting the term "major life activity" should be given.

Sections 501(g) and 504(d) of the Rehabilitation Act indirectly charge the EEOC with interpreting most of the terms relevant to the determination of employment discrimination based upon disability. For example, section 101 of the ADA, 42 U.S.C. § 12111, which is included in Title I, provides definitions of the terms "qualified individual with a disability" and "reasonable accommodation." As the EEOC is charged with responsibility of issuing regulations governing Title I and interpreting its provisions, that agency's interpretations of these two terms are entitled to a wide latitude of deference.

---

[113] In Lisa Eichhorn, *Major Litigation Activities Regarding Major Life Activities: The Failure of the "Disability" Definition in the Americans with Disabilities Act of 1990*, 77 N.C.L. REV. 1405, 1427-28 (1999), the author summarizes the legislative history on the three-pronged test:

> Legislative history regarding section 504 reveals that the later three-pronged definition was designed to address different types of disability discrimination. The first prong was meant to address direct discrimination based on actual disability and to provide a definition to facilitate the statute's disability-based affirmative action requirements. The remaining two prongs were designed to address discrimination stemming from classification of and perceptions regarding disabilities. All three prongs incorporate the elements of "major life activities" and "substantial limitations," and both of these elements are problematic, as are other aspects of the definition.

However, the EEOC does not have the authority to interpret all the definitions contained in the ADA. The Supreme Court, in the recent case of *Sutton v. United Air Lines, Inc.*, — U.S. —, —, 119 S.Ct. 2139, 2144-45 (1999), stated, with respect to the anti-discrimination provisions of the ADA and the EEOC's authority to regulate with respect to the ADA:

> The ADA prohibits discrimination by covered entities, including private employers, against qualified individuals with a disability. Specifically, it provides that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U. S. C. §12112(a); see also §12111(2) ("The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee"). A "qualified individual with a disability" is identified as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." §12111(8). In turn, a "disability" is defined as:
>
> '(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> '(B) a record of such an impairment; or
>
> '(C) being regarded as having such an impairment.' §12102(2).
>
> Accordingly, to fall within this definition one must have an actual disability (subsection (A)), have a record of a disability (subsection (B)), or be regarded as having one (subsection (C)).
>
> The parties agree that the authority to issue regulations to implement the Act is split primarily among three Government agencies. According to the parties, the EEOC has authority to issue regulations to carry out the employment provisions in Title I of the ADA, §§12111-12117, pursuant to §12116 ("Not later than 1 year after [the date of enactment of this Act], the Commission shall issue regulations in an accessible format to carry out this subchapter in accordance with subchapter II of chapter 5 of title 5s"). The Attorney General is granted authority to issue regulations with respect to Title II, subtitle A, §§12131-12134, which relates to public services. See §12134 ("Not later than 1 year after [the date of enactment of this Act], the Attorney General shall promulgate regulations in an accessible format that

implement this part"). Finally, the Secretary of Transportation has authority to issue regulations pertaining to the transportation provisions of Titles II and III. See §12149(a) ("Not later than 1 year after [the date of enactment of this Act], the Secretary of Transportation shall issue regulations, in an accessible format, necessary for carrying out this subpart (other than section 12143 of   this title)"); §12164 (substantially same); §12186(a)(1) (substantially same); §12143(b) ("Not later than one year after [the date of enactment of this Act], the Secretary shall issue final regulations to carry out this section"). See also §12204 (granting authority to the Architectural and Transportation Barriers Compliance Board to issue minimum guidelines to supplement the existing Minimum Guidelines and Requirements for Accessible Design). Moreover, each of these agencies is authorized to offer technical assistance regarding the provisions they administer. See §12206(c)(1) ("Each Federal agency that has responsibility under paragraph (2) for implementing this chapter may render technical assistance to individuals and institutions that have rights or duties under the respective subchapter or subchapters of this chapter for which such agency has responsibility").

*No agency, however, has been given authority to issue regulations implementing the generally applicable provisions of the ADA, see §§12101-12102, which fall outside Titles I-V. Most notably, no agency has been delegated authority to interpret the term "disability."* §12102(2). . . .  The EEOC has, nonetheless, issued regulations to provide additional guidance regarding the proper interpretation of this term. After restating the definition of disability given in the statute, see 29 CFR §1630.2(g) (1998), the EEOC regulations define the three elements of disability: (1) "physical or mental impairment," (2) "substantially limits," and (3) "major life activities." See *id.*, at §§1630.2(h)-(j). Under the regulations, a "physical impairment" includes "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito- urinary, hemic and lymphatic, skin, and endocrine." §1630.2(h)(1).  The term "substantially limits" means, among other things, "[u]nable to perform a major life activity that the average person in the general population can perform;" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life

activity." §1630.2(j). Finally, "[m]ajor [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." §1630.2(i). Because both parties accept the regulations as valid, and determining their validity is not necessary to decide this case, we have no occasion to consider what deference they are due, if any.

(Emphasis added.) While the Supreme Court refused to entirely disregard the EEOC regulations concerning disability in *Sutton* because the parties assumed them to be applicable, from the opinion, it would appear that the Court would, in the proper case, refuse to give any deference to the EEOC regulations interpreting the term disability. Given that, as the Court stated, the EEOC arguably has no authority to issue regulations regarding the meaning of the term "disability" under the ADA, by implication, little deference is due the regulations issued by the EEOC with respect to the Rehabilitation Act.

There exists a second reason why EEOC regulations governing the definition of disability are inapplicable in the instant case. Sections 501(g) and 504(d) of the Rehabilitation Act limit the applicability of the provisions of the ADA in employment related actions to Title I, sections 501 through 504, and section 510 of the ADA. Other sections of the ADA are excluded from the analysis of an employment discrimination action under the Rehabilitation Act. Therefore, even were the EEOC's regulations regarding disability applicable to a claim of employment discrimination under the ADA, they would have no bearing on the determination of disability under either section 501 or 504 the Rehabilitation Act.

The meaning of the term "disability," and attendant phrases, must be garnered from the relevant sections of the Rehabilitation Act and those regulations properly interpreting those terms, if any. The present definitions are the old wine of the 1974 amendment in new bottles. Section 705(9)(B) of Title 29 defines "disability," for purposes of the Act dealing with employment practices, as "a mental or physical impairment that

substantially limits one or more major life activities." Under § 705(20)(B) of the Title, "an individual with a disability," for purposes of employment issues, is any individual who:

(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities;
(ii) has a record of such an impairment; or
(iii) is regarded as having such an impairment.

29 U.S.C. § 705(20)(B).

Though many agencies, including the TVA, have, pursuant to sections 501(b) and 504(a), defined the term "handicapped individual," a term used in the Rehabilitation Act prior to its recent amendments, few, if any, have attempted to interpret the terms "disability" or "disabled individual" under the Act after a 1992 amendment to the Act substituted the term "disability" for "handicap," *see* Pub. L. 102-569, § 102(p)(32). *See* Rehabilitation Act Amendments of 1998, Pub. L. 105-220, § 507. Nonetheless, aside from the deletion of the term "handicapped individual" from the Rehabilitation Act, the terms interpreted by the regulations, including "major life activities," remain the same. However, it is uncertain whether any agency has been given the authority to interpret the definitions included at 29 U.S.C. § 705, except, perhaps, the Secretary of Education, *see* 29 U.S.C. § 709(f), although even this is unclear. As such, this court finds no determinative guidance on the definition of the term "major life activity" under the Rehabilitation Act.

The focal question before this Court is whether an individual can be deemed a disabled individual under the Rehabilitation Act where *working* is the only major life activity in which an individual either is substantially limited, has a record of being substantially limited or is regarded as having a substantial limitation. In *Sutton v. United Air Lines, Inc.*, — U.S. at —,119 S.Ct. at 2151 (1999), the Supreme Court, in the context of an ADA case, exhibited a reticence to find that working is a major life activity for purposes of determining whether an individual is disabled.

Because the parties accept that the term "major life activities" includes working, we do not determine the validity of the cited regulations. We note, however, that there may be some conceptual difficulty in defining "major life activities" to include work, for it seems "to argue in a circle to say that if one is excluded, for instance, by reason of [an impairment, from working with others] . . . then that exclusion constitutes an impairment, when the question you're asking is, whether the exclusion itself is by reason of handicap." Tr. of Oral Arg. in *School Bd. of Nassau Co. v. Arline*, O. T. 1986, No. 85-1277, p. 15 (argument of Solicitor General). Indeed, even the EEOC has expressed reluctance to define "major life activities" to include working and has suggested that working be viewed as a residual life activity, considered, as a last resort, only "[i]f an individual is not substantially limited with respect to any other major life activity." 29 CFR pt. 1630, App. § 1630.2(j) (1998) (emphasis added) ("If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working" []).

This Court finds the Supreme Court's reticence to conclude that working is a major life activity for purposes of the Rehabilitation Act to be somewhat persuasive.

Further, and aside from the reason given by the Supreme Court for disregarding working as a major life activity — that is, the circularity in demonstrating that one is disabled by reference to one's inability to work, this Court, taking the Supreme Court's reasoning further, is of the opinion that, for the purposes of the statute, working cannot be a major life activity for another reason: working is not a life activity in the sense that it is an aspect of basic human physical or mental functioning. A limitation in one's ability to work is contingent upon an impairment's limiting some other area of physical or mental functioning. It makes sense to say that one is limited in his or her ability to work because he or she is limited in his or her ability to see; it makes no sense to say the contrary. Thus, a limitation on working is itself not a limitation on a basic aspect of human functioning. Rather, it is a consequence — albeit in many cases greatly unfortunate — of a limitation on an area of basic human functioning.

As the Fifth Circuit Court of Appeals recently noted in *E.E.O.C. v. R.J. Gallagher Co.*, — F.3d —, —, 1999 WL 499571 at *7 (5th Cir. 1999), "working" is a socially essential activity.  For most people in American society, an inability to work has as its practical consequences an inability to live a full life.[114]  Nonetheless, the conclusion that the Fifth Circuit Court of Appeals draws from the practical necessity of work — that "working" is a major life activity under the ADA — is unfounded.  It is not a matter of whether an individual practically needs to work, but whether by merely demonstrating that one has an impairment and one cannot perform a broad class of jobs that one can prove that the impairment causes a substantial limitation to a major life activity.

For a person to say "I have an impairment" and "Here are the broad range of jobs that I cannot do" paves over an essential link in the causal chain in demonstrating that one is an individual with a disability.  When one cannot perform a broad category of jobs due to an impairment, it is because that impairment has a substantial impact on a basic aspect of human functioning, mental or physical, which in turn makes it difficult or impossible to perform that class of jobs.  If a plaintiff attempts to demonstrate that his or her impairment substantially limits the major life activity of working by the mere demonstration that he or she has an impairment and that there is a broad range of jobs he or she cannot perform without showing the necessary causal link between the impairment and the inability to do the jobs —, i.e., that the impairment has a physical or mental impact that makes it difficult or impossible to do the jobs — he or she has failed to show that his or her impairment has *caused* the substantial limitation to his ability to work.  If, on the other hand, he or she can demonstrate that causal link, that the restriction on his or her ability to perform a broad class of jobs is caused by the physical or mental consequences of an impairment, a demonstration that the physical or mental consequences

---

[114] It is on this ground that most of the courts deciding that working is a major life activity after *Sutton* have chosen to justify that conclusion.

of the impairment have severely curtailed his or her ability to work is redundant; the plaintiff, by demonstrating such severe limitations on mental or physical functioning that he or she cannot perform a large class of jobs, has already demonstrated a substantial limitation in a major life activity —, i.e., the gross inability to perform some basic aspect of human functioning. Therefore, the only time that one can actually demonstrate that one is substantially limited in the major life activity of working *because of* an impairment or impairments is when it is redundant to do so.[115]

This is not to imply that an individual whose impairment prevents him or her from working cannot demonstrate that he or she is disabled; rather, to demonstrate that his or her inability to work due to an impairment is a disability, he or she must show that the inability to work stems from a substantial curtailment in his or her ability to engage in some major life activity or group of major life activities. The Plaintiffs' attempt to demonstrate that they are (or are perceived to be or had a record of being) disabled because of limitations on the major life activity of working, and consequently their claims, fail.

*b.  Even were working a major life activity, whether any of the Plaintiffs have demonstrated a substantial limitation in their ability to work, a record of such limitation or that he or she was regarded as having such limitation.*

Even were the Court to consider working to be a major life activity for purposes of the Rehabilitation Act, the claims of most Plaintiffs in this action would nonetheless not be viable. In general, the Plaintiffs' claims that they are substantially impaired in the major life activity of working center on their alleged inability to perform construction-type labor. This includes work as steamfitters, carpenters, plumbers, ironworkers, welders and the like. "When referring to the major life activity of working, the Equal  Employment

---

[115]  This does not prevent the use of proof of an inability to engage in a broad class of jobs to demonstrate that a limitation in a major life activity is substantial, however. To the contrary, such proof may be the best available in a given case.

Opportunity Commission (EEOC) defines 'substantially limits' as: 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" *Murphy v. U.P.S.*, — U.S. —, 119 S.Ct. 2133, 2138 (1999) (citing 29 C.F.R. § 1630.2(j)(3)(i)). "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Airlines, Inc.*, — U.S. —, 119 S.Ct. at 2151.

> The EEOC further identifies several factors that courts should consider when determining whether an individual is substantially limited in the major life activity of working, including the geographical area to which the individual has reasonable access, and "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographical area, from which the individual is also disqualified." §§ 1630.2(j)(3)(ii)(A), (B). To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Id. See Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d at 911-12. "An impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one." *Heilweil v. Mount Sinai Hospital*, 32 F.3d 718, 723 (2[d] Cir. 1994).

The Defendants advance the general argument that the Plaintiffs are not disabled because they could perform the work in the positions in which they were employed. This argument points the way to the problem with the Plaintiffs' reliance on their varying inabilities to perform specific construction-type jobs as constituting a substantial limitation writ large. First, the Plaintiffs have failed, in some cases, to demonstrate that the type of jobs from which they are limited constitute a broad, rather than a select and narrow, class. They have failed to connect limitations caused by impairments to general requirements of a broad grouping of jobs, but have rather, without explaining the general essential functions of a class of jobs, simply *asserted* that the impairments, with their functional

limitations, cause them to be unable to perform the class of positions. They have failed to demonstrate a geographic area to which the Plaintiffs have access to find employment and how many of the jobs of a similar nature to the jobs they cannot perform are in the region. Further, they have failed to contrast the number of jobs they cannot perform with the number of jobs, given their training, knowledge and skills, they can perform. Taking all of this into account, the Court concludes that although certain of the Plaintiffs would be disabled because of actual or perceived substantial limitations on the major life activity of working, the overwhelming majority of the Plaintiffs in this action could be dismissed on the grounds that they cannot establish a substantial limitation on the major life activity of working.[116]

Gothard is not substantially limited in the major life activity of work, nor was he viewed as such by TVA. While incapable of performing labor-intensive jobs such as pipefitter-welder, boilermaker or other work requiring climbing, this is a narrow range of jobs, given his skills. The plaintiff has provided no indication that he could not perform light carpentry work or welding work, if he was qualified to perform welding.[117]

---

[116] As to the other major life activities suggested by the Plaintiffs as supporting their claims of disability, even were the Court to permit them to argue such, the life activities listed are usually not major. *See Byrne v. Board of Education*, 979 F.2d 560, 564 (7th Cir. 1992) ( "The statute's inclusion of the limiting adjectives 'substantial' and 'major' emphasizes that the impairment must be a significant one.") Rather, the life activities specified by the Plaintiffs, such as climbing, stooping, bending, kneeling, twisting, and squatting, are minor aspects of an area of basic human function, such as self-locomotion, which includes climbing, running, crawling, walking, standing, and the like. Certainly, some aspects of an area of human functioning are in themselves "major." *See Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144, (2d Cir. 1998) ("The term 'major life activit[y],' by its ordinary and natural meaning, directs us to distinguish between life activities of greater and lesser significance."). A complete inability to perform some of these actions, such as running, or a partial inability to perform others of these aspects, such as walking or standing, would constitute a substantial impairment. Some activities, such as climbing, a person might be totally unable to perform — take the acrophobic — without that person being substantially impaired in the major life activity.

[117] Gothard's limitations as a consequence of his knee injury fail to demonstrate that he is substantially limited in another major life activity, as he himself testified that he could carry a forty pound bag of cement on his shoulder and walk fifteen feet if need be.

Putman claims an inability to perform work as a pipefitter, boilermaker, steamfitter, carpenter or ironworker because of the limitations on his right hand. Assuming this to be correct, Putman has still not demonstrated a substantial limitation in a broad class of jobs, as he has not explained what other jobs he cannot do and why the limitation would keep him from performing other work that did not involve right-hand lifting in excess of ten pounds and the vibrational limitations and what essential general job function his limitations would proscribe.[118]  Further, Putman has presented no evidence that TVA either had a record of or regarded him as suffering from a substantial limitation on the major life activity of working.

Hovater is not substantially limited in the major life activity of working, nor was she viewed as such by TVA.  She admits no substantial limitation on her ability to perform a broad class of jobs, but rather states that TVA viewed her as such.  She has put forward nothing to substantiate the contention that TVA regarded her as disabled beyond records that TVA knew of her injuries and minor limitations.[119]  These documents, standing alone, do not permit the inference that TVA believed the impairments and limitations to be substantially limiting of her ability to work.

Bailey has failed to demonstrate that he has, or that TVA had a record of or regarded him as having, a substantial limitation in the major life activity of working.  He claims that because of his impairments, he can no longer work as a pipefitter.  However,

---

[118]  The court also concludes that Putman is not substantially limited in another major life activity, as his limitation does not place him at a significant disadvantage with regard to lifting or performing manual tasks.  *See Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1228 (11th Cir. 1999) (holding that inability to lift greater than ten pounds not substantial limitation on ability to lift if employee is otherwise able to work) and *Helfter v. United Parcel Service, Inc.*, 115 F.3d 613, 616 (8th Cir. 1997) (limitation on frequent lifting to ten pounds not a substantial limitation on a major life activity).

[119]  The Court also concludes that Hovater could not demonstrate that she is substantially limited in any other major life activity as the limitations she allegedly suffers are not significantly limiting.

pipefitter alone is not a class of jobs. Nor has he demonstrated that the twenty pound lifting limitation constitutes a functional limitation that would prevent him from performing essential functions characteristic of a broad class of jobs or a group of functions characteristic of a broad class of jobs. Nor is there any indication that there are no other jobs that he can perform in the community.[120]

L. Chandler fails to demonstrate either that he has a substantial limitation in the major life activity of working or that TVA viewed him as having a substantial limitation in the major life activity of working. TVA, prior to the time this action was filed, issued a final agency decision on the claims of discrimination presented to this Court, discussing whether he was disabled. In that decision, TVA concluded that L. Chandler was disabled under the Rehabilitation Act, although he did not have a viable claim for other reasons.[121] However, an administrative decision contrary to the agency's position at the administrative level does not bar that administrative agency from reasserting its position before the district court. *See Weahkee v. Perry*, 587 F.2d 1256, 1263 (D.C. Cir. 1978) (stating that

---

[120] Bailey has also failed to demonstrate that he is substantially limited in any other major life activity, in that his inability to lift more than twenty pounds substantially affects his ability to manipulate physical objects or to move about. *See Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998); *Helfter v. United Parcel Service, Inc.*, 115 F.3d at 616 (8th Cir. 1997)(holding as to a twenty pound occassional lifting limit and ten pound frequent lifting limit, "[a]lthough this evidence indicates that Ms. Helfter's impairments limit work-related activities, we do not believe the evidence creates a genuine issue of material fact on whether the impairments impose substantial limitations on her major life activities other than work."); and *Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346, 349 (4th Cir. 1996) ("[W]e hold, as a matter of law, that a twenty-five pound lifting limitation — particularly when compared to an average person's abilities — does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity.").

[121] The conclusion regarding L. Chandler's being regarded as disabled with respect to the major life activity of working would seem, from the EO compliance office final agency decision, to also include other major life activities. Although this is the case, L. Chandler never presented this aspect of the claim to the Court in any of his pleadings, instead reserving the argument for his response to the fifth motion for summary judgment. Further, even if the Court permitted L. Chandler to proceed to trial as having demonstrated that he was regarded as having a substantial limitation on a major life activity other than working, his claims under the Rehabilitation Act would nonetheless fail. *See infra* at 146-47.

because "federal employees are entitled to a De novo proceeding in district court upon a complaint of employment discrimination. . . ," a district court should make "a fresh determination of the facts and issues. . . ," even where the final decision of the agency is favorable to the plaintiff) (citing *Chandler v. Roudebush*, 425 U.S. 840, 864 (1976)). Therefore, this Court need not blindly follow the final agency determination in this action that L. Chandler is disabled.

This Court concludes that L. Chandler is not disabled. His degenerative disc disease at present does not pose a sufficient limitation on his functionality substantially limit him in the major life activity of working. Although restricted generally from climbing, stooping and bending, and restricted from lifting in excess of twenty pounds, there is no evidence that is offered which connects this to his inability to perform a broad range of jobs. In addition, L. Chandler has failed to present sufficient evidence that TVA either had a record of disability or that TVA regarded him as being disabled.

Coats has failed to demonstrate either that he has a substantial limitation in the major life activity of working or that TVA had a record of or regarded him as having a substantial limitation in the major life activity of working. His back injury, he asserts, prevents him from working as a pipefitter, which he claims to be a class of jobs. However, pipefitter is too narrow a range of positions to which he is limited to constitute a substantial limitation on his ability to work, especially since the Plaintiffs have not produced evidence that there are significant other jobs that Coats could not perform in the relevant geographic region with his skills. Having received a degree in electrical technology, the range of jobs available to him is not limited to pipefitting, and he has not demonstrated that there are a substantially limited number of positions in the geographical area in which he could not utilize those skills because of his impairments.[122]

---

[122] Further, Coats has not demonstrated that he is substantially limited in the major life activities of stooping, bending, lifting and climbing, as all but lifting are not major life activities, and that he is

Crow has demonstrated that he has a substantial limitation in the major life activity of working. Limited in his ability to lift more than ten pounds and to walk for lengthy periods, among other things, Crow has shown that he is physically incapable of performing a broad range of jobs. The finding of the Social Security Administration that he is disabled is telling as to the functional limitations on his ability to work that result from his impairments. The central determination in a social security case is whether a claimant cannot be employed because of impairments.[123] A finding that a plaintiff is completely limited in his ability to work under the Social Security Act would seem to imply somewhat persuasively that the plaintiff is significantly limited in his ability to work.[124]

Desruisseaux has failed to demonstrate that he has, or that TVA had a record of or regarded him as having, a substantial limitation in the major life activity of working. The only positions he contends to be incapable of filling because of his lower back injury are those of machinist or those in construction. It is unclear whether, in the absence of a purview of available jobs in the geographic market which Desruisseaux could or could not occupy, these positions form a broad class of jobs. In any case, Desruisseaux has failed to connect his limitations with general essential functions of a broad class of jobs he could otherwise perform.[125]

---

substantially impaired in his ability to physically manipulate objects.

[123] This court further finds that Crow is substantially limited in the major life activity of physical manipulation, although the Plaintiffs have not advanced this as a life activity, instead relying on a somewhat less important set of activities. Nonetheless, even were the court to consider the Plaintiffs to have properly raised other major life activities in addition to working, their claims would nonetheless fail.

[124] At the very least, it would raise an issue of fact. The converse implication, that if a plaintiff is not entitled to social security, he or she is not substantially limited in the major life activity of working, does not hold, however.

[125] Desruisseaux is also incapable of demonstrating that his is substantially limited in a major life activity other than working, as his alleged physical impairments are insufficient to constitute substantial limitations on major life activities. *Helfter v. United Parcel Service, Inc.*, 115 F.3d at 616.

Dutton has failed to demonstrate either that he has a substantial limitation in the major life activity of working or that TVA had a record of or regarded him as having a substantial limitation in the major life activity of working. He claims to be incapable of working as a carpenter because his injured knee somewhat limits his ability to squat, work on a catwalk or to climb. First, there is no indication that his rather mild limitations would cause such a gross incapacity that Dutton would be incapable of working in any carpentry position. Further, even assuming his testimony to be true, Dutton has failed to illustrate that in the local economy, carpentry is a broad class of jobs and that a large portion of the jobs in the local economy that he would otherwise be capable of performing he is, because of his impairment, incapable of performing.[126]

Greene has demonstrated that TVA had a record of disability and regarded him as disabled due to a substantial limitation in the major life activity of working. In a favorable final agency decision entered in June of 1995, Greene was adjudged disabled because of the combination of his impairments. As there is no indication that the relevant facts have changes, the unchallenged determination that Greene was disabled precludes the parties to that action from arguing otherwise in the instant action.

Mansell has failed to demonstrate either that he has a substantial limitation in the major life activity of working, or that TVA had a record of or regarded him as having a substantial limitation in the major life activity of working. Although Mansell may be incapable of working as an ironworker, he has not demonstrated that there is a class of jobs of which he cannot perform some essential function because of his limitations. Further, he has obtained a technical electronics degree and there is no indication that because of his

---

[126] Dutton also fails to demonstrate that he is substantially limited in a major life activity other than working. First, the "major life activities" averred by Dutton, squatting and climbing, are not "major" as contemplated by the statute. Further, even were they, Dutton has not shown that he is substantially impaired in his ability to engage in those activities.

limitations, he cannot perform a substantial portion of the jobs available to him in the geographic area.[127]

Massey has failed to raise a genuine issue of material fact either that he has a substantial limitation on the major life activity of working, or that TVA had a record of or regarded him as having a substantial limitation in the major life activity of working. He is restricted from lifting in excess of ten to twenty pounds at any given time; however, this is insufficient to demonstrate a substantial limitation on a major life activity. *Helfter v. United Parcel Service, Inc.*, 115 F.3d at 616. It has not been shown that Massey's limitations, while probably preventing him from doing the heavier aspects of construction work, do not preclude his working in the construction area. Finally, there is no proof before the court that heavy construction-type work constitutes a substantial portion of the employment available to him within the relevant geographic area.[128]

Miles has failed to raise a genuine issue of material fact that he has, or that TVA had a record of or regarded him as having, a substantial limitation in the major life activity of working. While he has asserted a class of jobs that he is incapable of performing, his testimony is absent of facts that would establish the causal nexus between his functional limitations created by his knee impairment and the range of jobs he asserts he cannot perform, as he has not explained why his functional limitations on climbing, squatting, kneeling, extended walking and heavy lifting render him unable to perform these positions. In some instances the nexus is obvious; for example, the difficulty in climbing would certainly prevent him from roofing a structure, as such a job requires the roofer to

---

[127] Arguably, however, Mansell has demonstrated a substantial limitation in his ability to walk. Mansell complains that he cannot walk about for long and that his knee is highly prone to giving way beneath him. He further alleges that his six knee surgeries have done little to correct his limitations in his ability to walk. Nonetheless, even were the Court to consider Mansell disabled, he would fail to state a claim. *See infra* at 146-47.

[128] For the same reasons given above, Massey cannot demonstrate a substantial limitation on a major life activity other than working.

climb and operate, virtually unprotected, at heights. However, there are no grounds on which to infer from the small range of jobs Miles asserts he is incapable of performing that Miles suffers a wide-scale limitation on his ability to work, without any testimony or evidence showing that his limitations prevent him in some way from holding a broad range of jobs.[129]

Mullins has failed to raise a genuine issue of material fact either that he has, or that TVA had a record of or regarded him as having, a substantial limitation in the major life activity of working. His inability to lift over twenty pounds, and to climb, bend or stoop as a consequence of his back injury does not rise to the level of a substantial limitation. *Helfter v. United Parcel Service, Inc.*, 115 F.3d at 616. Further, Mullins has failed to demonstrate why his limitations prevent him from performing a broad class of jobs, as he has not presented evidence that there exists a general range of jobs comprising a broad range of jobs in the local economy that he has sufficient skill to perform and that his limitations prevent him from performing.[130]

Rainer has failed to raise a genuine issue of triable fact either that he has or that TVA had a record of or regarded him as having a substantial limitation in the major life activity of working. Although Rainer states that his back injury causes a substantial limitation on his ability perform work as a pipefitter or a steamfitter, given the number of jobs that he has the ability to perform, he has failed to raise an issue of fact as to whether he is substantially limited in the major life activity of working.[131]

---

[129] Miles may, in fact, be substantially limited in the major life activity of walking; however, Miles has not detailed how limited he is in his ability to walk. Nonetheless, even were the Court to consider Miles disabled, he would fail to state a claim. *See infra* at 146-47.

[130] Mullins has not demonstrated that he is substantially limited in any major life activity other than working, either.

[131] Rainer has further failed to demonstrate that he is substantially limited in major life activities other than working because he has not demonstrated the severity of his functional limitations.

Shores has failed to raise a genuine issue of triable fact either that he has, or that TVA had a record of or regarded him as having, a substantial limitation in the major life activity of working. While clearly detailing his functional limitations, he has failed to demonstrate how those limitations prevent him from working in a broad class of jobs. Further, the limitations that he details are not so significant that they depart from limitations on the average person. Finally, a vocational assessment found twenty-nine assorted types of jobs that he could potentially perform.[132]

Smart has not presented a genuine issue of material fact that he is substantially limited in the major life activity of working or that TVA had a record of his being or regarded him as being substantially limited in the major life activity of working. While it is clear that Smart's impairments are significant and pose significant limitations for him to surmount in various aspects of his life, it has not been specifically demonstrated that these limitations pose a serious limitation on his ability to work. Smart has clearly demonstrated that he is unfit to work in a painter position; his inability to sustain his balance and his inability to fully attend to circumstances around him make him a potential danger to himself and others. However, no other evidence related to how his limitations would affect his ability to work in other positions has been offered. Again, no evidence has been offered to show a causal nexus between his limitations and his inability to perform a substantial number of jobs in the geographic area for which he would otherwise be qualified.[133]

---

[132] Shores has not demonstrated that his limitations substantially limit him in other major life activities. His limitations do not depart significantly from the capacities of average individuals.

[133] Smart has, however, demonstrated that he is substantially limited in other major life activities, such as thinking and walking. Nonetheless, because these major life activities were not raised by Smart until much later, he cannot demonstrate disability on this basis. In any case, his claim of discriminatory termination fails for other reasons explained in this opinion. *See infra* at 146-47.

Smith has not presented a genuine issue of material fact that he is substantially limited in the major life activity of working or that TVA had a record of his being or regarded him as being substantially limited in the major life activity of working. He asserts that his functional limitations resulting from his back impairment and depression — limitations on bending, stooping, twisting, climbing and sitting — render him incapable of performing work as an ironworker, carpenter, millwright, boilermaker or electrician. Assuming this to be the case, he has nonetheless failed to demonstrate that his inability to perform these jobs constitutes an inability to work in a broad class of jobs; he has not demonstrated that these jobs represent a substantial number of the jobs in the local economy. Nor has he demonstrated that his limitations disqualify him from performing an essential job function (or functions) common to a set of jobs for which he would otherwise be qualified that are significant in number in the relevant geographic market.[134] Finally, Smith's assertion at the time of his deposition that he is attempting to start an ironwork construction company belies his contentions of an inability to work as an ironworker or in other heavy construction jobs.

Speer has not presented a genuine issue of material fact that he is substantially limited in the major life activity of working or that TVA had a record of his being or regarded him as being substantially limited in the major life activity of working. The limitations resulting from Speer's back injury are insufficient to constitute a substantial limitation. Further, Speer has failed to demonstrate in what way, if any, his limitations keep him from performing a broad range of the positions otherwise available to him in the geographic area.[135]

---

[134] Smith has also failed to present a genuine issue of material fact with respect to any major life activity other than working.

[135] Speer has, in addition, failed to demonstrate that his impairments created a substantial limitation on a major life activity other than work. *Helfter v. United Parcel Service, Inc.*, 115 F.3d at 616.

Williams has not presented a genuine issue of material fact that he is substantially limited in the major life activity of working or that TVA had a record of his being or regarded him as being substantially limited in the major life activity of working. He has not demonstrated that the jobs he cannot perform make up a substantial portion of the jobs otherwise available to him in the geographic area, nor has he demonstrated that his limitations prevent him from doing a broad class of jobs in the geographic area.[136]

J. Chandler has presented no genuine issue of material fact that he is substantially limited in the major life activity of working or that TVA had a record of his being or regarded him as being substantially limited in the major life activity of working. First, his restrictions clearly are insufficiently severe to disqualify him from much work. Second, he has failed to point to one job, much less a class of jobs, that his limitations prevent him from performing.[137]

Murks has raised a genuine issue of triable fact that he is substantially limited in the major life activity of working or that TVA had a record of his being or regarded him as being substantially limited in the major life activity of working. As with J. Chandler, Murks has failed to point to one job, much less a class of them, that he is unable to perform. However, given his limitations on his abilities to sit for long periods of time and his ten pound lifting limitation, there are clearly some jobs that he cannot perform. Further, Murks was determined by the Social Security Administration to be disabled in the

---

[136] In addition, Williams has not presented a genuine issue of triable fact that he was substantially limited in any other major life activity. *Helfter v. United Parcel Service, Inc.*, 115 F.3d at 616.

[137] J. Chandler has also failed to demonstrate that his is substantially limited in major life activities other than working. First, most of those activities he claims to be unable to perform are not major. For those activities that might be considered major, there is no indication that he is anything close to substantially limited with respect to them. *Helfter v. United Parcel Service, Inc.*, 115 F.3d at 616.

early 1990's. This determination carries with it some presumption that Murks is incapable of working in a broad class of jobs.[138]

Shelton has not raised a genuine issue of triable fact that he is substantially limited in the major life activity of working or that TVA had a record of his being or regarded him as being substantially limited in the major life activity of working. Assuming that he cannot perform the jobs of ironworker, steamfitter, sheet metal worker, operating engineer or laborer, this does not alone show that he is unable to perform a sufficiently broad class of jobs to constitute a substantial limitation on his ability to work. Further, he has failed to demonstrate that his limitations would disqualify him from a broad class of jobs in the local economy that he could otherwise perform.[139]

Troy Tucker has demonstrated that he was regarded as disabled by the TVA in that his knee injury substantially limited him in the major life activity of working. In a 1994 agency decision, Tucker was adjudged disabled by the TVA because of limitations resulting from his knee injury. Given that TVA did not challenge the decision and that the facts have not changed sufficiently to deprive that conclusion of impact, there is sufficient evidence both that TVA regarded Tucker as disabled and that it had a record of his having a disability.

### 3. Legitimate non-discriminatory reason and pretext.

The Defendants assert that the reduction in force was undertaken for legitimate budgetary concerns. The Plaintiffs respond that this is not a legitimate non-discriminatory reason, as the Plaintiffs were put on retention rosters by themselves and ultimately

---

[138] Murks's limitations on his ability to sit may also constitute a substantial limitation on a major life activity. Nonetheless, his claim of discriminatory termination fails on other grounds. *See infra* at 146-47.

[139] Shelton has further failed to demonstrate that he is substantially limited in other non-work related major life activities.

terminated in an effort to reduce the charge backs to the OWCP. Even assuming that the Plaintiffs have proven a *prima facie* case, the Plaintiffs have failed to demonstrate pretext. The motivating factor asserted by the Plaintiffs for the improper classification and ultimate termination is a desire on the part of TVA to cut FECA benefit charge backs. Thus, even under their own theory of the case, the Plaintiffs aver *not* that they were terminated because of their disabilities, but because they were receiving FECA benefits from the OWCP.

## Conclusion

It is possible that the Plaintiffs to the instant action were ill-treated by TVA in an attempt by that agency to reduce its payments to reimburse OWCP for the OWCP's payments of FECA benefits to the Plaintiffs. Nonetheless, such is a claim not a claim properly brought under the Rehabilitation Act. For the foregoing reasons, this court finding that there are no genuine issues of material fact and that the Defendants are entitled to judgment as a matter of law, the Defendants' motions for summary judgment will be GRANTED. All claims by Plaintiffs Thomas L. Bailey ("Bailey"), Ricky S. Coats ("Coats"), Jerry W. Chandler ("Chandler"), Michael D Desruisseaux ("Desruisseaux"), Jerry Gothard ("Gothard") Noonan Greene ("Greene"), Barbara Hovater ("Hovater"), Timothy L. Mansell ("Mansell"), Bobby Massey ("Massey"), Thomas Miles ("Miles"), Robert Mullins ("Mullins"), Michael Murks ("Murks"), Halbert Putnam ("Putnam") Millard I. Shelton ("Shelton"), Marc Shores ("Shores"), Frank Speer ("Speer"), Edward Smart ("Smart"), Lanny Smith ("Smith"), and Troy Tucker ("Tucker") and all claims of Plaintiffs Lonner T. Chandler ("L. Chandler"), Thomas A. Crow ("Crow"), Richard B. Dutton ("Dutton"), and Marion G. Rainer ("Rainer") will be DISMISSED, with prejudice. The motion for leave to file the decision of the EEOC (Document 128) will be GRANTED. The motion to submit

the affidavit of Richard B. Dutton out of time (Document 129) will be GRANTED. The motion to include the parties' briefs on the motions for summary judgment as part of the record filed by the Plaintiffs on July 28, 1999 (Document 134) will be GRANTED. All other pending motions will be DENIED.

DONE and ORDERED this 21st day of September 1999.

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE